**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | |
|---|---|
| **SHERIFF BRAD COE in his official capacity and KINNEY COUNTY, TEXAS; SHERIFF J.W. GUTHRIE in official capacity and EDWARDS COUNTY, TEXAS; SHERIFF EMMETT SHELTON in his official capacity and MCMULLEN COUNTY, TEXAS; SHERIFF ARVIN WEST in his official capacity and HUDSPETH COUNTY, TEXAS; THE FEDERAL POLICE FOUNDATION, ICE OFFICERS DIVISION,** ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | <u>3:21</u>**-CV-**<u>00168</u> |
| ) | **COMPLAINT** |
| **JOSEPH R. BIDEN, JR., President, in his official capacity; THE UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official Capacity; IMMIGRATION AND CUSTOMS ENFORCEMENT; TROY MILLER, Senior Official Performing the Duties of Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION,** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| ) | |
| **Defendants.** ) | |

## INTRODUCTION

1.      Plaintiffs are sheriffs of Texas counties in their official capacity and Texas counties, as well as the Federal Police Foundation, ICE Officers Division, an association of Immigration and Customs Enforcement ("ICE") officers.

2.      On February 18, 2021, Acting Director of ICE Tae Johnson issued a Memorandum to all ICE employees entitled "Interim Guidance:  Civil Immigration Enforcement Removal and Priorities," ("the February 18 Memorandum") available at: https://www.ice.gov/doclib/news/releases/2021/021821_civil-immigration-enforcement_interim-guidance.pdf.  The Memorandum instructs ICE officers to refrain from placing aliens who are unlawfully present in the United States ("illegal aliens") into removal proceedings or from taking custody of such aliens unless they fall into very narrow categories of "cases that are presumed to be priorities."  Those cases consist principally of illegal aliens who pose a national security or terrorist threat to the United States, have been convicted of an aggravated felony as defined by section 101(a)(43) of the Immigration and Nationality Act ) ("INA") (codified at 8 U.S.C. § 1101(a)(43)), or have recently arrived in the United States unlawfully (defined as those aliens who enter or attempt to enter the United States on or after November 1, 2020).

3.      According to the February 18 Memorandum, taking *any* enforcement action against illegal aliens falling outside of these narrow priority categories requires an ICE officer to obtain preapproval from a high-ranking field office director ("FOD") or special agent in charge ("SAC") *before* taking action.  The ICE officer must go through the time-consuming and usually futile process of "rais[ing] a written justification through the

chain of command, explaining why the action otherwise constitutes a justified allocation of limited resources, and identify the date, time, and location the enforcement action or removal is expected to take place."

4.      As a result of the February 18 Memorandum and its implementation, the number of arrests and removals by ICE has dropped precipitously, to levels one-third of what they were prior to the beginning of the Biden Administration.  In April 2021, ICE carried out fewer than 3,000 arrests, the lowest number on record.  ICE's approximately 6,000 officers were reported to be averaging one arrest every two months.  (*Washington Post*, "Biden administration reins in street-level enforcement by ICE as officials try to refocus agency mission," May 25, 2021, available at https://archive.is/NeSHE#selection-33.0-333.104).  This compares to an average of 8,634 arrests per month by ICE in FY 2020.  *ICE Annual Report*, FY 2020 at 5 (showing 103,603 administrative arrests for the year) (available at: https://www.ice.gov/doclib/news/library/reports/annual-report/iceReportFY2020.pdf).

5.      This standdown in ICE enforcement has fueled a crisis at the border and in other Texas counties, encouraging a massive surge in illegal immigration.  Monthly totals in apprehensions by Border Patrol agents are at levels not seen in over 21 years.  In March 2021, Border Patrol agents apprehended 173,337 aliens after they illegally entered the United States.   In April 2021, the number was 178,854.  And in May 2021, the number was a staggering 180,034 aliens. This compares to 21,593 during May 2020— or approximately eight times the previous year's total.  (Official statistics are available at: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters).

6.     Plaintiff sheriffs and Texas counties have experienced a dramatic increase in the influx of illegal aliens and in criminal activity by illegal aliens resulting from the implementation of the unlawful and unconstitutional February 18 Memorandum and the related standdown of federal immigration enforcement.

7.     When Plaintiff sheriffs or their deputies arrest illegal aliens who have committed crimes, their offices inform ICE, or in some cases CBP.  Prior to the February 18 Memorandum, ICE issued detainer requests and/or took custody of such aliens and initiated removal proceedings against them as the Immigration and Nationality Act (INA) requires.

8.     Since the issuance of the February 18 Memorandum, ICE officers have been unable to take custody of, or issue detainer requests for, dangerous criminal aliens whose detention is mandated by the INA. Specifically, detention is required for aliens who have committed or been convicted of numerous crimes other than aggravated felonies, such as: crimes of moral turpitude, crimes involving controlled substances, human trafficking, money laundering, and certain firearm offenses. *See generally* 8 U.S.C. §§ 1182(a)(2) and 1227(a)(2) (listing crimes that render aliens inadmissible or deportable, respectively).  Written requests for preapproval to take enforcement actions against such non-priority criminal aliens are systematically denied by FODs and SACs.

9.     Prior to the February18 Memorandum, ICE officers routinely issued detainers to take custody of illegal aliens who, after being arrested and charged with crimes by local law enforcement, had posted bond, thereby keeping dangerous criminal aliens off the streets and ensuring that such aliens were eventually removed from the

country.  Since the issuance of the February 18 Memorandum, ICE officers have not been permitted to take custody of such illegal aliens.

10.     Prior to the February18 Memorandum, ICE officers routinely took custody of criminal aliens who, after serving time for the commission of state crimes, were about to be released.  ICE officers were contacted by local law enforcement so that ICE could take custody of the aliens upon their release and remove them from the country.  Since the issuance of the February 18 Memorandum, in many cases ICE officers have not been permitted to take custody of such criminal aliens.  As a result, numerous criminal aliens have been released onto the streets.

11.     In addition, since the issuance of the February 18 Memorandum, ICE officers are no longer permitted to take custody of most of the inmates in Plaintiffs' jails who previously would have been transferred to ICE as a result of the "287(g)" agreements between those counties and ICE (referring to 8 U.S.C. § 1357(g)).

12.     In a wide variety of other circumstances, ICE officers are, contrary to federal statute, no longer permitted to remove dangerous illegal aliens who present a criminal threat because those aliens do not fall into the very narrow categories of "cases that are presumed to be priorities" under the February 18 Memorandum.

13.     Plaintiff sheriffs are no longer able to present to ICE criminal aliens for removal and expect them to be removed.  The detention costs, crime response costs, crime investigation costs, and related costs experienced by the Plaintiff sheriffs and counties have consequently increased dramatically for at least two related reasons. First, criminal aliens who are released instead of detained or removed commit more crimes.

Second, the ability of criminal aliens to remain in the United States encourages additional criminal aliens to come here illegally.

14.     On May 31, 2021, as a result of the criminal activity and other adverse consequences of the surge in illegal immigration, Texas Governor Greg Abbott issued a proclamation of disaster covering 34 Texas Counties.  On June 25, 2021, the Governor issued an amended proclamation of disaster covering 28 Texas Counties.  The counties represented in this complaint are included in the disaster areas described in both proclamations.

15.     As detailed below, the February 18 Memorandum commands ICE officers to violate the specific terms of several federal immigration statutes, violates the Administrative Procedure Act ("APA"), and violates the obligation of the executive branch faithfully to execute the law, as required by Article II, Section 3, of the United States Constitution.

16.     Plaintiffs bring this civil action to seek injunctive relief preventing the continued implementation of the unlawful and unconstitutional February 18 Memorandum or a similar successor memorandum and requiring, instead, ICE and U.S. Customs and Border Patrol ("CBP") leadership to detain and/or remove illegal aliens as required by federal law.

## THE PARTIES

### Plaintiffs

17.     Plaintiff Brad Coe is the Sheriff of Kinney County, Texas, acting in his official capacity.  The Kinney County Sheriff's Office is located at 109 North Street,

Brackettville, Texas.  The Sheriff's Office operates the Kinney County Jail, which can house 14 inmates and is used to detain individuals arrested for the commission of crimes in Kinney County.

18.     Plaintiff Kinney County, Texas, is a county of 1,365 square miles with a population of 3,598 in the 2010 census.

19.     Plaintiff J.W. Guthrie is the Sheriff of Edwards County, Texas, acting in his official capacity.  The Edwards County Sheriff's Office is located at 404 West Austin Street, Rocksprings, Texas.  The Sheriff's Office operates the Edwards County Jail, which can house 20 inmates and is used to detain individuals arrested for the commission of crimes in Edwards County.

20.     Plaintiff Edwards County, Texas, is a county of 2,118 square miles with a population of 2,002 in the 2010 census.

21.     Plaintiff Emmett Shelton is the Sheriff of McMullen County, Texas, acting in his official capacity.  The McMullen County Sheriff's Office is located at 401 Main Street, Tilden, Texas.   The Sheriff's Office detains individuals arrested for the commission of crimes in McMullen County in the jails of Live Oak County and Atascosa County at a cost of $55.00 and $48.00 per day, per inmate, respectively.

22.     Plaintiff McMullen County, Texas, is a county of 1,157 square miles with a population of 707 in the 2010 census.

23.     Plaintiff Arvin West is the Sheriff of Hudspeth County, Texas, acting in his official capacity.  The Hudspeth County Sheriff's Office is located at 525 N. Wilson Avenue, Sierra Blanca, Texas.  The Sheriff's Office operates the Hudspeth County Jail,

which can house 103 inmates and is used to detain individuals for the commission of crimes in Hudspeth County.

24.     Plaintiff Hudspeth County, Texas, is a county of 4,572 square miles with a population of 3,476 in the 2010 census.

25.     Plaintiff sheriffs have each taken an oath of office pursuant to Article XVI, § 1(a) of the Texas Constitution and § 85.001 of the Texas Local Government Code to execute faithfully the duties of their office and, to the best of their ability, to preserve, protect, and defend the Constitution and laws of the United States and of Texas.

26.     Plaintiff Federal Police Foundation is a nonprofit association of federal law enforcement officers registered in the State of Delaware.  The purposes of the Federal Police Foundation include, *inter alia*, conducting research, informing federal law enforcement officers, and informing the public about federal law enforcement matters. The ICE Officers Division of the Federal Police Foundation includes members who are ICE officers actively serving in immigration law enforcement and who are being compelled to implement the February 18 Memorandum in violation of federal law. Members of the Federal Police Foundation, ICE Officers Division, are serving in the Southern District of Texas.

**Defendants**

27.     Defendants are the United States of America, President Joseph R. Biden, Jr., and officials in the U.S. Department of Homeland Security ("DHS").  All Defendants are sued in their official capacity only.

28.     Defendant Joseph R. Biden, Jr. is the President of the United States and is responsible for taking care that the laws of the United States are faithfully executed.

29.     Defendant United States of America is the federal sovereign.

30.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security and the head of DHS and in his official capacity is responsible for the enforcement of federal immigration laws, 6 U.S.C. § 112, 8 U.S.C. § 1101, et seq., pursuant to 8 U.S.C. § 1103(a)(2).

31.     Defendant U.S. Department of Homeland Security oversees ICE and CBP in their enforcement of federal immigration laws.

32.     Defendant Tae Johnson is the Acting Director of ICE and in his official capacity is responsible for administering all operations of ICE.

33.     Defendant Troy Miller is the Senior Official Performing the Duties of the Commissioner of CBP and in his official capacity is responsible for administering all operations of CBP.

34.     Defendant Johnson issued the February 18 Memorandum.   Defendant Johnson is not authorized to promulgate regulations implementing the Immigration and Nationality Act in the Department of Homeland Security.

35.     Defendant Mayorkas is the official authorized to promulgate regulations implementing the Immigration and Nationality Act in the Department of Homeland Security.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction over Plaintiffs' claims under the Constitution and laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 702 and 703. This Court is authorized to grant Plaintiffs' requests for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1361, 2201, and 2202 and 5 U.S.C. §§ 705 and 706.

37.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the Plaintiffs named in this complaint are sheriffs of Texas counties who reside and exercise their law enforcement duties in the State of Texas, and their respective counties. McMullen County is in the Southern District of Texas. Plaintiff Federal Police Foundation, ICE Officers Division, includes members who are ICE officers serving in the Southern District of Texas.

## THE FEBRUARY 18 MEMORANDUM AND RELATED EVENTS

38.     On January 20, 2021, the first day of the Biden Administration, the acting DHS secretary issued a memorandum ordering a department-wide review of "policies and practices concerning immigration enforcement." *See* DHS Memorandum: Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities, at 2 ("January 20 Memorandum"), available at: https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_ signed.pdf. The January 20 Memorandum also established "interim enforcement priorities" pending the outcome of the policy review and ordered an "immediate pause on removals . . . for 100 days." *Id.* at 2-3.

39.     The January Memo established three interim enforcement priorities:

1. **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.

2. **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.

3. **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a) (43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

*Id.* at 2. These priorities:

apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action or parole.

*Id.*

40.     The January 20 Memorandum did not consider any of the significant harms that the States, their political subdivisions, government officials such as county sheriffs, or the public would face as a result of DHS listing such a narrow set of enforcement priorities, including its failure to take custody, as required by federal law, of certain illegal aliens arrested by local law enforcement agencies and its failure to initiate removal proceedings against illegal aliens whose removal is required by federal law.

41.     The January 20 Memorandum was issued without notice and comment as required under the APA.

42.     On February 18, 2021, Acting Director of ICE Tae Johnson issued the February 18 Memorandum providing guidance on how ICE was to implement the enforcement priorities iterated in the January 20 Memorandum.

43.     The February 18 Memorandum states that it "shall be applied to all civil immigration enforcement and removal decisions," including "whether to issue a detainer [or] assume custody of a noncitizen subject to a previously issued detainer," "whether to issue, serve, file, or cancel a Notice to Appear," "whether to stop, question, or arrest" an alien for violating immigration laws, and "whether to detain or release from custody subject to conditions." February 18 Memorandum at 3.

44.     The February 18 Memorandum retained the three enforcement priority categories adopted in the January Memorandum, and added criminal gang members to the public safety category. *Id.* at 4-5. Thus, the only priority enforcement categories consist of 1) terrorists, spies, or other national security risks; 2) recent arrivals (defined as those aliens who enter or attempt to enter the United States on or after November, 1, 2020); and 3) aggravated felons and criminal gang members who pose a risk to public safety. *Id.*

45.     The February 18 Memorandum directs immigration officers to exercise their discretion in taking enforcement actions against aliens who fall within one of the three priority categories, but requires preapproval by a FOD or SAC before any enforcement action may be taken against an alien who falls outside those priority categories. *Id.* at 5-6.

46.     Regarding non-priority aliens an ICE officer encounters, the February 18 Memorandum purports to narrow the options available to the ICE officer:  either seek preapproval to take enforcement actions or take no enforcement action at all.  These options apply even where federal law makes detention and/or removal of the aliens *mandatory*.

47.     The February 18 Memorandum did not consider any of the significant harms that the States, counties, county sheriffs, their respective offices, or the public would face as a result of ICE no longer obeying federal statutes requiring the mandatory detention and removal of certain illegal aliens, including its failure to take custody of certain illegal aliens arrested by local law enforcement agencies and its failure to initiate removal proceedings against illegal aliens whose removal is required by federal law.

48.     The February 18 Memorandum was issued without the notice and comment that the APA requires.

49.     Defendants are no longer requiring officers to detain or initiate removal proceedings against large numbers of illegal aliens whose detention and/or removal is required by federal law.

50.     The preapproval process established by the February 18 Memorandum is intended to discourage ICE officers from taking enforcement actions required by law, and FODs and SACs have rarely granted preapproval for enforcement actions against non-priority aliens.

51.     In the very rare cases in which ICE FODs and SACs actually grant preapproval, the length of time taken has been extraordinarily long.  For example, in one

of the cases in which preapproval was granted, involving an alien charged with the rape of a child, the request for preapproval was submitted on May 6, 2021.  Preapproval was not granted until 53 days later, on June 28, 2021.

52.     The time-consuming paperwork and the low probability of preapproval being granted have caused many ICE officers not even to attempt to seek preapproval.

53.     Many extremely dangerous illegal aliens who would have been detained prior to the February 18 Memorandum consistent with federal statutes are now being released from custody, against the judgment of the ICE officers seeking to detain them, and in violation of federal statutes requiring their detention and/or removal.  Several illustrative cases (with names omitted) from ICE offices in Texas and other States are as follows.

54.     Case A involves an illegal alien who was previously deported twice and is in local custody facing pending charges for aggravated assault.  ICE officers put a detainer in place to request custody, prior to the beginning of the Biden Administration.  After the February 18 Memorandum was issued, an evaluation of all cases was ordered.  Following this evaluation, ICE officers were directed to remove the detainer because detaining the alien did not meet the requirements of the February 18 Memorandum.

55.     Case B involves an illegal alien who was previously deported four times and has again returned to the United States.  He has been convicted of domestic violence, evading arrest, and multiple counts of driving under the influence.  He now has an additional driving under the influence charge pending.  ICE officers requested preapproval to place a detainer on the alien under the February 18 Memorandum process.

14

ICE management denied the request.  As a result, this dangerous, previously-deported, criminal alien remains on the street, able to drive under the influence once again.

56.    Case C involves an illegal alien who is a fugitive with a final order of removal and who faces a pending local charge of aggravated assault.  ICE officers initiated the time-consuming preapproval process in the hope of detaining him prior to his release on bond.  However, the subject posted bond before ICE management issued a decision on the preapproval request.  This dangerous illegal alien is now at large.

57.    Case D involves an illegal alien who was previously deported and has returned to the United States.  He has been convicted of sexual battery against a child.  ICE officers requested preapproval to make an arrest under the February 18 Memorandum process.  ICE management denied their request.  As a result, this dangerous, previously-deported, criminal alien remains on the street.

58.    Case E involves an illegal alien who was previously deported two times and returned to the United States.  Local police initiated an arrest of the alien for the sale of heroin.  The alien attempted to evade arrest by ramming the police car with his vehicle, nearly hitting an officer who was standing outside the police car.  The alien was eventually arrested and found to have a quarter of a pound of heroin in his possession, as well as a female and a baby in the back seat of his vehicle.  He faces pending local charges of distribution of heroin, aggravated assault, endangerment of a child, and failure to stop at the command of police.  ICE officers requested preapproval to place a detainer on the illegal alien, in order to detain him when he is released from local custody.  ICE management denied the preapproval request.

15

59.    Case F involves an illegal alien who was previously deported and has returned to the United States.  He has been convicted of sexual assault of a minor under 14.  ICE officers requested preapproval to make an arrest under the February 18 Memorandum process.  ICE management denied their request, stating that the alien's conviction was too old to warrant his removal.  As a result, this dangerous, previously-deported, criminal alien remains on the street.

60.    Case G involves an illegal alien who was previously deported and has returned to the United States.  He has been convicted of indecency with a child with sexual contact.  ICE officers put a detainer in place to request custody, prior to the beginning of the Biden Administration.  After the February 18 Memorandum was issued, an evaluation of all cases was ordered.  Following this evaluation, ICE officers were directed to remove the detainer and were given the explanation that the alien's conviction was too old to warrant his removal and that he did not pose a threat to public safety.  As a result, this dangerous, previously-deported, criminal alien remains on the street.

61.    Case H involves an illegal alien who was previously deported and has returned to the United States.  He has been convicted of alien smuggling (aggravated felony) and theft.  ICE officers requested preapproval to make an arrest under the February 18 Memorandum process.  ICE management denied their request, stating that the alien's conviction was too old to warrant his removal and that he did not pose an immediate threat to public safety.  As a result, this dangerous, previously-deported, criminal alien remains on the street.

62.     Pursuant to the February 18 Memorandum many detainers that were in place for criminal aliens have since been lifted because they were deemed not to meet the threshold for enforcement under the February 18 Memorandum.  The crimes committed by illegal aliens whose detainers have been lifted include, *inter alia*:  aggravated sexual assault on a child, aggravated assault with a deadly weapon, larceny, burglary, domestic violence, carrying a prohibited weapon, possession of amphetamines, possession of cocaine, possession of heroin, possession of marijuana, resisting a law enforcement officer, and driving under the influence.

63.     Since the issuance of the February 18 Memorandum, CBP officers have been constrained from taking enforcement actions against illegal aliens who are apprehended crossing the border, including aliens who fall within a presumptive priority category under the February 18 Memorandum.  Detention of such aliens and the institution of removal proceedings are required by federal statute, but, contrary to law, Defendants have ordered CBP officers to release aliens into the United States without taking steps to initiate removal proceedings.

## FEDERAL STATUTORY BACKGROUND

64.     In 1996, Congress sought to reduce executive discretion significantly in the enforcement of federal immigration laws: "[I]mmigration law enforcement is as high a priority as other aspects of Federal law enforcement, and illegal aliens do not have the right to remain in the United States undetected and unapprehended."  H.R. Rep. No. 104-725 (1996), at 383.

65.     Enacted in 1996, 8 U.S.C. § 1225(a)(1) provides that "an alien present in the United States who has not been admitted … shall be deemed for purposes of this chapter an applicant for admission."

66.     8 U.S.C. § 1225(a)(3) provides that all applicants for admission "shall be inspected by immigration officers."

67.     8 U.S.C. § 1225(b)(2)(A) mandates that "if the examining immigration officer determines that an alien seeking admission is not *clearly and beyond a doubt* entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." (emphasis added).  Proceedings under 8 U.S.C. § 1229a are regular removal proceedings before an immigration judge.

68.     The Northern District of Texas has interpreted these provisions of law as imposing a *mandatory obligation* upon ICE to detain and initiate removal proceedings against aliens encountered by ICE officers:  "The Court finds that Congress's use of the word 'shall' in Section 1225(b)(2)(A) imposes a mandatory obligation on immigration officers to initiate removal proceedings against aliens they encounter who are not 'clearly and beyond a doubt entitled to be admitted.'  *Crane v. Napolitano*, Case No. 3:12-cv-03247-O (N.D. Tex. April 23, 2013), slip op. at 15.

69.     The mandatory obligation imposed by 8 U.S.C. § 1225(b)(2)(A) leaves no room for discretion by immigration officers or the preapproval process created by the February 18 Memorandum.

70.     The mandatory obligation of 8 U.S.C. § 1225(b)(2)(A) applies to "immigration officers," a term that encompasses both ICE and CBP officers.

71.     The February 18 Memorandum violates this provision of federal law, by making the detention and removal of illegal aliens encountered by ICE officers discretionary in some cases, and impermissible in others unless preapproval is granted by an ICE FOD or SAC.

72.     A second federal statute that has been violated through the implementation of the February 18 Memorandum is 8 U.S.C. § 1226(c), which makes the detention of certain aliens mandatory, pending adjudication of their removal proceedings and ultimately their removal from the United States.

73.     The categories of aliens whom DHS "shall take into custody" under 8 U.S.C. § 1226(c) include those who have committed an offense covered in 8 U.S.C. § 1182(a)(2), which includes "any alien convicted of . . . a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance." 8 U.S.C. § 1182(a)(2)(A)(i)(II).   8 U.S.C. § 1226(c)(1)(C) also requires the detention of aliens convicted of crimes of moral turpitude (referring to 8 U.S.C. § 1227(a)(2)(A)(i)).   8 U.S.C. § 1226(c) also mandates the detention of aliens convicted of certain firearms offenses.

74.     Aliens in the mandatory detention categories listed above fall outside of the priority enforcement categories of the February 18 Memorandum and therefore can *only* be detained by an ICE officer if preapproval from a FOD or SAC is obtained.   This violates the mandatory detention requirement of 8 U.S.C. § 1226(c), which leaves no room for discretion.

75.     The mandatory detention obligation of 8 U.S.C. § 1226(c) applies to both ICE and CBP officers.

76.     The February 18 Memorandum violates 8 U.S.C. § 1226(c) on its face, by making discretionary the detention of relevant aliens who fall outside of the priority enforcement categories.  The mandatory obligation imposed by 8 U.S.C. § 1226(c) leaves no room for discretion by immigration officers or the preapproval process created by the February 18 Memorandum.

77.     A third statute that has been violated through the implementation of the February 18 Memorandum is 8 U.S.C. § 1231(a), which makes the removal of certain aliens mandatory.  8 U.S.C. § 1231(a)(1)(A) requires the removal of an alien who is subject to a final order of removal.  The executive branch "shall remove the alien from the United States within a period of 90 days."  8 U.S.C. § 1231(a)(5) requires the removal of an alien who has reentered the United States illegally after having been removed: "[T]he alien shall be removed under the prior order at any time after the reentry."

78.     The February 18 Memorandum violates 8 U.S.C. § 1231(a) on its face, by applying the preapproval process to "deciding when and under what circumstances to execute final orders of removal."  February 18 Memorandum at 3.  This makes discretionary the removal of aliens subject to a final order of removal who fall outside of the priority enforcement categories.  The mandatory obligation imposed by 8 U.S.C. § 1231(a) leaves no room for discretion by immigration officers or the preapproval process created by the February 18 Memorandum.

79.     The February 18 Memorandum thus transforms a mandatory removal requirement under federal law into a discretionary policy as it pertains to the removal of aliens subject to a final order of removal who fall outside of the priority enforcement categories.

## IRREPARABLE INJURY CAUSED BY DEFENDANTS' ACTIONS

80.     Defendants' failure to detain and/or remove illegal aliens as required by federal law significantly injures the Plaintiff sheriffs and counties.

81.     Detaining illegal alien criminals imposes significant costs upon the Plaintiff sheriffs and counties.   These costs include the financial cost of detention and the consumption of scarce county law enforcement resources.

82.     Those detention costs have already increased substantially since the implementation of the February 18 Memorandum and will continue to remain elevated as a result of Defendants' failure to detain and/or remove illegal aliens, particularly those involved in criminal activity, because it increases the number of criminal illegal aliens that Plaintiff sheriffs and counties must detain.

83.     The cost of detaining additional individuals is significant, ranging from $48.00 to $80.00 per inmate, per day.

84.     The sudden nature of the shift in Defendant's policies exacerbates the harm to Plaintiff sheriffs and counties.

85.     In addition, the release of criminal aliens into Plaintiff sheriffs' counties imposes significant costs on Plaintiff sheriffs and their respective offices.  Those costs include the effects of the crimes they commit while free, the costs of investigating those

crimes, the costs of monitoring or supervising criminal aliens, and the costs of arresting and detaining those same aliens a subsequent time or times.

86.     In addition, the February 18 Memorandum and the actions of Defendants have caused a surge in illegal immigration and massive increase in crime in Plaintiffs' counties.  This surge includes thousands of additional illegal aliens beyond the specific aliens that Defendants encountered, but failed to detain or remove.  Plaintiffs bear the financial costs of investigation, arrest, and detention caused by that increase in crime.

87.     In addition, the surge in illegal immigration and related crime caused by the actions of Defendants has diverted Plaintiff sheriffs' and counties' scarce law enforcement resources.  Sheriff's deputies are not able to attend to their normal patrol and other public safety duties because the crime associated with the surge in illegal immigration has consumed their attention and time.

88.     Finally, Defendants' failure to take custody of, or remove, illegal aliens whose detention and/or removal is required by federal law has led to demands on Plaintiff's jail facilities beyond their capacity.  As a result, Plaintiff sheriffs are left with no alternative but to release such criminal aliens into the public when, prior to the February 18 Memorandum, ICE would have taken custody of such aliens and removed them, as required by federal law.

89.     This release of illegal aliens and consequent endangering of the public effectively forces Plaintiff sheriffs to violate their oaths of office to preserve, protect, and defend the Constitution and laws of the United States and of Texas.  In particular, they

are concerned that they are compelled to release illegal aliens whose detention and removal is mandated by federal law.

90.     Plaintiff Federal Police Foundation, ICE Officers Division, has been compelled to expend resources that it otherwise would not have expended informing its members of the February 18 Memorandum and the ways in which it violates federal law. The Foundation has had to divert resources to advising members of their legal options and employment consequences when those members face the dilemma of following federal law versus following the unlawful February 18 Memorandum.  The Plaintiff Federal Police Foundation, ICE Officers Division, has also been forced to provide information to its members regarding the consequences and results of the complicated preapproval process created by the February 18 Memorandum.

91.     Members of Plaintiff Federal Police Foundation, ICE Officers Division, are forced by the February 18 Memorandum to choose between following the dictates of the Memorandum and following federal laws that clearly require them to detain and/or remove certain illegal aliens.  Plaintiffs fear that they will be disciplined or will lose their jobs if they follow the law.

92.     Members of Plaintiff Federal Police Foundation, ICE Officers Division, are compelled by the February 18 Memorandum to effectively violate their oaths of office because it forces them to knowingly violate federal law or face discipline.

**FIRST CAUSE OF ACTION**
**THE FEBRUARY 18 MEMORANDUM VIOLATES 8 U.S.C. § 1225(b)(2)(A)**
**WHICH REQUIRES THE DETENTION AND INITIATION OF REMOVAL OF**
**ILLEGAL ALIENS ENCOUNTERED BY IMMIGRATION OFFICERS**

93.     Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

94.     8 U.S.C. § 1225(a)(1) requires that "an alien present in the United States who has not been admitted … shall be deemed for purposes of this chapter an applicant for admission."  This designation triggers 8 U.S.C. § 1225(a)(3), which requires that all applicants for admission "shall be inspected by immigration officers."  This in turn triggers 8 U.S.C. § 1225(b)(2)(A), which mandates that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."  The proceedings under 8 U.S.C. § 1229a are removal proceedings in United States immigration courts.

95.     The February 18 Memorandum violates the above-listed provisions of federal law by declining to place certain aliens into removal proceedings, when federal law clearly requires Defendants to place such aliens into removal proceedings.

96.     Because Congress has expressly limited the discretion of Defendants to not initiate removal proceedings, any "prosecutorial discretion" that Defendants exercise must be consistent with 8 U.S.C. § 1225 and can only occur after an alien has been placed into removal proceedings as required by 8 U.S.C. § 1225, or under a provision of federal law expressly authorizing such "prosecutorial discretion."

97.     Defendant Mayorkas's authority under 8 USC § 1103(a)(5) and 8 CFR § 2.1 does not authorize him to order his subordinate officers or employees to violate the requirements of federal law set forth in 8 U.S.C. § 1225(b)(2)(A).

98.     Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

## SECOND CAUSE OF ACTION
## THE FEBRUARY 18 MEMORANDUM VIOLATES 8 U.S.C. § 1226(c) WHICH MAKES THE DETENTION OF CERTAIN ILLEGAL ALIENS MANDATORY

99.     Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

100.    8 U.S.C. § 1226(c) makes the detention of certain aliens mandatory.  The categories of aliens whom DHS "shall take into custody" include "any alien convicted of . . . a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance." 8 U.S.C. § 1182(a)(2)(A)(i)(II),   any alien convicted of a crime of moral turpitude, and any alien convicted of certain firearms offenses.

101.    A mandatory duty to detain that is expressly spelled out in federal law cannot be modified by a discretionary enforcement policy that requires immigration officers to seek preapproval before taking any enforcement action.

102.    The February 18 Memorandum violates 8 U.S.C. § 1226(c) on its face, by making discretionary and difficult the detention of relevant aliens who fall outside of the priority enforcement categories.

103.    Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

## THIRD CAUSE OF ACTION
## THE FEBRUARY 18 MEMORANDUM VIOLATES 8 U.S.C. § 1231(a) WHICH MAKES THE REMOVAL OF CERTAIN ILLEGAL ALIENS MANDATORY

104.    Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

105.    8 U.S.C. § 1231(a) makes the removal of certain illegal aliens mandatory.

106.    Specifically, 8 U.S.C. § 1231(a)(5) mandates the removal of an alien who has reentered the United States illegally after having been removed: "[T]he alien *shall* be removed under the prior order at any time after the reentry." *Id*. (emphasis added).

107.    The February 18 Memorandum violates 8 U.S.C. § 1231(a) on its face, by making discretionary the removal of aliens subject to a final order of removal who fall outside of the priority enforcement categories.  Doing so subverts a mandatory removal requirement and transforms it into a discretionary policy.

108.    Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

## FOURTH CAUSE OF ACTION
## THE FEBRUARY 18 MEMORANDUM VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

109.    Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

110.    The February 18 Memorandum is a final agency action that is reviewable under the APA: (1) the Memorandum consummates Defendants' policy decision; and (2)

26

legal consequences flow from the decision because it changes the statutory obligations of ICE officers.

111.    As explained above, the February 18 Memorandum violates three different federal statutes.  Plaintiffs accordingly ask this Court to "hold unlawful and set aside agency action" which is "not in accordance with law."  5 U.S.C. § 706(2)(A).

112.    The February 18 Memorandum also violates the specific requirements of the APA in three respects, described below.

113.    First, the APA requires that agencies implementing congressional statutes in whole or in part through an agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy do so through a rulemaking. A rulemaking under the APA is defined as the agency process for formulating, amending, or repealing a rule through notice and comment procedures under the APA, 5 U.S.C. § 553.  The INA delegates authority to the Secretary of Homeland Security and the Attorney General to implement its provisions through regulations.  The Secretary has not promulgated any regulation that establishes the criteria or processes of the February 18 Memorandum.

114.    Establishing classes of aliens who cannot be detained or removed except through a laborious preapproval process is a "rule" under the APA, 5 U.S.C. § 551(4). The Secretary has not issued a notice of proposed rulemaking or promulgated a final rule implementing this policy in conformity with the APA.

115.    Defendant Mayorkas's authority under 8 U.S.C. § 1103(a)(5) and 8 C.F.R. § 2.1 does not include the authority to circumvent the terms of the Administrative

Procedure Act by simply issuing a "Memorandum" that significantly transforms the enforcement of federal immigration law.

116.    The February 18 Memorandum should be held "unlawful and set aside" because it was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

117.    The February 18 Memorandum violates the APA in a second respect because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

118.    The February 18 Memorandum represents a sharp and significant departure from previous policy governing detainers, detention, and removal.  Because Defendants do not sufficiently explain that sudden departure, the Memorandum is arbitrary and capricious.

119.    The February 18 Memorandum does not represent reasoned decision making.

120.    DHS and ICE ignored the harms that failing to detain and remove illegal aliens will cause.  The February 18 Memorandum did not analyze the costs that predictably fall on local law enforcement entities such as Plaintiff sheriffs and counties.  Failing to consider important costs of a new policy renders that policy arbitrary and capricious.

121.    The February 18 Memorandum also failed to consider alternative approaches that would have allowed a greater number of detentions and removals to

occur, which would have offered greater protection to the public, caused less financial injury to Plaintiffs, and would have caused less of an influx of additional illegal immigration.

122.    Even if the Defendants had considered the harms caused by, and alternative approaches to, the February 18 Memorandum, they did not explain or justify the grounds on which the Defendant agency proceeded to issue the Memorandum.

123.    The February 18 Memorandum violates the APA in a third respect by unlawfully withholding and unreasonably delaying agency action.  *See* 5 U.S.C. § 706(a).

124.    As explained above mandatory agency action to detain and/or remove certain illegal aliens is compelled by 8 U.S.C. §§ 1225(b)(2)(A), 1226(c), and 1231(a). These federal statutes to not permit the exercise of agency discretion through a laborious and dilatory preapproval process that may last fifty days or longer.  By failing to detain and remove certain aliens where such detention and removal is mandatory under federal law, Defendants are unlawfully withholding and unreasonably delaying agency action.

125.    Defendant Mayorkas's authority under 8 U.S.C. § 1103(a)(5) and 8 C.F.R. § 2.1 does not authorize him to circumvent the terms of the Administrative Procedure Act by simply issuing a "Memorandum" that significantly transforms the enforcement of federal immigration law.

126.    Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

## FIFTH CAUSE OF ACTION
## THE FEBRUARY 18 MEMORANDUM VIOLATES THE ARTICLE II, SECTION 3, CONSTITUTIONAL OBLIGATION OF THE EXECUTIVE TO TAKE CARE THAT THE LAWS ARE FAITHFULLY EXECUTED

127.    Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

128.    Article II, section 3, of the United States Constitution requires that the President, by and through his executive branch officials, including Defendants, "shall take Care that the Laws be faithfully executed."

129.    The February 18 Memorandum is unconstitutional because it directs executive officials not to enforce federal law, and not to comply with federal statutes that impose mandatory obligations upon immigration officers.

130.    Unconstitutional agency action or inaction violates the APA.  *See* 5 U.S.C. § 706.

131.    Defendant Mayorkas's authority under 8 U.S.C. § 1103(a)(5) and 8 C.F.R. § 2.1 does not include the authority to order his subordinate officers or employees to decline to enforce federal immigration laws against the vast majority of illegal aliens.

132.    Constitutional violations are actionable independently of the APA.  Federal courts possess the power to enjoin federal officers from violating the Constitution.

133.    Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

A.      Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that the February 18 Memorandum (or any materially similar successor memorandum) is unlawful and in violation of 8 U.S.C. § 1225(b)(2)(A), 8 U.S.C. § 1226(c), and 8 U.S.C. § 1231(a) and vacate the Memorandum.

B.      Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(D) that the February 18 Memorandum (or any materially similar successor memorandum) is unlawful and in violation of the Administrative Procedure Act as a rule promulgated without conforming to the procedure described therein and vacate the Memorandum;

C.      Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that the February 18 Memorandum (or any materially similar successor memorandum) is unlawful and in violation of Article II of the Constitution of the United States as in excess of executive authority and vacate the Memorandum;

D.      Preliminarily enjoin and permanently enjoin Defendants and their subordinate officers, employees, and agents from implementing or enforcing the February 18 Memorandum;

E.      Preliminarily enjoin and permanently enjoin Defendants and their subordinate officers, employees, and agents from implementing or enforcing any successor Memorandum or policy that substantially conforms to the February 18 Memorandum;

F.      Preliminarily enjoin and permanently enjoin Defendants and their subordinate officers, employees, and agents to fully comply with their statutory

obligations to take enforcement actions against certain aliens, including taking custody of, detaining, and removing illegal aliens as mandated by 8 U.S.C. § 1225(b)(2)(A), 8 U.S.C. § 1226(c), and 8 U.S.C. § 1231(a).

G.      Preliminarily enjoin and permanently enjoin Defendants and subordinate officers, employees, and agents to take custody of all criminal illegal aliens whose detention is required by law and who are presented to them pursuant to a "287(g) agreement," regardless of the crime of which the illegal aliens were convicted.

H.      Preliminarily enjoin and permanently enjoin Defendants and subordinate officers, employees, and agents to take custody of all illegal aliens whose detention or removal is required by 8 U.S.C. § 1225(b)(2)(A), 8 U.S.C. § 1226(c), or 8 U.S.C. § 1231(a), and who have been arrested by local law enforcement agencies for the commission of state crimes, when such local law enforcement agencies seek to transfer custody of such aliens to ICE.

I.      Direct Defendants to pay all costs associated with this lawsuit; and

J.      Grant such other and further relief as this Court deems equitable, just, and proper.


Dated:  July 1, 2021            By: s/ Kris W. Kobach
                                **Kris W. Kobach** (*Attorney-in-charge*)
                                Kansas Bar No. 17280, *pro hac vice applic. forthcoming*
                                Alliance for Free Citizens
                                P.O. Box 155
                                Lecompton, Kansas 66050
                                Telephone:  913-638-5567
                                kkobach@gmail.com

**Brent P. Smith**
Texas Bar No. 24080722, *pro hac vice applic. forthcoming*
County Attorney, Kinney County, Texas
P.O. Box 365
Brackettville, Texas 78832
Telephone: 830-563-2240
bsmith@co.kinney.tx.us

**Christopher J. Hajec**
D.C. Bar No. 492551, *pro hac vice applic. forthcoming*
Immigration Reform Law Institute
25 Massachusetts Avenue, N.W.
Suite 335
Washington, D.C. 20001
Telephone:  202-323-5590
info@irli.org

**Kimberly Kreider-Dusek**
Texas Bar No. 50511919
County Attorney, McMullen County, Texas
P.O. Box 237
Tilden, Texas 78072
kimberly.dusek@mcmullencounty.org

**Douglas Poole**
Texas Bar. No. 16115600
S.D. Texas Bar. No. 619
McLeod, Alexander, Powel, & Apffel, P.C.
802 Rosenberg
Galveston, Texas 77553
Telephone:  409-763-2481
dwpoole@mapalaw.com


*Attorneys for Plaintiffs*