# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

SHERIFF BRAD COE in his official    )
capacity and KINNEY COUNTY,    )
TEXAS; SHERIFF J.W. GUTHRIE in    )
his official capacity and EDWARDS    )
COUNTY, TEXAS; SHERIFF    )
EMMETT SHELTON in his official    )
Capacity and MCMULLEN COUNTY,    )
TEXAS; SHERIFF ARVIN WEST in his    )
official capacity and HUDSPETH    )
COUNTY, TEXAS; THE FEDERAL    )
POLICE FOUNDATION, ICE    )
OFFICERS DIVISION,    )
    )
       *Plaintiffs*,    )
    )      Civil Action No.
    v.    )      3:21-CV-00168
    )
JOSEPH R. BIDEN, JR., President,    )
in his official capacity; THE UNITED    )
STATES OF AMERICA; ALEJANDRO    )
MAYORKAS, Secretary of Homeland    )
Security, in his official capacity; U.S.    )
DEPARTMENT OF HOMELAND    )
SECURITY; TAE JOHNSON, Acting    )
Director of U.S. Immigration and    )
Customs Enforcement, in his official    )
Capacity; IMMIGRATION AND    )
CUSTOMS ENFORCEMENT; TROY    )
MILLER, Senior Official Performing the    )
Duties of Commissioner of U.S. Customs    )
and Border Protection, in his official    )
capacity; U.S. CUSTOMS AND    )
BORDER PROTECTION,    )
    )
       *Defendants*.    )

---

# PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTIVE RELIEF

---

# **TABLE OF CONTENTS**

Table of Contents.................................................................................................i

Table of Authorities...........................................................................................iii

Preliminary Statement ........................................................................................1

Statement of Facts ..............................................................................................1

Summary of Argument ........................................................................................1

Standards for Injunctive Relief...........................................................................3

Argument and Authorities ..................................................................................4

    I.    **THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.** ...............................................................................................4

        A.    **The February 18 Memorandum Violates 8 U.S.C. § 1225(b).** ...........................................................................5

        B.    **The February 18 Memorandum Violates 8 U.S.C. § 1226(c).** ........................................................................ 10

        C.    **The February 18 Memorandum Violates 8 U.S.C. § 1231(a).** ........................................................................ 12

        D.    **The February 18 Memorandum Violates the APA.**................... 14

            1.    **The February 18 Memorandum is Final Agency Action** .15

            2.    **The February 18 Memorandum Violates the APA Requirement for Notice-and-Comment Rulemaking** ...... 16

            3.    **The February 18 Memorandum Is Arbitrary and Capricious** ........................................................................ 20

            4.    **The February 18 Memorandum Does Not Warrant Deference** ........................................................................ 21

        E.    **The February 18 Memorandum Violates the Constitutional Obligation to Faithfully Execute the Law.** ......... 22

**II.     THE PLAINTIFFS WILL SUFFER IRREPARABLE INJURY UNLESS THE COURT ISSUES A PRELIMINARY INJUNCTION.** ............................................................................ 25

**III.    THE INJURY TO THE PLAINTIFFS GREATLY OUTWEIGHS ANY PURPORTED INJURY TO THE DEFENDANTS OR THE AGENCIES THAT THEY ADMINISTER.** ......................................................... 27

**IV.     INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.** .................. 27

Request for Relief ................................................................................ 29

Certificate of Service ........................................................................... 33

# TABLE OF AUTHORITIES

## Cases

*Adams v. Richardson*,
480 F.2d 1159 (D.C. Cir. 1973) (*en banc*) ........................................................ 8

*Alaska Professional Hunters Assoc. v. FAA*,
177 F.3d 1030 (D.C. Cir. 1999) .......................................................... 17

*Allied Marketing Group, Inc. v. CDL Mktg, Inc.*,
878 F.2d 806 (5th Cir. 1989) ........................................................... 3

*Am. Mining Congress v. Mine Safety & Health Admin.*,
995 F.2d 1106 (D.C. Cir. 1993) ........................................................ 16

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) .................................................. 17, 19

*Auer v. Robbins*,
519 U.S. 452 (1997) ...................................................................... 21

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
715 F.2d 897 (5th Cir. 1983) ......................................................... 14

*Bennett v. Spear*,
520 U.S. 154 (1997) ...................................................................... 15

*Center for Auto Safety v. National Highway Traffic Safety Administration*,
452 F.3d 798 (D.C. Cir. 2006) ......................................................... 19

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ................................................................. 21, 22

*Communist Party of Indiana v. Whitcomb*,
414 U.S. 441 (1974) (Powell, J., concurring) ................................... 23

*Compact Van Equipment Co. v. Leggett & Platt, Inc.*,
566 F.2d 9524 (5th Cir. 1978) ......................................................... 5

*Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) ...................................... 7

*Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 U.S. Dist. LEXIS 57788, at *28
(N.D. Tex. Apr. 23, 2013) ........................................................... 7, 10

*CSX Transportation, Inc. v. Surface Transportation Board*,
    584 F.3d 1076 (D.C. Cir. 2009) ......................................................... 19

*Demore v. Kim*, 538 U.S. 510 (2003) ........................................................ 11

*Dunlop v. Bachowski*,
    421 U.S. 560 (1975) .......................................................................... 8, 29

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
    762 F.2d 464 (5th Cir. 1985) ............................................................ 25

*Evergreen Presbyterian Ministries, Inc. v. Hood*,
    235 F.3d 908 (5th Cir. 2000) ............................................................ 4

*Fong Yue Ting v. United States*,
    149 U.S. 698 (1893) ....................................................................... 7, 23

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .................................................................. 8, 9, 10

*Janvey v. Alguire*,
    628 F.3d 164 (5th Cir. 2010) ............................................................ 4

*Johnson v. Guzman Chavez*, 594 U.S. ___ (2021) ................................. 12

*Lakedreams v. Taylor*,
    932 F.2d 1103 (5th Cir. 1991) .......................................................... 3

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) .......................................................................... 7

*Martin v. Linen Systems for Hospitals, Inc.*,
    671 S.W.2d 706 (Tex. App. – Houston [1st Dist.] 1984, no writ) ................ 26

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985) ............................................................ 4

*Morales v. TWA*,
    504 U.S. 374 (1992) .......................................................................... 25

*Morton v. Ruiz*,
    415 U.S. 199 (1974) .......................................................................... 17

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................... 15, 21

*Placid Oil Co. v. United States Dep't of the Interior*,
    491 F. Supp. 895 (N.D. Tex. 1980) .................................................. 4

*Reno v. American-Arab Antidiscrimination Committee*,
    525 U.S. 471 (1999) ........................................................................................... 5

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ......................................................................................... 22

*Texas Medical Providers Performing Abortion Services v. Lakey*,
    667 F.3d 570 (5th Cir. 2012) ............................................................................ 4

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .......................................................................... 16

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ............................................... 20

*Texas v. United States*, No. 6:21-cv-00003, 2021 U.S. Dist. LEXIS 33890 (S.D.
    Tex. Feb. 23, 2021) .......................................................................................... 13

*Travelhost, Inc. v. Modglin*,
    2012 U.S. Dist. LEXIS 78539 (N.D. Tex. June 6, 2012) .................................. 4

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ......................................................................................... 22

*United States v. Valenzuela-Bernal*,
    458 U.S. 858 (1982) ......................................................................................... 23

## **Statutes**

1226(c) ............................................................................................... 3, 10, 11, 12

1231(a) ................................................................................................... 3, 13, 14

5 U.S.C. § 551(4) ...................................................................................... 16

5 U.S.C. § 553(b)-(c) ................................................................................. 14

5 U.S.C. § 704 ............................................................................................ 15

5 U.S.C. § 706(2)(D) .................................................................................. 14

5 U.S.C. §§ 551-706 ................................................................................... 14

8 U.S.C. § 1182(a)(2) ................................................................................. 10

8 U.S.C. § 1182(a)(2)(A)(i)(II) ................................................................... 10

8 U.S.C. § 1225 ........................................................................................... 12

8 U.S.C. § 1225(a) ................................................................................................. 5

8 U.S.C. § 1225(a)(3) ........................................................................................... 5, 8

8 U.S.C. § 1225(b) ........................................................................................... passim

8 U.S.C. § 1225(b)(1)(A)(i) ..................................................................................... 6

8 U.S.C. § 1225(b)(1)(B) .......................................................................................... 6

8 U.S.C. § 1226(c)(1)(C) ........................................................................................ 10

8 U.S.C. § 1227(a)(2)(A)(i) ..................................................................................... 11

8 U.S.C. § 1231 ....................................................................................................... 12

8 U.S.C. § 1231(a)(5) .............................................................................................. 12

8 U.S.C. § 1357 .................................................................................................. 16, 18

U.S. Const. art. II, § 3 ................................................................................ 22, 23, 24, 25

## Other Authorities

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat.
    3009-546 ............................................................................................................ 5

H.R. Rep. 104-725 (1996) (Conf. Rep.) .................................................................. 5

## Secondary Sources

Ronald Dworkin, *The Model of Rules*, 35 U. Chi. L. Rev 14 (1967) ........................... 9

**PRELIMINARY STATEMENT**

Plaintiffs Sheriff Brad Coe and Kinney County, Texas, Sheriff J.W. Guthrie, and Edwards County, Texas, Sheriff Emmett Shelton and McMullen County, Texas, Sheriff Arvin West and Hudspeth County, Texas, and the Federal Police Foundation, ICE Officers Division, file this Brief in Support of Plaintiffs' Motion for Preliminary Injunctive Relief. The motion seeks to enjoin Defendants from implementing and enforcing the Memorandum issued on February 18, 2021, by Defendant Acting Director of ICE Tae Johnson to all ICE employees entitled "Interim Guidance:  Civil Immigration Enforcement Removal and Priorities," ("the February 18 Memorandum") available at: https://www.ice.gov/doclib/news/releases/2021/021821_civil-immigration-enforcement_interim-guidance.pdf, or its predecessor January 20, 2021, Memorandum, Section B, issued by the Acting Secretary of DHS entitled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities" available at: https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf, or any similar successor Memorandum, until this Court adjudicates the lawfulness of the February 18 Memorandum and renders a final judgment in this matter.

**STATEMENT OF FACTS**

The facts supporting the motion are set forth in detail in the Complaint.  To avoid repetition, Plaintiffs incorporate by reference the facts contained therein.

**SUMMARY OF ARGUMENT**

Unless enjoined by this Court, Defendants will impose irreparable injury on the

Plaintiffs.   Defendants (1) have adopted and implemented, in violation of the Administrative Procedure Act, the February 18 Memorandum, which makes the detention or removal of the vast majority of illegal aliens impermissible unless an ICE officer obtains "preapproval" through a time-consuming, burdensome, and usually-futile process; (2) have denied the overwhelming majority of ICE officer requests for preapproval to take enforcement actions; (3) have removed most of the "detainers" that were in place on criminal illegal aliens in state or local custody prior to the February 18 Memorandum; and (4) have refused to take custody or other enforcement actions against illegal aliens arrested for crimes by Plaintiff sheriffs.   These actions prevent the ICE officer members of Plaintiff Federal Police Foundation from complying with the express terms of the Immigration and Nationality Act (INA), which *require* them to initiate removal proceedings and to detain illegal aliens in specified cases.   Defendants' actions also place the ICE officers on the horns of a dilemma; they must either comply with federal law and face disciplinary actions, or ignore the requirements of federal law and participate in the administration of an illegal program.   The need to respond to this dilemma has caused, and will continue to cause, the Plaintiff Federal Police Foundation to divert its scarce resources.

As a result of Defendants' actions, moreover, Plaintiff Texas sheriffs and counties have been harmed through the calculable and already-mounting fiscal costs imposed upon them, in the form of detention costs, crime response costs, criminal investigation costs, and diversion of scarce law enforcement resources.   Plaintiff Texas sheriffs and counties have experienced a dramatic increase in the influx of illegal aliens and in criminal activity by illegal aliens resulting from the implementation of the unlawful and unconstitutional

February 18 Memorandum.  This standdown in ICE enforcement has fueled a crisis at the border as well as in other Texas counties, encouraging a massive surge in illegal immigration.  Monthly totals in apprehensions by Border Patrol agents are at levels not seen in over 21 years.  The implementation of the February 18 Memorandum has resulted in the release of a massive number of illegal alien criminals onto the streets.  Many of those illegal aliens have committed criminal acts after their release from criminal detention, at great cost to Plaintiffs and the general public.

Plaintiffs ask this Court preliminarily to enjoin Defendants from further implementation of the February 18 Memorandum and enjoin Defendants to follow the federal statutes governing the detention and removal of aliens that the Memorandum violates, specifically:  8 U.S.C. §§ 1225(b), 1226(c), and 1231(a).

## STANDARDS FOR INJUNCTIVE RELIEF

Courts are to consider four criteria in determining whether to grant a preliminary injunction: (1) the probability of success on the merits; (2) the threat of irreparable harm if the injunction does not issue; (3) the relative balance of harm to the parties; and (4) the public interest.  *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991); *Allied Marketing Group, Inc. v. CDL Mktg, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).  Here, each factor favors the issuance of appropriate injunctive relief.  Plaintiffs demonstrate through the attached affidavits and through this brief:

(1)     that they have a substantial likelihood of prevailing on the merits of their claims after trial;

(2)     a substantial threat that they will suffer irreparable injury if the

preliminary injunction is not granted pending resolution of their claims at trial;

(3)     that the substantial threat of irreparable injury outweighs any harm to Defendants and their respective agencies, the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), and Customs and Border Patrol (CBP), from the granting of the preliminary injunction; and

(4)     that granting the preliminary injunction pending trial will not disserve the public interest.

*See Travelhost, Inc. v. Modglin*, 2012 U.S. Dist. LEXIS 78539, *9-10 (N.D. Tex. June 6, 2012) (Fish, J.), *citing Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012).  The decision to grant or deny preliminary injunctive relief rests in the sound discretion of the district court.  *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## ARGUMENT AND AUTHORITIES

## I.     THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Although a movant must demonstrate that eventual success in the litigation is probable, *see Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908, 918-19 (5th Cir. 2000), the likelihood of success need not be established with absolute certainty.  *Placid Oil Co. v. United States Dep't of the Interior*, 491 F. Supp. 895, 905 (N.D. Tex. 1980) ("It is not necessary for Plaintiffs to prove to an absolute certainty that they will prevail on the merits").  A "plaintiff must present a prima facie case but need not show that he is certain to win." *Janvey v. Alguire*, 628 F.3d 164, 175 (5th Cir. 2010).  To obtain an injunction, the movant's likelihood of success must be more than negligible, *Compact Van Equipment*

*Co. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978).  For the reasons explained below, in this case it is likely that the Court will declare the February 18 Memorandum to be contrary to federal law and in violation of the United States Constitution.

### A.  The February 18 Memorandum Violates 8 U.S.C. § 1225(b).

In 1996, Congress acted to drastically limit the any discretion that ICE officers might otherwise have with respect to the initiation of removal proceedings.  Frustrated with executive non-enforcement of federal immigration laws, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009-546 (IIRIRA).  "[A]t the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."  *Reno v. American-Arab Antidiscrimination Committee*, 525 U.S. 471, 483-84 (1999).  Congress therefore acted to restrict the discretion available to the executive branch by statute.  As a conference committee report in 1996 succinctly stated: "[I]mmigration law enforcement is as high a priority as other aspects of Federal law enforcement, and illegal aliens do not have the right to remain in the United States undetected and unapprehended."  H.R. Rep. 104-725 (1996), at 383 (Conf. Rep.).  To achieve its objective of maximizing the removal efforts of the executive branch, Congress inserted several interlocking provision into the INA to *require* removal when immigration officers encounter illegal aliens.

8 U.S.C. § 1225(a)(1) requires that "an alien present in the United States (who has not been admitted … shall be deemed for purposes of this chapter an applicant for

admission."   This designation triggers 8 U.S.C. § 1225(a)(3), which requires that all applicants for admission "shall be inspected by immigration officers."   This in turn triggers 8 U.S.C. § 1225(b), which governs inspection of applicants for admission.   Section 1225(b)(1) mandates the expedited removal of aliens who either lack entry documents or attempt to gain admission through misrepresentation.[1]   8 U.S.C. § 1225(b)(1)(A)(i). Section 1225(b)(2)(A), which applies to all other applicants for admission, mandates that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall* be detained for a proceeding under section 1229a of this title."  8 U.S.C. § 1225(b)(2)(A) (emphasis added). The proceedings under 8 U.S.C. § 1229a are removal proceedings in United States Immigration Courts.

The February 18 Memorandum violates these provisions of federal law on its face by making discretionary (and highly unlikely) the placement of certain aliens into removal proceedings, when federal law clearly mandates that Defendants' immigration officers *must* place aliens they encounter into removal proceedings if the aliens are unlawfully present in the United States.

Because Congress has expressly limited Defendants' discretion not to initiate removal proceedings, any "prosecutorial discretion" that they exercise must be consistent with 8 U.S.C. § 1225(b)(2)(A).  Since that statute mandates the commencement of removal proceedings, such discretion can only be exercised *after* such proceedings have been

---

[1] If such an alien requests asylum, the INA mandates detention of such an alien pending consideration of an application for asylum. 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV).

initiated, and only in a manner authorized by law, such as through the cancellation or withholding of removal. *See* 8 U.S.C. §§ 1229b, 1231(b)(3). An executive agency's policy preference about how to enforce (or, in this case, not enforce) an act of Congress cannot trump the power of Congress: a Court may not, "simply … accept an argument that the [agency] may … take action which it thinks will best effectuate a federal policy" because "[a]n agency may not confer power upon itself." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

The Northern District of Texas has interpreted 8 U.S.C. § 1225(b)(2)(A) and has come to the inescapable conclusion that "shall" means shall and that ICE officers are under a mandatory duty to initiate removal proceedings when they encounter such illegal aliens. "The Court finds that Congress's use of the word 'shall' in Section 1225(b)(2)(A) imposes a mandatory obligation on immigration officers to initiate removal proceedings against aliens they encounter who are not 'clearly and beyond a doubt entitled to be admitted.'" *Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 U.S. Dist. LEXIS 57788, at *28 (N.D. Tex. Apr. 23, 2013), *aff'd sub nom. Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015).

It is Congress that determines which aliens are to be removed from the United States, even though it exercises that power through executive officers such as Defendants: "The power of Congress … to expel, like the power to exclude aliens, or any specified class of aliens, from the country, may be exercised through executive officers …." *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893). Defendant Mayorkas's authority to enforce the immigration laws under 8 U.S.C. § 1103(a)(5), which confers upon him "the power and duty to control and guard the boundaries and borders of the United States against

the illegal entry of aliens," cannot possibly be construed to authorize him to order subordinate employees to violate the requirements of federal law in 8 U.S.C. § 1225(b).

The Supreme Court has recognized that Congress has the authority to restrict executive discretion in this manner by statute: "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Heckler v. Chaney*, 470 U.S. 821, 833 (1985). Through IIRIRA, Congress circumscribed the executive branch's discretion *not* to detain and remove illegal aliens. The interlocking provisions of 8 U.S.C. § 1225(a)(1),  (a)(3), (b)(1), and  (b)(2)(A) provide clear statutory direction to DHS. If an illegal alien is encountered by DHS, an inspection *must* occur, and if that illegal alien is not entitled to be admitted to the United States, he or she *must* be either removed expeditiously, detained pending consideration of an asylum application, or detained and placed in removal proceedings. Any subsequent relief, whether it be through asylum, cancellation of removal, or withdrawal of removal, must be authorized by federal statute.

Unfettered discretion ceases to exist where federal law "not only requires the agency to enforce the Act, but also sets forth specific enforcement procedures." *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (*en banc*). Here, as was true in the Labor-Management Reporting and Disclosure Act case of *Dunlop v. Bachowski*, 421 U.S. 560 (1975), Congress established clearly defined factors requiring the executive agency to take action to enforce federal law. "The statute being administered [in *Dunlop*] quite clearly withdrew discretion from the agency and provided guidelines for exercise of its

enforcement power." *Heckler*, 470 U.S. at 834.  So, too, IIRIRA "quite clearly withdrew discretion from the agency."   The defendants cannot now by Directive exercise the discretion that Congress took away.  "Discretion, like the hole in a doughnut, does not exist except as an area left open by a surrounding belt of restriction."  Ronald Dworkin, *The Model of Rules*, 35 U. Chi. L. Rev 14, 32 (1967).

Defendants will doubtless protest that the February 18 Memorandum enables them to prioritize their allocation of limited enforcement resources more efficiently than the "if you encounter an inadmissible alien, start removal proceedings" approach of IIRIRA. They may or may not have a good policy argument.  But they no longer have the legal authority to set policy in that respect – Congress has done it for them.  If Defendants do not like the way IIRIRA forces them to utilize their limited enforcement resources, they have two choices: (1) ask Congress for more resources, or (2) ask Congress to change the law.  They cannot circumvent the requirements of federal law through executive fiat.

The Defendants in this matter may argue that the February 18 Memorandum is simply guidance as to how to exercise prosecutorial discretion in the enforcement of immigration laws.  That argument was specifically rejected by the Northern District of Texas, when it interpreted 8 U.S.C. § 1225(b)(2)(A).  As that court observed:

> While DHS and ICE generally have the discretion to determine when to initiate removal proceedings, the Supreme Court has noted that "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Heckler,* 470 U.S. at 833. The Court finds that Congress, by using the mandatory term "shall" in Section 1225(b)(2)(A), has circumscribed ICE's power to exercise discretion when determining against which "applicants for admission" it will initiate removal proceedings.  *See* 8 U.S.C. § 1225(b)(2)(A).

*Crane v. Napolitano*, at \*31-32.  But at the stage where an immigration officer encounters an illegal alien who has not been admitted, Congress created a mandatory duty either to remove expeditiously or to detain and initiate removal proceedings.  The February 18 Memorandum violates 8 U.S.C. § 1225(b) by attempting to transform that mandatory duty into a discretionary decision.

The February 18 Memorandum violates the express terms of federal law.  That authorizes this Court to require Defendants to follow the law: "If [Congress] has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under [5 U.S.C.] § 701(a)(2), and courts may require that the agency follow that law …."  *Heckler*, 470 U.S. at 834-35.  For the reasons explained above, Plaintiffs are likely to prevail on this claim.

**B.     The February 18 Memorandum Violates 8 U.S.C. § 1226(c).**

As explained above, Congress has specifically removed any prosecutorial discretion with respect to the initial detention of illegal aliens encountered by ICE officers and the placement of such aliens into removal proceedings.  Congress also listed specific categories where detention of the aliens is required during their removal proceedings.  8 U.S.C. § 1226(c) makes the detention of certain aliens mandatory pending adjudication of their removal proceedings and ultimately their removal from the United States.

The categories of aliens whom DHS "shall take into custody" under 8 U.S.C. § 1226(c) include those who have committed an offense covered in 8 U.S.C. § 1182(a)(2), which includes "any alien convicted of . . . a violation of (or a conspiracy or attempt to

violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance." 8 U.S.C. § 1182(a)(2)(A)(i)(II). 8 U.S.C. § 1226(c)(1)(C) also requires the detention of aliens convicted of crimes of moral turpitude (referring to 8 U.S.C. § 1227(a)(2)(A)(i)). 8 U.S.C. § 1226(c) also mandates the detention of aliens convicted of certain firearms offenses.

The mandatory nature of the detentions commanded by 8 U.S.C. § 1226(c) is well established. The Supreme Court has described detention under that statute as "mandatory." *Demore v. Kim*, 538 U.S. 510, 521 (2003). The Supreme Court has also described the intent of Congress when it created that mandatory detention requirement in 1990:

> Some studies presented to Congress suggested that detention of criminal aliens during their removal proceedings might be the best way to ensure their successful removal from this country. See, *e.g.*, 1989 House Hearing 75; Inspection Report, App. 46; S. Rep. 104-48, at 32 ("Congress should consider requiring that all aggravated felons be detained pending deportation. Such a step may be necessary because of the high rate of no-shows for those criminal aliens released on bond"). It was following those Reports that Congress enacted 8 USC § 1226 [8 USCS § 1226], requiring the Attorney General to detain a subset of deportable criminal aliens pending a determination of their removability.

*Id*. The Supreme Court has also upheld the constitutionality of this mandatory detention provision, recognizing that detention during deportation proceedings is a constitutionally valid aspect of the removal process. *Id.* at 523.

The February 18 Memorandum prioritizes only terrorists, spies, recent arrivals, convicted aggravated felons, and gang members. But many if not most of the aliens in the mandatory detention categories of 8 U.S.C. § 1226(c) above fall outside of the priority enforcement categories of the February 18 Memorandum and therefore can *only* be

detained by an ICE officer if preapproval from a FOD or SAC is obtained.  This plainly violates the mandatory detention requirement of 8 U.S.C. § 1226(c), which leaves no room for discretion.  Accordingly, Plaintiffs are likely to prevail on this claim.

### C.   The February 18 Memorandum Violates 8 U.S.C. § 1231(a).

In addition to the mandatory obligations imposed by 8 U.S.C. § 1225(b)(2)(A) and 8 U.S.C. § 1226(c), Congress also limited executive discretion regarding the removal of previously-deported aliens.  8 U.S.C. § 1231(a)(5) mandates the removal of an alien who has reentered the United States illegally after having been removed: "[T]he alien *shall* be removed under the prior order at any time after the reentry."  *Id*. (emphasis added).

The Supreme Court recently reiterated that 8 U.S.C. § 1231(a)(5) removes executive discretion in the matter.  "Those reinstated orders are not subject to reopening or review, nor are respondents eligible for discretionary relief under the INA. Instead, they 'shall be removed under the prior order at any time after the reentry.'"  *Johnson v. Guzman Chavez*, 594 U.S. ___ (2021) (slip op. at 9) (quoting 8 U.S.C. § 1231(a)(5)).  The Supreme Court also described 8 U.S.C. § 1231(a)(5) as imposing a "requirement" upon DHS.  "The bar on reopening or reviewing those removal orders, as well as the *requirement* that DHS remove aliens subject to reinstated orders, also appears in §1231(a)(5)."  *Id*. at 19 (emphasis added).

In the same case, the Supreme Court provided some helpful context as to why Congress might make the initiation of removal proceedings mandatory in 8 U.S.C. § 1225 and then again make the execution of removal mandatory in 8 U.S.C. § 1231:

> The sections within that part proceed largely in the sequential steps of the removal process. Sections 1221 to 1224 address the arrival of aliens. Section 1225 provides instructions for inspecting aliens, expediting the removal of

> some, and referring others for a removal hearing. Section 1226 authorizes the arrest and detention of aliens pending a decision on whether they are to be removed. Section 1227 explains which aliens are deportable. Section 1228 authorizes the expedited removal of some of those deportable aliens. Sections 1229, 1229a, and 1229b set out the process for initiating and conducting removal proceedings, and they specify the types of relief that an alien can request during those proceedings, such as cancellation of removal. Section 1229c addresses voluntary departure. Section 1230 explains what to do if an alien is admitted. And §1231 explains what to do if the alien is ordered removed.

*Id*. at 19.  The sections are not redundant; rather, they describe two different points in the

process at which Congress imposes upon ICE a mandatory, non-discretionary duty.

And the Supreme Court made clear that Congress's judgment about which aliens

must be removed or detained must be followed.  A regime that did not respect Congress's

command regarding when removal or detention is mandatory would "undermine

Congress's judgment regarding the detention of different groups of aliens who posed

different risks of flight…."  *Id*. at 20.  The only discretion left to DHS is that which the

statute spells out:  "§1231's directive … states that DHS 'shall' remove the alien within 90

days '[e]xcept as otherwise provided in this section.' §1231(a)(1)(A).  And, as noted above,

'this section' provides for post-removal detention and supervised release in the event an

alien cannot be removed within the 90-day removal period, §§1231(a)(3), (6)."  *Id*. at 22.

This Court has also recently opined on the meaning of 8 U.S.C. § 1231(a).  "[T]he

Court has determined that 'shall' in section 1231(a)(1)(A) means *must*."  *Texas v. United

States*, No. 6:21-cv-00003, 2021 U.S. Dist. LEXIS 33890, at *108 (S.D. Tex. Feb. 23,

2021) (emphasis in original).  This Court reviewed the lengthy statutory history of that

section, concluding that "[t]hat statutory history and the consistent federal court

recognition of those purposes lead inexorably to a single conclusion: the word 'shall' in section 1231(a)(1)(A) means *must…."* Id. at *98. This Court has, therefore, already addressed the mandatory nature of the command to remove in 8 U.S.C. § 1231(a).

On its face, the February 18 Memorandum transforms a mandatory duty to remove into a discretionary duty. Removal only occurs *if* the immigration officer seeks preapproval to take an enforcement action *and if* the FOD or SAC grants preapproval. As applied, the implementation of the February 18 Memorandum has resulted in brazenly illegal outcomes. In Plaintiffs' Complaint alone, there are seven cases in which approval was denied, even though the alien in question had been previously removed. Complt. ¶¶ 54-55, 57-61. As Plaintiffs will show at trial, previous removal orders seem to matter little to the ICE FODs and SACs under the regime created by the February 18 Memorandum. On this claim, Plaintiffs are likely to prevail at trial.

### D.   The February 18 Memorandum Violates the APA.

The Administrative Procedure Act, 5 U.S.C. §§ 551-706 (APA), sets out the requirements for federal agencies to follow when adopting rules and regulations. In addition to providing judicial review of substantively unlawful agency action, 5 U.S.C. § 706(2)(B)-(C), the APA also requires that agencies follow a notice-and-comment process when adopting substantive regulations, 5 U.S.C. § 553(b)-(c); *cf.* 5 U.S.C. § 706(2)(D) (providing judicial review of failure to follow required procedures); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 909-10 (5th Cir. 1983). That process, in turn, requires that agencies engage in reasoned decisionmaking. *See Motor Vehicle Mfrs. Assn. of United*

*States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 46-57 (1983); *cf.* 5 U.S.C. § 706(2)(A) (providing judicial review of agency action that is arbitrary, capricious, or an abuse of discretion). The February 18 Memorandum is reviewable final agency action, and its promulgation violated both the notice-and-comment and the reasoned-decisionmaking requirements of the APA. These violations would void the February 18 Memorandum, even if it complied with the INA.

The INA delegates authority to the Secretary of Homeland Security and the Attorney General to implement its provisions through the formal promulgation of rules pursuant to the APA. The February 18 Memorandum attempts to eliminate the mandatory enforcement processes established by federal law and replace them with a discretionary enforcement regime using criteria spelled out in the Memorandum. Yet the Secretary has not promulgated any rule that makes this sweeping change through notice-and-comment rulemaking.

### 1.    The February 18 Memorandum is Final Agency Action.

To be reviewable under the APA, an agency action must either be made reviewable by statute or must be "final agency action." 5 U.S.C. § 704. For an agency action to be final it must reflect "the consummation of the agency's decisionmaking process" in a way that impacts "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The February 18 Memorandum meets both tests because Defendants have changed the obligations of ICE agents, and circumscribed their statutory authority, by definitively providing that ICE agents cannot exercise their statutory authority to initiate enforcement

actions without prior approval.  *See* 8 U.S.C. § 1357.  Even if the FOD/SAC pre-approval process were not illusory and stacked against enforcement, its existence alone would affect "rights or obligations."

### 2.    The February 18 Memorandum Violates the APA Requirement for Notice-and-Comment Rulemaking.

Although the APA exempts certain agency actions from the notice-and-comment requirements, those exemptions do not apply when agency action narrows the discretion otherwise available to agency staff or amends an existing regulation.  *Texas v. United States*, 809 F.3d 134, 172-73 (5th Cir. 2015); *Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).  The February 18 Memorandum fails both of these tests.

An administrative action that establishes criteria for detaining, removing, or taking any other enforcement action against an illegal alien is quintessentially a "rule" under the Administrative Procedure Act.  5 U.S.C. § 551(4) ("'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy").  The United States Supreme Court has made clear that "on-off" or "yes-no" eligibility for benefits under a congressional enactment must be defined through formal rulemaking:

> The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.  In the area of Indian affairs, the Executive has long been empowered to promulgate rules and policies, and the power has been given explicitly to the Secretary and his delegates at the BIA.  This agency power to make rules that affect substantial individual rights and obligations carries

with it the responsibility not only to remain consistent with the governing legislation, … but also to employ procedures that conform to the law. …

The Administrative Procedure Act was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations.

*Morton v. Ruiz*, 415 U.S. 199, 231-32 (1974) (citations and footnotes omitted).  In this instance, the Secretary has set out in the February 18 Memorandum a process for the determination of future obligations of aliens who are unlawfully present in the United States—including whether they must surrender to detention and whether they will be removed.  In so doing, Defendants have attempted to bury, outside of the APA, rulemaking decisions that have the "inherently arbitrary nature of unpublished ad hoc determinations." And as in *Morton*, "[t]he Secretary has presented no reason why the requirements of the Administrative Procedure Act could not or should not have been met."  *Morton*, 415 U.S. at 235.  In the wake of *Morton*, whether an agency has unlawfully altered substantive rights through "guidance" has become one of the staples of administrative litigation. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("[W]hatever EPA may think of its Guidance generally, the elements of the Guidance petitioners challenge consist of the agency's settled position, a position it plans to follow in reviewing State-issued permits, a position it will insist State and local authorities comply with in setting the terms and conditions of permits issued to petitioners, a position EPA officials in the field are bound to apply"); *Alaska Professional Hunters Assoc. v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) ("Those regulated by an administrative agency are entitled to 'know the rules by which the game will be played'").

The preapproval process established by the February 18 Memo also constrains the authority conferred upon immigration officers by the INA and implementing regulations. The INA establishes the powers of immigration officers, which include the authority to take certain actions without warrant, to administer oaths and take evidence, and to detain aliens in specified situations. *See* 8 U.S.C. § 1357. The implementing regulations grant certain authorized immigration officers the "[p]ower and authority to interrogate[;] [to] patrol the border[;] to arrest[;] to conduct searches[;] to execute warrants[;] [and] to carry firearms." 8 C.F.R. § 287.5.   Authorized officers are those "who have successfully completed basic immigration law enforcement training" and generally include:

> border patrol agents; air and marine agents; special agents; deportation officers; CBP officers; immigration enforcement agents; supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and immigration officers who need the authority to arrest persons under [8 U.S.C. § 1357(a)(4)] in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner of CBP, the Assistant Secretary/Director of ICE, or the Director of the USCIS.

8 C.F.R. § 287.5(c).

The February 18 Memo, however, limits the authority of immigration officers to take *any* enforcement actions by requiring such officers to seek written pre-approval for non-priority enforcement actions.   The February 18 Memo provides that "[a] civil immigration enforcement or removal action that does not meet the … criteria for presumed priority cases will require preapproval…."  February 18 Memo at 5.  Furthermore, such approval, if obtained, only applies to the alien it references and does not extend to any aliens "encountered during an [approved] operation if" such aliens are not in one of the

priority categories.  *Id.* at 6.  Thus, immigration officers who previously had the authority to interrogate and arrest aliens without a warrant have been stripped of such authority and may now only exercise it in "exigent circumstances."  *Id.* at 6.

Such officers are also prevented from taking enforcement actions against aliens with final orders of removal who do not meet DHS's priority criteria.  *Id.*  Any officer who takes an enforcement action against a non-priority alien without the preapproval required by the new DHS policy must subsequently submit paperwork for such approval.  *Id.*  It is unclear what consequences will follow should such retroactive preapproval be denied.

In implementing the February 18 Memorandum, Defendants have treated the Memorandum as if it were a rule.  The February 18 Memorandum decrees the steps that ICE officers must take in the vast majority of cases.  *See Appalachian Power Co. v. EPA, supra*; *see also Center for Auto Safety v. National Highway Traffic Safety Administration*, 452 F.3d 798 (D.C. Cir. 2006).  The enforcement process that is laid out in considerable detail in the INA may not be changed without advance notice and an opportunity for public comment.  *See*, *e.g., CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076, 1081-82 (D.C. Cir. 2009) (on rehearing) (logical outgrowth doctrine limits scope of permissible change in numerical metrics), and cases cited therein.

The Fifth Circuit has held that a comparable non-enforcement memorandum in immigration law, Deferred Action for Parents of Aliens (DAPA), was the equivalent of a rule and was therefore subject to the notice and comment requirements of the APA. "DAPA establishes '"the *substantive standards* by which the [agency] evaluates applications" which seek a benefit that the agency [purportedly] has the power to

provide'—a critical fact requiring notice and comment." *Texas v. United States*, 809 F.3d 134, 177 (5th Cir. 2015).  In the instant case, the February 18 Memorandum establishes the substantive standards defining cases that are presumed to be priorities.  All other cases are presumed to be ones in which no enforcement action can be taken, unless the relevant ICE officer undertakes the laborious and time-consuming process of filing a preapproval request.  The overwhelming majority of such requests are denied; and the time taken to respond to such requests may be 53 days or more.  See Complt. ¶ 51.

### 3.    The February 18 Memorandum Is Arbitrary and Capricious.

Had Defendants conducted a rulemaking, they would have provided affected stakeholders the opportunity to raise issues that Defendants themselves did not consider. By short circuiting that process—whether required or not—Defendants also ensured a second APA violation: their failure to engage in reasoned decisionmaking, including the consideration not only of alternatives to the policy adopted and consequences of that policy, but also of the underlying lawfulness of the policy.

Instead, the Secretary has deviated from the course laid out by the APA and the INA without explanation.  The February 18 Memorandum does not clarify existing statutes or regulations; instead, it creates a new policy of presumptive non-enforcement that contradicts existing federal statutes.  The February 18 Memorandum represents a sharp and significant departure from previous policy governing detainers, detention, and removal. Because Defendants do not sufficiently explain that sudden departure, the Memorandum is arbitrary and capricious.  An unexplained and significant shift in agency practice is a reason

for holding an interpretation to be an arbitrary and capricious change from agency practice under the APA.  *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 46-57 (1983).

The February 18 Memorandum did not analyze the costs that predictably fall on local law enforcement entities such as Plaintiff sheriffs and counties when ICE no longer takes custody of, or removes, categories of illegal aliens in which enforcement action is mandatory under federal law.  Nor did it consider alternative approaches that would have allowed a greater number of detentions and removals to occur, offered greater protection to the public, caused less financial injury to Plaintiffs, and caused less of an influx of additional illegal immigration.

**4.     The February 18 Memorandum Does Not Warrant Deference.**

Finally, it should be pointed out that familiar standards of deference in judicial review of final agency rules are inapplicable here because the Secretary has not promulgated even an interpretive rule.  An administrative *rule* may receive substantial deference if it interprets the issuing agency's own ambiguous regulation.  *Auer v. Robbins*, 519 U.S. 452, 461-63 (1997).  An interpretation of an ambiguous statute may also receive substantial deference if embodied in a *rule*.  *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984).

Deference in accordance with *Chevron* is warranted only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise

of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). "If the agency's decision is a result of a sufficiently formal and deliberative process to warrant deference, the second step of *Chevron* requires the court to assess whether the agency's interpretation is 'based on a permissible construction of the statute.'" *Mead*, 533 U.S. at 230 (quoting *Chevron*, 467 U.S. at 843). Otherwise, the interpretation is "entitled to respect" only to the extent it has the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

In the instant case, no "sufficiently formal and deliberative process," such as a formal rulemaking, has taken place. Nor can the February 18 Memorandum be treated as an interpretive rule; it does not purport to be one, and has not been promulgated under any of the procedures of the APA or the Federal Register Act, 44 U.S.C. §§ 1501, *et seq*. For both reasons, it is not entitled to deference.

### E. The February 18 Memorandum Violates the Constitutional Obligation to Faithfully Execute the Law.

U.S. Const. art. II, § 3, requires that the President, by and through his executive branch officials, including Defendants, "shall take Care that the Laws be faithfully executed." The February 18 Memorandum violates this constitutional command in two ways. First, as explained above, it orders ICE officers not to take enforcement actions when federal law states that the officers "shall" take such enforcement actions. It thereby orders executive branch officials to violate the law. Second, the standdown of ICE that the February 18 Memorandum has caused is not consistent with the executive's duty to take care that the laws be faithfully executed. In effect, the February 18 Memorandum orders

that the immigration laws of the United States shall *not* be executed against the majority of illegal aliens encountered by ICE officers.  Non-enforcement of the law on this scale is impossible to reconcile with the wording of art. II, § 3.

The "take care" clause does not merely describe an executive prerogative; it "imposes on the President the *affirmative duty* to 'take Care that the Laws be faithfully executed.'"  *Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 452 (1974) (Powell, J., concurring) (emphasis added); *Fong Yue Ting*, 149 U.S. at 712.  This affirmative duty extends to faithfully enforcing the immigration laws of the United States:

> The Constitution imposes on the President the duty to "take Care that the Laws be faithfully executed."  U.S. Const., Art. II, § 3.  One of the duties of the Executive Branch, and a vitally important one, is that of apprehending and obtaining the conviction of those who have violated criminal statutes of the United States.  The prosecution of respondent [illegal alien] is of course one example of the Executive's effort to discharge that responsibility.

*United States v. Valenzuela-Bernal*, 458 U.S. 858, 863 (1982).  The February 18 Memorandum is an extraordinary attempt to evade this duty imposed by the Constitution.

Defendants will doubtless claim that they cannot achieve 100% enforcement of federal immigration laws against all illegal aliens; therefore, the February 18 Memorandum is simply a decision not to enforce the law against "low priority" illegal aliens.  While it is true that 100% enforcement of any law is virtually impossible, that reality does not free the Executive Branch from its Article II obligation faithfully to attempt to enforce the law.  By making it extremely difficult for ICE officers to take any enforcement actions against the vast majority of illegal aliens, Defendants have done something entirely different than attempting to enforce the law faithfully but falling short of 100% enforcement.  Their

willful non-enforcement of the law against illegal aliens and their compelling of ICE officers, themselves, to violate the law are extraordinary actions that violate the high duty imposed by art. II, § 3.

To understand what the defendants have done, consider an analogous scenario in tax law. Federal law currently requires all individual taxpayers to declare any income that they receive from capital gains and to pay taxes on those capital gains. *See* 26 U.S.C. § 1(h). Suppose that a future President, after failing to push through Congress a bill eliminating the taxation of capital gains, decides to take the following actions. He orders his Treasury Secretary to issue a "memorandum" that requires (highly unlikely) "preapproval" before Internal Revenue Service (IRS) personnel can take enforcement actions against anyone who fails to pay federal income taxes on capital gains. The "memorandum" further orders the IRS and its agents to refrain from taking administrative actions to collect any taxes on capital gains. Instead, the IRS is ordered devote its limited enforcement resources to the collection of other taxes. The memorandum cloaks this lawless act in the language of executive discretion, saying that this national policy change merely guides the allocation of enforcement resources and will be implemented on a "case by case" basis. But of course such a memorandum would be nothing like executive discretion that the IRS might legitimately exercise not to take action against a particular taxpayer. Rather, it would be an abrogation of the executive's duty faithfully to execute the laws.

The same may be said of the February 18 Memorandum. Defendants have made the political decision radically to scale back all enforcement activity by ICE. The results

are already evident in the removal statistics.  In April 2021, ICE carried out fewer than 3,000 arrests, the lowest monthly total on record.  (*Washington Post*, "Biden administration reins in street-level enforcement by ICE as officials try to refocus agency mission," May 25, 2021, available at https://archive.is/NeSHE#selection-33.0-333.104).  This compares to an average of 8,634 arrests per month by ICE in FY 2020.  *ICE Annual Report*, FY 2020 at 5 (showing 103,603 administrative arrests for the year) (available at: https://www.ice.gov/doclib/news/library/reports/annual-report/iceReportFY2020.pdf). Because Defendants' actions abrogate the executive's duty under art. II, § 3, Plaintiffs are likely to prevail on this cause of action.

## II.    THE PLAINTIFFS WILL SUFFER IRREPARABLE INJURY UNLESS THE COURT ISSUES A PRELIMINARY INJUNCTION.

An injury is irreparable if it cannot be adequately compensated by an award of damages.  *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472-73 (5th Cir. 1985).  As an aspect of that rule, courts may enjoin government officers "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected [by] an unconstitutional act, violating the Federal Constitution."  *Morales v. TWA,* 504 U.S. 374, 381 (1992).

The injuries to Plaintiff sheriffs and counties are irreparable.  The costs of detaining illegal aliens who commit local crimes and investigating those crimes go far beyond the dollar value of a detention bed for one day or the cost in man hours of investigating a particular crime.  The crisis created by the February 18 Memorandum has also interfered with all of the other law enforcement duties that Plaintiff sheriffs must perform.  The

officers and the detention beds simply are not available to perform the routine law enforcement actions that local law enforcement would otherwise be taking. Even if damages equal to the net fiscal cost that Plaintiffs have been forced to bear could be recovered from Defendants in the future, many aspects of the immediate injury could not be repaired. So, for example, if the high cost to a county of incarcerating illegal alien offenders means that the sheriff's office cannot hire another officer that year, the fact that damages might recovered at some time in the future does not repair the damage to the county of having one fewer law enforcement officer protecting the county's residents.

The injury to the Federal Police Foundation, ICE Officers Division, is also irreparable. Limited resources are being diverted because of the February 18 Memorandum in order to inform and advise ICE officers concerning their legal options in dealing with this unlawful memorandum. There is no way for a court to go back in time and permit the Foundation to attend to other concerns and priorities of the organization that otherwise would have been pursued.

In addition, the injury to the careers of ICE officer members of the Foundation who seek only to follow federal law, caused by unjust disciplinary action up to and including termination, is harm of an irreparable nature. Just as, for example, dollar values cannot easily be assigned to a company's loss of clientele, goodwill, marketing techniques, or office stability, *Martin v. Linen Systems for Hospitals, Inc.*, 671 S.W.2d 706, 710 (Tex. App. – Houston [1st Dist.] 1984, no writ), neither can the harm to ICE officers' reputations as law enforcement officers or the stigmatization of having been disciplined for resisting the illegal February 18 Memorandum be remedied by back pay for a suspension shorter

-26-

than the threshold for administrative review under the Civil Service Reform Act.

III.   **THE INJURY TO THE PLAINTIFFS GREATLY OUTWEIGHS ANY PURPORTED INJURY TO THE DEFENDANTS OR THE AGENCIES THAT THEY ADMINISTER.**

In contrast to the considerable, irreparable, and immediate harm that implementation of the February 18 Memorandum will inflict upon the plaintiffs, Defendants can claim no injury that would result from enjoining their implementation of the February 18 Memorandum.  Defendants can assert no national interest in refusing to detain or remove illegal aliens, because Congress itself discounted any such national interest when it enacted the three statutes that Defendants are violating.

Nor can Defendants claim that they lack the detention beds to comply with the requirements of the federal laws at issue in this case.  As was reported on April 5, 2021: "In 2019, ICE had 56,000 migrants in detention and currently pays for 29,000 adult beds. As of last week, ICE's average daily adult population was 14,134. At an average contract rate of $75 a day, the agency was paying $1,125,000 a day to maintain empty beds." (*FOX News*, "ICE detentions plunge under Biden, leaving thousands of empty beds," April 5, 2021, available at https://www.foxnews.com/politics/ice-detentions-plunge-under-biden-leaving-thousands-of-empty-beds).  Although ICE may be attempting to terminate its contracts with the private entities that provide those unused beds, it can certainly continue those contracts so as to meet its obligations under 8 U.S.C. §§ 1225(b)(2)(A) and 1226(c).

IV.   **INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.**

The grant of injunctive relief in this matter would serve four significant public

interests.  First, there is an immense public interest in the enforcement of the immigration laws of the United States.  This is specifically true where Congress has already weighed the public interest in imposing mandatory detention and/or removal requirements against any competing interests, and has proceeded to enact 8 U.S.C. §§ 1225(b), § 1226(c), and § 1231(a).  The February 18 Memorandum has forced ICE to stand down, reducing removals to approximately one-third of what they were a year ago.  That has compounded the immigration crisis that is unfolding in Texas and other States.  Injunctive relief in this matter would plainly serve the public interest in enforcing immigration laws and thereby reducing the magnitude of the immigration crisis.

Second, the implementation of the February 18 Memorandum poses a safety risk not only to the residents of Plaintiff counties, but also to all residents of the United States. As a direct result of the February 18 Memorandum, illegal aliens who have been convicted of aggravated sexual assault on a child, aggravated assault with a deadly weapon, larceny, burglary, domestic violence, carrying a prohibited weapon, possession of amphetamines, possession of cocaine, possession of heroin, possession of marijuana, resisting a law enforcement officer, and driving under the influence are being released into the public, rather than being detained and removed as required by federal law.  *See* Federal Police Foundation Affidavit.  The safety risk is particularly high in counties such as those represented in this case, where local law enforcement has been stretched so thin that it cannot adequately respond to the surge in crime.  In Kinney County, for example, 180 illegal aliens were arrested for various crimes in 2020; the number of illegal aliens arrested in 2021 as of the date of this filing is already over 420.  Coe Affidavit, attached, ¶ 7.  Every

day that passes is another day in which criminal aliens who evaded detention and/or removal because of the February 18 Memorandum have the opportunity to commit additional crimes.

Third, the February 18 Memorandum is costing the taxpayers of Plaintiff counties, and by extension the taxpayers of all fifty states, a great deal of money. In Kinney County, for example, the county's detention costs for 2020 are already more than $75,000 greater than they were for the entirety of 2021. *Id.* at ¶ 11. There are also many other law enforcement costs imposed upon Plaintiff counties, including the costs of responding to and investigating crimes that would not have occurred if the illegal alien perpetrator had been detained and/or removed by Defendants, as required by federal law. Kinney County estimates that over 4,000 additional law enforcement hours have already been required, and that the total additional law enforcement costs for 2021 will be approximately $300,000. *Id.* at ¶¶ 8, 12.

Fourth, the defiance of federal law by the executive branch is by its very nature a matter of immense public interest. "If the Secretary were to declare that he no longer would enforce [a particular law]" such a case "inevitably would be a matter of grave public concern." *Dunlop*, 421 U.S. at 574. Here, Defendants are not only declining to enforce federal immigration laws against illegal aliens, they are also ordering immigration officers themselves to violate the requirements of federal law.

## **REQUEST FOR RELIEF**

In light of the foregoing, Plaintiffs respectfully request that the Court issue a

preliminary injunction (a) restraining and enjoining Defendants from implementing or enforcing the February 18 Memorandum, or its predecessor January 20 Memorandum, Section B, or any similar successor Memorandum, (b) enjoining Defendants to fully comply with the statutory obligations imposed upon them by 8 U.S.C. §§ 1225(b), 1226(c), and 1231(a), (c) enjoining Defendants to reinstate the detainers that were lifted pursuant to the February 18 Memorandum, (d) enjoining Defendants to take custody of aliens arrested by local law enforcement when such aliens are unlawfully present in the United States, as required by 8 U.S.C. § 1225(b), and (e) granting Plaintiffs such other relief, at law or in equity, to which they may show themselves entitled.

In order to prevent the harms explained above, Plaintiffs seek a nationwide preliminary injunction pending resolution of this litigation.  The Plaintiff Federal Police Foundation seeks a nationwide injunction because its members are assigned to different offices in different States across the United States.  The Plaintiff sheriffs and counties also must seek a nationwide injunction because the failure of DHS to detain illegal aliens or place them into removal proceedings does not stop or start at the borders of Plaintiff counties.  Illegal alien criminals cross county boundaries and impose costs on any county or State in which they commit crimes.  Plaintiffs therefore request that this Court issue preliminary injunctive relief that is nationwide in scope.

Finally, Plaintiffs respectfully request that the Court set an expedited briefing schedule for the submission of Defendants' Response to this Motion and Plaintiffs' Reply thereafter, due to the urgency of this matter and the continuing injuries suffered by Plaintiffs.

Respectfully submitted,


Dated:  July 8, 2021          By: s/ Kris W. Kobach
                              **Kris W. Kobach** (*Attorney-in-charge*)
                              Kansas Bar No. 17280, admitted *pro hac vice*
                              Alliance for Free Citizens
                              P.O. Box 155
                              Lecompton, Kansas 66050
                              Telephone:  913-638-5567
                              kkobach@gmail.com

                              **Brent P. Smith**
                              Texas Bar No. 24080722, admitted *pro hac vice*
                              County Attorney, Kinney County, Texas
                              P.O. Box 365
                              Brackettville, Texas 78832
                              Telephone: 830-563-2240
                              bsmith@co.kinney.tx.us

                              **Christopher J. Hajec**
                              D.C. Bar No. 492551, *pro hac vice* admission pending
                              Immigration Reform Law Institute
                              25 Massachusetts Avenue, N.W.
                              Suite 335
                              Washington, D.C. 20001
                              Telephone:  202-323-5590
                              info@irli.org

                              **Kimberly Kreider-Dusek**
                              Texas Bar No. 50511919
                              County Attorney, McMullen County, Texas
                              P.O. Box 237
                              Tilden, Texas 78072
                              kimberly.dusek@mcmullencounty.org

                              **Douglas Poole**
                              Texas Bar. No. 16115600
                              S.D. Texas Bar. No. 619
                              McLeod, Alexander, Powel, & Apffel, P.C.

802 Rosenberg
Galveston, Texas 77553
Telephone:  409-763-2481
dwpoole@mapalaw.com


*Attorneys for Plaintiffs*

## CERTIFICATE OF CONFERENCE

I hereby certify that on this 8th day of July, 2021, I conferred with counsel for Defendants, and that Defendants are opposed to this motion.

/s Kris W. Kobach
KRIS W. KOBACH

## CERTIFICATE OF SERVICE

I hereby certify that this Motion for Preliminary Injunctive Relief has been served on Defendants by electronic mail to counsel for Defendants below on this 8th day of July, 2021.

/s Kris W. Kobach
KRIS W. KOBACH

Adam D. Kirschner
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044
Adam.Kirschner@usdoj.gov