**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| **SHERIFF BRAD COE in his official capacity and KINNEY COUNTY, TEXAS; SHERIFF J.W. GUTHRIE in official capacity and EDWARDS COUNTY, TEXAS; SHERIFF EMMETT SHELTON in his official capacity and MCMULLEN COUNTY, TEXAS; SHERIFF ARVIN WEST in his official capacity and HUDSPETH COUNTY, TEXAS; SHERIFF LARRY BUSBY in his official capacity and LIVE OAK COUNTY, TEXAS; SHERIFF NATHAN JOHNSON in his official capacity and REAL COUNTY, TEXAS; GALVESTON COUNTY, TEXAS; THE FEDERAL POLICE FOUNDATION, ICE OFFICERS DIVISION,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) ) | **Civil Action No. 3:21-CV-00168 SECOND AMENDED COMPLAINT** |
| **JOSEPH R. BIDEN, JR., President, in his official capacity; THE UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TROY MILLER, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## INTRODUCTION

1.      Plaintiffs are sheriffs of Texas counties in their official capacity and Texas counties, as well as the Federal Police Foundation, ICE Officers Division, an association of U.S. Immigration and Customs Enforcement ("ICE") officers.

2.      On January 20, 2021, the first day of the Biden Administration, the acting secretary of the U.S. Department of Homeland Security ("DHS") issued a memorandum ordering a department-wide review of "policies and practices concerning immigration enforcement."   *See* DHS Memorandum: Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities, at 2, available at: https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf ("January 20 Memorandum").   The January 20 Memorandum also established "interim enforcement priorities" pending the outcome of the policy review and ordered an "immediate pause on removals . . . for 100 days." *Id.* at 2-3.

3.      The January 20 Memorandum established three interim enforcement priorities:

> 1. **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.
> 2. **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.
> 3. **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a) (43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

*Id.* at 2. These priorities:

> apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action or parole.

*Id.*

4.     On February 18, 2021, Acting Director of ICE Tae Johnson issued a Memorandum to all ICE employees entitled "Interim Guidance:  Civil Immigration Enforcement Removal and Priorities," available at: https://www.ice.gov/doclib/news/releases/2021/021821_civil-immigration-enforcement_interim-guidance.pdf   ("February 18 Memorandum").   The Memorandum provides guidance on how to implement the enforcement priorities of the January 20 Memorandum and instructs ICE officers to refrain from placing aliens who are unlawfully present in the United States ("illegal aliens") into removal proceedings or from taking custody of such aliens unless they fall into very narrow categories of "cases that are presumed to be priorities."  Those cases consist principally of illegal aliens who pose a national security or terrorist threat to the United States, have been convicted of an aggravated felony as defined by section 101(a)(43) of the Immigration and Nationality Act) ("INA") (codified at 8 U.S.C. § 1101(a)(43)), or have recently arrived in the United States unlawfully (defined as those aliens who enter or attempt to enter the United States on or after November 1, 2020).

5.     According to the February 18 Memorandum, taking *any* enforcement action against illegal aliens falling outside of these narrow priority categories requires an ICE officer to obtain preapproval from a high-ranking field office director ("FOD") or special

agent in charge ("SAC") *before* taking action.  The ICE officer must go through the time-consuming and usually futile process of "rais[ing] a written justification through the chain of command, explaining why the action otherwise constitutes a justified allocation of limited resources, and identify the date, time, and location the enforcement action or removal is expected to take place."

6.     In implementing the February 18 Memorandum, ICE Defendants formalized the process whereby ICE officers could apply for preapproval to take an enforcement action against aliens falling outside of the priority categories, by creating the Arrest Authorization Request Tool (AART) system for officers to apply for preapproval using ICE computers.  The AART process is extremely burdensome and time consuming and has had the effect of discouraging ICE Officers from even attempting to apply for preapproval.

7.     In some ICE field offices, officers have been required to obtain approval from their supervisors before even beginning the AART request process. Typically, they must send an email to their supervisors and then receive permission to start the AART process.  In effect, those officers must obtain pre-preapproval, as well as pre-approval, to take any enforcement action against a non-priority alien.

8.     Shortly after the issuance of the February 18 Memorandum, in approximately March of 2021, U.S. Customs and Border Protection (CBP) Defendants implemented a dramatic shift in enforcement practices.  The Border Patrol in certain southwest border sectors began issuing new Notices to Report ("NTRs") to illegal aliens, rather than Notices to Appear ("NTAs").  Unlike the NTA, an NTR is not a charging

document and does not start a removal proceeding.  The NTR merely asks the alien to report to an ICE office within 60 days.  In the unlikely event that the alien actually shows up at an ICE office, the ICE officer dealing with the alien is supposed to issue an NTA and initiate the removal proceeding.

9.     At the same time, shortly after the issuance of the February 18 Memorandum, CBP implemented a policy of declining to detain illegal aliens apprehended at the southern border who are not expeditiously removed under 8 U.S.C. § 1225(b)(1)   or directed to remain in Mexico under 8 U.S.C. § 1225(b)(2)(C).

10.     As a result of the February 18 Memorandum and its implementation, the number of arrests and removals by ICE dropped precipitously, to levels one-third of what they were prior to the beginning of the Biden Administration.  In April 2021, ICE carried out fewer than 3,000 arrests, the lowest number on record.  ICE's approximately 6,000 officers were reported to be averaging one arrest every two months.  (*Washington Post*, "Biden administration reins in street-level enforcement by ICE as officials try to refocus agency mission," May 25, 2021, available at https://archive.is/NeSHE#selection-33.0-333.104).  This compares to an average of 8,634 arrests per month by ICE in FY 2020. *ICE Annual Report*, FY 2020 at 5 (showing 103,603 administrative arrests for the year) (available               at:               https://www.ice.gov/doclib/news/library/reports/annual-report/iceReportFY2020.pdf).

11.     This standdown in ICE enforcement, along with CBP replacing NTAs with NTRs in some sectors and CBP failing to detain illegal aliens in all sectors, has fueled a crisis at the border and in other Texas counties, encouraging a massive surge in illegal

immigration.  Monthly totals in apprehensions by Border Patrol agents are at levels not seen in over 21 years.  In March 2021, Border Patrol agents apprehended 173,337 aliens after they illegally entered the United States.   In April 2021, the number was 178,854.  In May 2021, the number was 180,034. In June 2021, the number was 189,020. In July 2021, the number was 213,534.  And in August 2021, the number was 208,887.  This compares to 50,014 during August 2020— or more than four times the previous year's total.  (Official statistics are available at: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters).

12.     On September 30, 2021, Defendant DHS Secretary Alejandro Mayorkas issued a Memorandum entitled "Guidelines for the Enforcement of Civil Immigration Laws"  available at https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf ("September 30 Memorandum").  The September 30 Memorandum stated that it would take effect on November 29, 2021, and would on that date serve to rescind the January 20 and February 18 Memoranda.  *See id*. at 6.

13.     The September 30 Memorandum identified the same three priority enforcement categories found in the previous Memoranda:  threats to national security, threats to public safety, and threats to border security.   *Id*. at 3-4.   However, the September 30 Memorandum modified the February 18 Memorandum so that *even priority category aliens cannot be presumptively subjected to enforcement actions*. Instead "investigative work" must be done before any enforcement action is taken; the September 30 Memorandum states that "our personnel should, to the fullest extent possible, obtain and review the totality of the facts and circumstances of the conduct at

6

issue.  The gravity of an apprehension and removal on a noncitizen's life, and potentially the life of family members and the community, warrants the dedication of investigative and evaluative effort."  *Id*. at 4.

14.     Although the September 30 Memorandum does not describe the approval process whereby "the totality of the facts and circumstances" will be assessed prior to taking enforcement actions, the AART system has remained in effect post-September 30, 2021.  In addition, it is the understanding of ICE officer members of the Federal Police Foundation, based on the statements of Defendant Secretary Mayorkas and the actions of ICE leadership, that the AART system will continue to be utilized prior to ICE officers being permitted to take enforcement actions after November 29, 2021.  In virtually every case, the "discretion" described in the September 30 Memorandum will not permit ICE officers to take any enforcement actions without first obtaining approval from their supervising officers.

15.     Importantly, in the threat to public safety category, the September 30 Memorandum made a significant change; the fact that an illegal alien has been convicted of an aggravated felony would no longer be sufficient to allow an officer to take an enforcement action.  As the Memorandum stated:  "Our personnel should not rely on the fact of conviction or the result of a database search alone."  *Id*. at 4.

16.     The September 30 Memorandum made clear repeatedly that a conviction for an aggravated felony, in and of itself, would not justify taking an enforcement action against such aliens.  The Memorandum stated, "Whether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories."  *Id*.

at 3.  Instead, "mitigating factors that militate in favor of declining enforcement action" would have to be considered."  The Memorandum listed the following examples of such factors:

> • advanced or tender age;
>
> • lengthy presence in the United States;
>
> • a mental condition that may have contributed to the criminal conduct…;
>
> • status as a victim of crime or victim, witness, or party in legal proceedings;
>
> • the impact of removal on family in the Unites states, such as loss of provider…:
>
> • whether the noncitizen may be eligible for humanitarian protection…;
>
> • military or other public service of the noncitizen or their immediate family;
>
> • time since an offense and evidence of rehabilitation;
>
> • conviction was vacated or expunged.

*Id*. at 3-4.

17.    The September 30 Memorandum also listed a smaller number of aggravative factors that could be considered in cases where an alien was convicted of a crime:

> • the gravity of the offense of conviction and the sentence imposed;
>
> • the nature and degree of harm caused by the criminal offense;
>
> • the sophistication of the criminal offense;
>
> • use or threatened use of a firearm or dangerous weapon;
>
> • a serious prior criminal record.

*Id*. at 3.

8

18.     Plaintiff sheriffs and Texas counties experienced a dramatic increase in the influx of illegal aliens and in criminal activity by illegal aliens resulting from the implementation of the unlawful and unconstitutional January 20 and February 18 Memoranda and the related standdown of federal immigration enforcement.

19.     When Plaintiff sheriffs or their deputies arrest illegal aliens who have committed crimes, their offices inform ICE, or in some cases CBP.  Prior to the January 20 Memorandum and the February 18 Memorandum, ICE issued detainer requests and/or took custody of such aliens and initiated removal proceedings against them as the Immigration and Nationality Act (INA) requires.

20.     Since the issuance of the February 18 Memorandum, ICE officers have been unable to take custody of, or issue detainer requests for, dangerous criminal aliens whose detention is mandated by 8 U.S.C. §1226(c). Specifically, detention is required for aliens who have committed or been convicted of numerous crimes other than aggravated felonies, such as: crimes of moral turpitude, crimes involving controlled substances, human trafficking, money laundering, and certain firearm offenses.  *Id*.; *see also* 8 U.S.C. §§ 1182(a)(2) and 1227(a)(2) (listing crimes that render aliens inadmissible or deportable, respectively).  Written requests for preapproval to take enforcement actions against such non-priority criminal aliens are systematically denied by FODs and SACs.

21.     The September 30 Memorandum specifically stated that a conviction for a crime of moral turpitude (domestic violence) would no longer be sufficient to justify taking an enforcement action against such an alien criminal:  "For example, a categorical determination that a domestic violence offense compels apprehension and removal could

make victims of domestic violence more reluctant to report the offense conduct.  The specific facts of a case should be determinative."  September 30 Memorandum, at 4.  As is further explained below, this violates 8 U.S.C. §1226(c)(1)(A), which categorically makes the detention of such an alien mandatory, regardless of any specific facts.

22.     Prior to the January 20 Memorandum and the February 18 Memorandum, ICE officers routinely issued detainers to take custody of illegal aliens who, after being arrested and charged with crimes by local law enforcement, had posted bond, thereby keeping dangerous criminal aliens off the streets and ensuring that such aliens were eventually removed from the country.  Since then, ICE officers have not been permitted to take custody of such illegal aliens.

23.     Prior to the January 20 Memorandum and the February 18 Memorandum, ICE officers routinely took custody of criminal aliens who, after serving time for the commission of state crimes, were about to be released.  ICE officers were contacted by local law enforcement so that ICE could take custody of the aliens upon their release and remove them from the country.  Since then, in many cases ICE officers have not been permitted to take custody of such criminal aliens.  As a result, numerous criminal aliens have been released onto the streets.

24.     In addition, since the issuance of the February 18 Memorandum, ICE officers have no longer been permitted to take custody of most of the inmates in Plaintiffs' jails who previously would have been transferred to ICE as a result of the "287(g)" agreements between those counties and ICE (referring to 8 U.S.C. § 1357(g)).

25.     In a wide variety of other circumstances, ICE officers are, contrary to federal statute, no longer permitted to remove dangerous illegal aliens who present a criminal threat because those aliens do not fall into the very narrow categories of "cases that are presumed to be priorities" under the February 18 Memorandum.   After the September 30 Memorandum becomes effective, even public safety priority aliens will not be subjected to enforcement action without preapproval through the AART system, or preapproval through a similar process whereby the various aggravating mitigating factors are weighed prior to any enforcement action.  *See* September 30 Memorandum, at 3-4.

26.     Plaintiff sheriffs are no longer able to present to ICE criminal aliens for detention or removal and expect them to be detained or removed.

27.     The detention costs, crime response costs, crime investigation costs, and related costs experienced by the Plaintiff sheriffs and counties have consequently increased dramatically for at least four related reasons: (1) recidivism by illegal alien criminals who have been released, (2) the fact that ICE is no longer taking custody of illegal aliens who have committed crimes in the counties, (3) the related fact that the average period of county detention for illegal alien criminals is now longer, and (4) the entry of new illegal alien criminals into the counties encouraged by Defendants' shutdown of immigration enforcement.

28.     On May 31, 2021, as a result of the criminal activity and other adverse consequences of the surge in illegal immigration, Texas Governor Greg Abbott issued a proclamation of disaster covering 34 Texas counties.  On June 25, 2021, the Governor issued an amended proclamation of disaster covering 28 Texas counties.  On July 1,

2021, the Governor issued another amended proclamation of disaster covering 35 Texas counties. Every county represented in this complaint is included in the disaster areas described in the second and third proclamations.

29.     As detailed below, the February 18 and September 30 Memoranda command ICE officers to violate the specific terms of several federal immigration statutes, violate the Administrative Procedure Act ("APA"), and violate the obligation of the executive branch faithfully to execute the law, as required by Article II, Section 3, of the United States Constitution.

30.     Plaintiffs bring this civil action to seek injunctive relief preventing the continued implementation of the unlawful and unconstitutional January 20, February 18, and September 30 Memoranda and requiring, instead, ICE and CBP leadership to detain and/or remove illegal aliens as required by federal law.

## THE PARTIES

### Plaintiffs

31.     Plaintiff Brad Coe is the Sheriff of Kinney County, Texas, acting in his official capacity.  The Kinney County Sheriff's Office is located at 109 North Street, Brackettville, Texas.  The Sheriff's Office operates the Kinney County Jail, which can house 14 inmates and is used to detain individuals arrested for the commission of crimes in Kinney County.

32.     Plaintiff Kinney County, Texas, is a county of 1,365 square miles with a population of 3,598 in the 2010 census.

12

33.     Plaintiff J.W. Guthrie is the Sheriff of Edwards County, Texas, acting in his official capacity.  The Edwards County Sheriff's Office is located at 404 West Austin Street, Rocksprings, Texas.  The Sheriff's Office operates the Edwards County Jail, which can house 20 inmates and is used to detain individuals arrested for the commission of crimes in Edwards County.

34.     Plaintiff Edwards County, Texas, is a county of 2,118 square miles with a population of 2,002 in the 2010 census.

35.     Plaintiff Emmett Shelton is the Sheriff of McMullen County, Texas, acting in his official capacity.  The McMullen County Sheriff's Office is located at 401 Main Street, Tilden, Texas.   The Sheriff's Office detains individuals arrested for the commission of crimes in McMullen County in the jails of Live Oak County and Atascosa County at a cost of $55.00 and $48.00 per day, per inmate, respectively.

36.     Plaintiff McMullen County, Texas, is a county of 1,157 square miles with a population of 707 in the 2010 census.

37.     Plaintiff Arvin West is the Sheriff of Hudspeth County, Texas, acting in his official capacity.  The Hudspeth County Sheriff's Office is located at 525 N. Wilson Avenue, Sierra Blanca, Texas.  The Sheriff's Office operates the Hudspeth County Jail, which can house 103 inmates and is used to detain individuals for the commission of crimes in Hudspeth County.

38.     Plaintiff Hudspeth County, Texas, is a county of 4,572 square miles with a population of 3,426 in the 2010 census.

39.     Plaintiff Larry Busby is the Sheriff of Live Oak County, Texas, acting in his official capacity.  The Live Oak County Sheriff's Office is located at 200 Larry R. Busby Drive, George West, Texas.  The Sheriff's Office operates the Live Oak County Jail, which can house 96 inmates and is used to detain individuals for the commission of crimes in Live Oak County and other counties.

40.     Plaintiff Live Oak County, Texas, is a county of 1,079 square miles with a population of 11,531 in the 2010 census.

41.     Plaintiff Nathan Johnson is the Sheriff of Real County, Texas.  The Real County Sheriff's Office is located at 146 Highway 83 South, Leakey, Texas.  The Sheriff's Office operates the Real County Jail, which can house three inmates and is used to detain individuals arrested for the commission of crimes in Real County.  The Sheriff's Office also detains individuals arrested for the commission of crimes in Real County in the jails of Uvalde, Bandera, Edwards, Kerr, Dimmit, Val Verde Counties, at a cost ranging from $56.00 to $80.00 per day, per inmate.

42.     Plaintiff Real County, Texas, is a county of 700 square miles with a population of 3,309 in the 2010 census.

43.     Plaintiff Galveston County, Texas, owns and operates the Galveston County Jail through the Galveston County Sheriff's Office.  The Galveston County Jail can house up to approximately 1,171 inmates.  It costs Galveston County $69.43 per person, per day, to detain someone in the Galveston County Jail.

44.     Plaintiff Galveston County, Texas, is a county of 873 square miles with a population of 291,309 in the 2010 census and an estimated population of 342,139 in 2019.

45.     Plaintiff sheriffs have each taken an oath of office pursuant to Article XVI, § 1(a) of the Texas Constitution and § 85.001 of the Texas Local Government Code to execute faithfully the duties of their office and, to the best of their ability, to preserve, protect, and defend the Constitution and laws of the United States and of Texas.

46.     Plaintiff Federal Police Foundation is a nonprofit association of federal law enforcement officers registered in the State of Delaware.  The purposes of the Federal Police Foundation include, *inter alia*, conducting research, informing federal law enforcement officers about legal and policy issues affecting their work, and informing the public about federal law enforcement matters.  The ICE Officers Division of the Federal Police Foundation includes members who are ICE officers actively serving in immigration law enforcement and who are being compelled to implement the January 20, February 18, and September 30 Memoranda in violation of federal law.  Members of the Federal Police Foundation, ICE Officers Division, are serving in the Southern District of Texas.

**Defendants**

47.     Defendants are the United States of America, President Joseph R. Biden, Jr., and officials in the U.S. Department of Homeland Security ("DHS").  All Defendants are sued in their official capacity only.

48.     Defendant Joseph R. Biden, Jr. is the President of the United States and is responsible for taking care that the laws of the United States are faithfully executed.

49.     Defendant United States of America is the federal sovereign.

50.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security and the head of DHS and in his official capacity is responsible for the enforcement of federal immigration laws, 6 U.S.C. § 112, 8 U.S.C. § 1101, *et seq.*, pursuant to 8 U.S.C. § 1103(a)(2).

51.     Defendant U.S. Department of Homeland Security oversees ICE and CBP in their enforcement of federal immigration laws.

52.     Defendant Tae Johnson is the Acting Director of ICE and in his official capacity is responsible for administering all operations of ICE.

53.     Defendant ICE is the component agency of DHS that is principally responsible for the enforcement of federal immigration and customs laws in the interior of the United States, including the removal of those aliens not lawfully present in the United States.

54.     Defendant Troy Miller is the Acting Commissioner of CBP and in his official capacity is responsible for administering all operations of CBP.

55.     Defendant CBP is the component agency of DHS that is principally responsible for the enforcement of federal immigration laws at the international borders of the United States, for managing and protecting and those borders, and for overseeing customs enforcement at international ports of entry.

56.     Defendant Johnson issued the February 18 Memorandum.  Defendant Johnson is not authorized to promulgate regulations implementing the Immigration and Nationality Act in the Department of Homeland Security.

57.     Defendant Mayorkas is the official authorized to promulgate regulations implementing the Immigration and Nationality Act in the Department of Homeland Security.

## JURISDICTION AND VENUE

58.     This Court has subject matter jurisdiction over Plaintiffs' claims under the Constitution and laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 702 and 703. This Court is authorized to grant Plaintiffs' requests for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1361, 2201, and 2202 and 5 U.S.C. §§ 705 and 706.

59.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the Plaintiffs named in this complaint are sheriffs of Texas counties who reside and exercise their law enforcement duties in the State of Texas, or counties in the State of Texas.  McMullen County, Live Oak County, and Galveston County are in the Southern District of Texas.  Plaintiff Federal Police Foundation, ICE Officers Division, includes members who are ICE officers serving in the Southern District of Texas.  Galveston County is the location of the Galveston Division of the Southern District of Texas.

## THE THREE MEMORANDA AND RELATED EVENTS

60.     The January 20 Memorandum did not consider any of the significant harms that the States, their political subdivisions, government officials such as county sheriffs,

or the public would face as a result of DHS listing such a narrow set of enforcement priorities, including its failure to take custody, as required by federal law, of certain illegal aliens arrested by local law enforcement agencies and its failure to initiate removal proceedings against illegal aliens whose removal is required by federal law.

61.     The January 20 Memorandum was issued without notice and comment as required under the APA.

62.     On February 18, 2021, Acting Director of ICE Tae Johnson issued the February 18 Memorandum providing guidance on how ICE was to implement the enforcement priorities iterated in the January 20 Memorandum.

63.      The February 18 Memorandum stated that it "shall be applied to all civil immigration enforcement and removal decisions," including "whether to issue a detainer [or] assume custody of a noncitizen subject to a previously issued detainer," "whether to issue, serve, file, or cancel a Notice to Appear," "whether to stop, question, or arrest" an alien for violating immigration laws, and "whether to detain or release from custody subject to conditions." February 18 Memorandum at 3.

64.     The February 18 Memorandum retained the three enforcement priority categories adopted in the January 20 Memorandum and added criminal gang members to the public safety category. *Id.* at 4-5. Thus, the only priority enforcement categories consisted of 1) terrorists, spies, or other national security risks; 2) recent arrivals (defined as those aliens who enter or attempt to enter the United States on or after November 1, 2020); and 3) aggravated felons and criminal gang members who pose a risk to public safety. *Id.*

65.     The February 18 Memorandum directed immigration officers to exercise their discretion in taking enforcement actions against aliens who fall within one of the three priority categories but requires preapproval by a FOD or SAC before any enforcement action may be taken against an alien who falls outside those priority categories. *Id.* at 5-6.

66.     Regarding non-priority aliens an ICE officer encounters, the February 18 Memorandum purported to narrow the options available to the ICE officer:  either seek preapproval to take enforcement actions or take no enforcement action at all.  These restrictions on taking enforcement actions apply even where federal law makes detention and/or removal of the aliens *mandatory*.

67.     The February 18 Memorandum did not consider any of the significant harms that the States, counties, county sheriffs, their respective offices, or the public would face as a result of ICE no longer obeying federal statutes requiring the mandatory detention and removal of certain illegal aliens, including its failure to take custody of certain illegal aliens arrested by local law enforcement agencies and its failure to initiate removal proceedings against illegal aliens whose removal is required by federal law.

68.     The February 18 Memorandum was issued without the notice and comment that the APA requires.

69.     The February 18 Memorandum stated that Defendant Secretary Mayorkas anticipated issuing new enforcement guidelines in less than 90 days.  February 18 Memorandum, at 1.  It was more than 220 days later when he issued the enforcement guidelines contained in the September 30 Memorandum.

70.     The September 30 Memorandum did not consider any of the significant harms that the States, counties, county sheriffs, their respective offices, or the public would face as a result of ICE no longer obeying federal statutes requiring the mandatory detention and removal of certain illegal aliens, including its failure to take custody of certain illegal aliens arrested by local law enforcement agencies and its failure to initiate removal proceedings against illegal aliens whose removal is required by federal law.

71.     The September 30 Memorandum was issued without the notice and comment that the APA requires.

72.     The replacement of NTAs with NTRs in some Border Patrol sectors was done without consideration of any of the significant harms that the States, counties, county sheriffs, their respective offices, or the public would face as a result of CBP no longer obeying federal statutes requiring the mandatory detention and removal of certain illegal aliens, including its failure to initiate removal proceedings against illegal aliens whose removal is required by federal law.

73.     The INA does not grant Defendants the authority to replace NTAs with NTRs, but even if it did, Defendants failed to enact that substantive policy by complying with the APA's notice and comment requirement.

74.     Defendants are no longer requiring ICE and CBP officers to detain or initiate removal proceedings against large numbers of illegal aliens whose detention and/or removal is required by federal law.

75.     After the January 20 Memorandum, Defendants began reviewing all cases in which detainer requests ("detainers") had been placed on illegal aliens in state or local

custody. Detainers are formal requests that those aliens be transferred to ICE custody and that those aliens not be released. This review, which continued under the February 18 Memorandum and is contemplated by the September 30 Memorandum, is to determine if the relevant aliens fit within the priority enforcement categories. If the alien does not, ICE lifts the detainer. As a result, hundreds, if not thousands, of detainers on criminal aliens have been lifted since January 20, 2021.

76.     After the February 18 Memorandum, ICE officers in at least one field office were ordered to identify all NTAs that had been issued regarding aliens who did not fall within the three priority categories and to present those cases to their front-line supervisors. The front-line supervisors then cancelled those NTAs that fell outside of the three priority categories. This screening and cancellation of NTAs that were previously issued has continued to the date of this filing, including after the September 30 Memorandum.

77.     The preapproval process established by the February 18 Memorandum is intended to discourage ICE officers from taking enforcement actions required by law, and FODs and SACs have rarely granted preapproval for enforcement actions against non-priority aliens.

78.     In the very rare cases in which ICE FODs and SACs actually grant preapproval, the length of time taken has been extraordinarily long. For example, in one of the cases in which preapproval was granted, involving an alien charged with the rape of a child, the request for preapproval was submitted on May 6, 2021. Preapproval was not granted until 53 days later, on June 28, 2021.

79.     The time-consuming paperwork and the low probability of preapproval being granted have caused many ICE officers not even to attempt to seek preapproval.

80.     Many extremely dangerous illegal aliens who would have been detained prior to the February 18 Memorandum consistent with federal statutes are now being released from custody, against the judgment of the ICE officers seeking to detain them, and in violation of federal statutes requiring their detention and/or removal.  Several illustrative cases (with names omitted) from ICE offices in Texas and other States are as follows.

81.     Case A involves an illegal alien who was previously deported twice and is in local custody facing pending charges for aggravated assault.  ICE officers put a detainer in place to request custody, prior to the beginning of the Biden Administration.  At some point after January 20, 2021, an evaluation of all cases was ordered.  Following this evaluation, ICE officers were directed to remove the detainer because detaining the alien did not meet the requirements of the February 18 Memorandum.

82.     Case B involves an illegal alien who was previously deported four times and has again returned to the United States.  He has been convicted of domestic violence, evading arrest, and multiple counts of driving under the influence.  He now has an additional driving under the influence charge pending.   ICE officers requested preapproval to place a detainer on the alien under the February 18 Memorandum process.  ICE management denied the request.  As a result, this dangerous, previously-deported, criminal alien remains on the street, able to drive under the influence once again.

83.    Case C involves an illegal alien who is a fugitive with a final order of removal and who faces a pending local charge of aggravated assault.  ICE officers initiated the time-consuming preapproval process in the hope of detaining him prior to his release on bond.  However, the subject posted bond before ICE management issued a decision on the preapproval request.  This dangerous illegal alien is now at large.

84.    Case D involves an illegal alien who was previously deported and has returned to the United States.  He has been convicted of sexual battery against a child.  ICE officers requested preapproval to make an arrest under the February 18 Memorandum process.  ICE management denied their request.  As a result, this dangerous, previously-deported, criminal alien remains on the street.

85.    Case E involves an illegal alien who was previously deported two times and returned to the United States.  Local police initiated an arrest of the alien for the sale of heroin.  The alien attempted to evade arrest by ramming the police car with his vehicle, nearly hitting an officer who was standing outside of the police car.  The alien was eventually arrested and found to have a quarter of a pound of heroin in his possession, as well as a female and a baby in the back seat of his vehicle.  He faces pending local charges of distribution of heroin, aggravated assault, endangerment of a child, and failure to stop at the command of police.  ICE officers requested preapproval to place a detainer on the illegal alien in order to detain him when he is released from local custody.  ICE management denied the preapproval request.

86.    Case F involves an illegal alien who was previously deported and has returned to the United States.  He has been convicted of sexual assault of a minor under

14.   ICE officers requested preapproval to make an arrest under the February 18 Memorandum process.   ICE management denied their request, stating that the alien's conviction was too old to warrant his removal.   As a result, this dangerous, previously-deported, criminal alien remains on the street.

87.   Case G involves an illegal alien who was previously deported and has returned to the United States.   He was convicted of indecency with a child with sexual contact and sentenced to 5 years of confinement.   He was also registered as a sex offender for life.   Prior to the beginning of the Biden Administration, the relevant ICE officer initiated an investigation of the case.   At some point after January 20, 2021, an evaluation of all pending cases was ordered.   Following the issuance of the February 18 Memorandum, the ICE officer determined that it would be futile to file an AART request to obtain preapproval.   As a result, this dangerous, previously-deported, criminal alien remains on the street.

88.   Case H involves an illegal alien who was previously deported and has returned to the United States.   He has been convicted of alien smuggling (an aggravated felony) and theft.   ICE officers requested preapproval to make an arrest under the February 18 Memorandum process.   ICE management denied their request, stating that the alien's conviction was too old to warrant his removal and that he did not pose an immediate threat to public safety.   As a result, this dangerous, previously-deported, criminal alien remains on the street.

89.   Since the issuance of the February 18 Memorandum, many detainers that were in place for criminal aliens have since been lifted because they were deemed not to

meet the threshold for enforcement under the February 18 Memorandum.  The crimes committed by illegal aliens whose detainers have been lifted include, *inter alia*: aggravated sexual assault on a child, aggravated assault with a deadly weapon, larceny, burglary, domestic violence, carrying a prohibited weapon, possession of amphetamines, possession of cocaine, possession of heroin, possession of marijuana, resisting a law enforcement officer, and driving under the influence.

90.     Since the issuance of the February 18 Memorandum, CBP officers have been constrained from taking enforcement actions against illegal aliens who are apprehended crossing the border, including aliens who fall within the priority categories of the February 18 and September 30 Memoranda.  Detention of such aliens and the institution of removal proceedings are required by federal statute, but contrary to law, Defendants have ordered CBP officers to release the aliens into the United States without detaining the aliens or taking steps to initiate removal proceedings.

91.     The replacement of NTAs with NTRs has enabled illegal aliens entering the country to ignore the NTR without facing the consequence of a removal order being issued in absentia.  In contrast, an alien who fails to show up at an immigration court proceeding specified in an NTA is ordered removed in absentia.

92.     According to August 6, 2021, ICE figures, from March 21, 2021, to July 30, 2021, CBP released 65,531 aliens with an NTR after those aliens arrived illegally at the southern border.  Of those, only 8,582 had reported to an ICE office for the issuance of a charging document (the NTA).  That is a compliance rate of only 13 percent.

93.     In FY2019, by utilizing contracts with other detention facilities, ICE was able to increase its detention capacity to more than 56,000 aliens, and the average daily detained population was 50,165.  *See* U.S. Immigration and Customs Enforcement, *ERO FY 2019 Achievements*, available at https://www.ice.gov/features/ERO-2019.  That is more than double the current detained population.  Since January 20, 2021, ICE has significantly reduced its use of contracts to acquire additional detention capacity.  If complying with federal law required Defendants to once again utilize that additional detention capacity, they could do so.

## FEDERAL STATUTORY BACKGROUND

94.     In 1996, Congress sought to reduce executive discretion significantly in the enforcement of federal immigration laws: "[I]mmigration law enforcement is as high a priority as other aspects of Federal law enforcement, and illegal aliens do not have the right to remain in the United States undetected and unapprehended."  H.R. Rep. No. 104-725 (1996), at 383.

95.     In several statutory sections, Congress eliminated the discretion that existed previously regarding the detention and/or removal of certain aliens, and replaced the discretionary regime with a mandatory regime.

96.     Enacted in 1996, 8 U.S.C. § 1225(a)(1) provides that "an alien present in the United States who has not been admitted … shall be deemed for purposes of this chapter an applicant for admission."

97.     8 U.S.C. § 1225(a)(3) provides that all applicants for admission "shall be inspected by immigration officers."

98.     8 U.S.C. § 1225(b)(2)(A) mandates that "if the examining immigration officer determines that an alien seeking admission is not *clearly and beyond a doubt* entitled to be admitted, the alien *shall* be detained for of this title." (emphasis added). Proceedings under 8 U.S.C. § 1229a are regular removal proceedings before an immigration judge.

99.     A parallel section at 8 U.S.C. § 1225(b)(1) applies to aliens arriving in the United States who either lack entry documents or attempt to gain admission through misrepresentation, and who are therefore subject to expedited removal.  The language of this section is also mandatory:  "the officer *shall* order the alien removed from the United States without further hearing or review" unless the alien seeks asylum or asserts a fear of persecution.  8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added).

100.     The Northern District of Texas has interpreted 8 U.S.C. § 1225(b)(2)(A) as imposing a *mandatory obligation* upon ICE to detain and initiate removal proceedings against aliens encountered by ICE officers:  "The Court finds that Congress's use of the word 'shall' in Section 1225(b)(2)(A) imposes a mandatory obligation on immigration officers to initiate removal proceedings against aliens they encounter who are not 'clearly and beyond a doubt entitled to be admitted.'  *Crane v. Napolitano*, Case No. 3:12-cv-03247-O (N.D. Tex. April 23, 2013), slip op. at 15.

101.     The mandatory obligation imposed by 8 U.S.C. § 1225(b)(2)(A) leaves no room for the discretion by immigration officers described in the February 18 and September 30 Memoranda or the preapproval process created by the February 18 Memorandum.

102.    The mandatory obligations of 8 U.S.C. § 1225(b)(2)(A) and 8 U.S.C. § 1225(b)(1)(A) apply to "immigration officers," a term that encompasses both ICE and CBP officers.

103.    The February 18 Memorandum and the September 30 Memorandum violate the mandatory commands of 8 U.S.C. § 1225(b)(1)(A) and (2)(A) by making the detention and removal of illegal aliens encountered by ICE officers discretionary in some cases, and impermissible in others unless preapproval is granted by an ICE FOD or SAC.

104.    The CBP policy of issuing NTRs instead of NTAs to aliens apprehended at the border violates the mandatory command of 8 U.S.C. § 1225(b)(2)(A), by failing to initiate a "a [removal] proceeding under section 1229a."

105.    The CBP policy of failing to detain illegal aliens apprehended at the southern border who are not expeditiously removed under 8 U.S.C. § 1225(b)(1)(A)  or directed to remain in Mexico under 8 U.S.C. § 1225(b)(2)(C) violates the mandatory command that such arriving aliens be detained pending removal. *See* 8 U.S.C. §§ 1225(b)(1)(B)(ii) (If it is determined that an alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum."); 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); 1225(b)(2)(A) ("[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.").

106.    A second federal statute that has been violated through the implementation of the February 18 and September 30 Memoranda is 8 U.S.C. § 1226(c), which makes the detention of certain aliens mandatory, pending adjudication of their removal proceedings and ultimately their removal from the United States.

107.    The categories of aliens whom DHS "shall take into custody" under 8 U.S.C. § 1226(c) include those who have committed an offense covered in 8 U.S.C. § 1182(a)(2), which includes "any alien convicted of . . . a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance."  8 U.S.C. § 1182(a)(2)(A)(i)(II).  8 U.S.C. § 1226(c)(1)(C) also requires the detention of aliens convicted of crimes of moral turpitude (referring to 8 U.S.C. § 1227(a)(2)(A)(i)).  8 U.S.C. § 1226(c) also mandates the detention of aliens convicted of certain firearms offenses.

108.    Aliens in the mandatory detention categories listed above fall outside of the priority enforcement categories of the February 18 Memorandum and therefore can *only* be detained by an ICE officer if preapproval from a FOD or SAC is obtained.  This violates the mandatory detention requirement of 8 U.S.C. § 1226(c), which leaves no room for discretion.

109.    The mandatory detention obligation of 8 U.S.C. § 1226(c) applies to both ICE and CBP officers.

110.    The February 18 Memorandum violates 8 U.S.C. § 1226(c) by making discretionary the detention of relevant aliens who fall outside of the priority enforcement categories.  The mandatory obligation imposed by 8 U.S.C. § 1226(c) leaves no room for

discretion by immigration officers or the preapproval process created by the February 18 Memorandum.

111.   The September 30 Memorandum compounds this violation of 8 U.S.C. § 1226(c) by making the detention of aliens who fall inside the priority enforcement categories discretionary as well.   The mandatory obligation imposed by 8 U.S.C. § 1226(c) leaves no room for discretion by immigration officers.

112.   The September 30 Memorandum also violates 8 U.S.C. § 1226(c) by unequivocally stating, "[o]ur personnel should not rely on the fact of conviction or the result of a database search alone" in deciding whether to detain or remove an illegal alien. September 30 Memorandum, at 4.   However, 8 U.S.C. § 1226(c) makes the detention of certain aliens mandatory, based solely on the fact that a qualifying conviction has occurred.

113.   A third statute that has been violated through the implementation of the February 18 Memorandum is 8 U.S.C. § 1231(a), which makes the removal of certain aliens mandatory.   8 U.S.C. § 1231(a)(1)(A) requires the removal of any alien who is subject to a final order of removal.   The executive branch "shall remove the alien from the United States within a period of 90 days."   8 U.S.C. § 1231(a)(5) requires the removal of an alien who has reentered the United States illegally after having been removed: "[T]he alien shall be removed under the prior order at any time after the reentry."

114.   The February 18 Memorandum violates 8 U.S.C. § 1231(a) by applying the preapproval process to "deciding when and under what circumstances to execute final orders of removal."   February 18 Memorandum at 3.   This makes discretionary the

removal of aliens subject to a final order of removal who fall outside of the priority enforcement categories.  The mandatory obligation imposed by 8 U.S.C. § 1231(a) leaves no room for discretion by immigration officers or the preapproval process created by the February 18 Memorandum.

115.   The September 30 Memorandum continues a preapproval process whereby ICE and CBP personnel must justify enforcement with "compelling facts that warrant enforcement action," September 30 Memorandum, at 4; and it compounds the violation of 8 U.S.C. § 1231(a) by making the removal of aliens inside the priority removal categories subject to discretion as well.  The September 30 Memorandum also violates 8 U.S.C. § 1231(a) by directing immigration officers to apply the following unlawful standard:  "The fact that an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them."  September 30 Memorandum, at 2.

116.   The February 18 Memorandum and the September 30 Memorandum thus transform a mandatory removal requirement under federal law into a discretionary policy as it pertains to the removal of aliens subject to a final order of removal.

**IRREPARABLE INJURY CAUSED BY DEFENDANTS' ACTIONS**

117.   Defendants' failure to detain and/or remove illegal aliens as required by federal law significantly injures the Plaintiff sheriffs and counties.

118.   Detaining illegal alien criminals imposes significant costs upon the Plaintiff sheriffs and counties.  These costs include the financial cost of detention and the consumption of scarce county law enforcement resources.

119.   Those detention costs have already increased substantially since the implementation of the January 20 and February 18 Memoranda and will continue to remain elevated under the September 30 Memorandum as a result of Defendants' failure to detain and/or remove illegal aliens, particularly those involved in criminal activity, because it increases the number of criminal illegal aliens that Plaintiff sheriffs and counties must detain.

120.   The cost of detaining additional individuals is significant, ranging from $48.00 to $80.00 per inmate, per day.

121.   In Kinney County, there has been a dramatic increase in the number of crimes committed by illegal aliens following the implementation of the January 20 and February 18 Memoranda.  From February to the beginning of July in 2021, the County apprehended more than 420 illegal aliens for the commission of various crimes.  This compares to 180 illegal aliens apprehended during all of 2020.

122.   As a result of this surge in illegal immigration and crimes by illegal aliens, since February 18, 2021, the Kinney County jail, which can hold 14 inmates, has been full or near full.  In addition, the Kinney County sheriff's office will have between 10-12 inmates detained in other counties' facilities at a cost of $70.00 per person, per day.

123.   As of July 1, 2021, the cost of detentions to Kinney County was already $75,000 greater than in was in all of 2020.

124.   The increase in Kinney County detention costs is principally attributable to Defendants' three Memoranda, due to (1) recidivism by illegal alien criminals who have been released, (2) the fact that ICE is no longer taking custody of illegal aliens who have

committed crimes in the county, (3) the related fact that the average period of county detention for illegal alien criminals is now longer, and (4) the entry of new illegal alien criminals into the county encouraged by Defendants' shutdown of immigration enforcement.

125.    In Edwards County, there has been a significant increase in the number of crimes committed by illegal aliens following the implementation of the January 20 and February 18 Memoranda.  During the February-July period of 2021, there were 62 percent more criminals booked into the Edwards County Jail than during the same period in 2020.

126.    After February 2021, the population of inmates in the Edwards County jail doubled, from 9 or fewer, to 18-21.  The vast majority of detainees arrested by the Edwards County Sheriff's Office since February 2021 have been either illegal aliens, or persons involved in criminal activity relating to illegal immigration.

127.    During the February-July 2021 period, the cost of the additional detentions to Edwards County, over and above the normal detention costs, was over $91,000.

128.    The increase in Edwards County detention costs is principally attributable to Defendants' three Memoranda, due to (1) recidivism by illegal alien criminals who have been released, (2) the fact that ICE is no longer taking custody of illegal aliens who have committed crimes in the county, (3) the related fact that the average period of county detention for illegal alien criminals is now longer, and (4) the entry of new illegal alien criminals into the county encouraged by Defendants' shutdown of immigration enforcement.

129.   In McMullen County, there has been a significant increase in the number of crimes committed by illegal aliens following the implementation of the January 20 and February 18 Memoranda.  During the period of February-July 2020, 54 people were arrested for criminal activities.  During the period of February-July 2021, 451 people were arrested for criminal activities.  The number of criminal arrests in 2021 is therefore more than eight times what it was during the same period in 2020.

130.   As a result of the sharp increase in crime caused by illegal aliens and those smuggling illegal aliens, McMullen County's criminal detention costs have risen, from $52,870 during February-July 2020 to $85,024 during February-July 2021.   That is an increase of $32,154.

131.   The increase in McMullen County detention costs is principally attributable to Defendants' three Memoranda, due to (1) recidivism by illegal alien criminals who have been released, (2) the fact that ICE is no longer taking custody of illegal aliens who have committed crimes in the county, (3) the related fact that the average period of county detention for illegal alien criminals is now longer, and (4) the entry of new illegal alien criminals into the county encouraged by Defendants' shutdown of immigration enforcement.

132.   In Galveston County, there has been an increase in the number of crimes committed by illegal aliens following the implementation of the January 20 and February 18 Memoranda.  During the February-July period of 2021, there were 30 percent more criminals booked into the Galveston County Jail than during the same period in 2020.

133.   It costs Galveston County $69.43 per person, per day, to detain an inmate in its jail.  Galveston County detention costs rose accordingly, during the February-July 2021 period.

134.   The increase in Galveston County detention costs is attributable in part to Defendants' three Memoranda, due to (1) recidivism by illegal alien criminals who have been released, (2) the fact that ICE is no longer taking custody of illegal aliens who have committed crimes in the county, (3) the related fact that the average period of county detention for illegal alien criminals is now longer, and (4) the entry of new illegal alien criminals into the county encouraged by Defendants' shutdown of immigration enforcement.

135.   In Hudspeth County, there has been a significant increase in the number of crimes committed by illegal aliens following the implementation of the January 20 and February 18 Memoranda.

136.   There has been an attendant increase in the number of criminals detained by Hudspeth County and in in the detention costs borne by the County since the implementation of the January 20 and February 18 Memoranda.

137.   The increase in Hudspeth County detention costs is principally attributable to Defendants' three Memoranda, due to (1) recidivism by illegal alien criminals who have been released, (2) the fact that ICE is no longer taking custody of illegal aliens who have committed crimes in the county, (3) the related fact that the average period of county detention for illegal alien criminals is now longer, and (4) the entry of new illegal

alien criminals into the county encouraged by Defendants' shutdown of immigration enforcement.

138.   In Live Oak County, there has been a significant increase in the number of crimes committed by illegal aliens following the implementation of the January 20 and February 18 Memoranda.

139.   There has been an attendant increase in the number of criminals detained by Live Oak County and in in the detention costs borne by the County since the implementation of the January 20 and February 18 Memoranda.

140.   The increase in Live Oak County detention costs is principally attributable to Defendants' three Memoranda, due to (1) recidivism by illegal alien criminals who have been released, (2) the fact that ICE is no longer taking custody of illegal aliens who have committed crimes in the county, (3) the related fact that the average period of county detention for illegal alien criminals is now longer, and (4) the entry of new illegal alien criminals into the county encouraged by Defendants' shutdown of immigration enforcement.

141.   In Real County, there has been a significant increase in the number of crimes committed by illegal aliens following the implementation of the January 20 and February 18 Memoranda.

142.   There has been an attendant increase in the number of criminals detained by Real County and in in the detention costs borne by the County since the implementation of the January 20 and February 18 Memoranda.

143.    The increase in Real County detention costs is principally attributable to Defendants' three Memoranda, due to (1) recidivism by illegal alien criminals who have been released, (2) the fact that ICE is no longer taking custody of illegal aliens who have committed crimes in the county, (3) the related fact that the average period of county detention for illegal alien criminals is now longer, and (4) the entry of new illegal alien criminals into the county encouraged by Defendants' shutdown of immigration enforcement.

144.    The sudden nature of the shift in Defendant's policies exacerbates the harm to all seven Plaintiff counties.

145.    In addition, the release of criminal aliens into all seven Plaintiff counties imposes significant costs on Plaintiff sheriffs and their respective offices.  Those costs include the effects of the crimes they commit while free, the costs of investigating those crimes, the costs of monitoring or supervising criminal aliens, and the costs of arresting and detaining those same aliens a subsequent time or times.

146.    In addition, the January 20 and February 18 Memoranda and the actions of Defendants have caused a surge in illegal immigration and massive increase in crime in all seven Plaintiff counties.  This surge includes thousands of additional illegal aliens beyond the specific aliens that Defendants encountered, but failed to detain or remove. Plaintiffs bear the financial costs of investigation, arrest, and detention caused by that increase in crime.

147.    In addition, the surge in illegal immigration and related crime caused by the actions of Defendants has diverted all seven Plaintiff counties' scarce law enforcement

resources.  Sheriff's deputies are not able to attend to their normal patrol and other public safety duties because the crime associated with the surge in illegal immigration has consumed their attention and time.

148.   Finally, Defendants' failure to take custody of, or remove, illegal aliens whose detention and/or removal is required by federal law has led to demands on Plaintiff's jail facilities beyond their capacity.  As a result, Plaintiff sheriffs are left with no alternative but to release such criminal aliens into the public when, prior to the February 18 Memorandum, ICE would have taken custody of such aliens and removed them, as required by federal law.

149.   This release of illegal aliens and consequent endangering of the public effectively forces Plaintiff sheriffs to violate their oaths of office to preserve, protect, and defend the Constitution and laws of the United States and of Texas.   In particular, Plaintiff sheriffs are concerned that they are compelled to release illegal aliens whose detention and removal is mandated by federal law.

150.   Plaintiff Federal Police Foundation, ICE Officers Division, has been compelled to expend resources that it otherwise would not have expended informing its members of the February 18 Memorandum and the ways in which it violates federal law. The Foundation has had to divert resources to advising members of their legal options and employment consequences when those members face the dilemma of following federal law versus following the unlawful February 18 Memorandum.   The Plaintiff Federal Police Foundation, ICE Officers Division, has also been forced to provide

information to its members regarding the consequences and results of the complicated preapproval process created by the February 18 Memorandum.

151.    As a result of Defendants' actions, the Federal Police Foundation has had to divert its limited resources to deal with the consequences of Defendants' radical change in immigration enforcement practices.  Addressing the February 18 and September 30 Memoranda and their consequences has consumed more than 50 percent of the Foundation's man-hours of activity.

152.    Addressing the February 18 and September 30 Memoranda and their consequences has also caused the Federal Police Foundation to spend an additional $1,017.48 per year to provide rapid updates to its members on the implementation of the Memoranda, consequent changes in agency protocols, and litigation regarding the Memoranda.

153.    Members of Plaintiff Federal Police Foundation, ICE Officers Division, are forced by the February 18 and September 30 Memoranda to choose between following the dictates of the Memorandum and following federal laws that clearly require them to detain and/or remove certain illegal aliens.  Plaintiffs fear that they will be disciplined or will lose their jobs if they follow the law.

154.    Members of Plaintiff Federal Police Foundation, ICE Officers Division, are compelled by the February 18 and September 30 Memoranda to effectively violate their oaths of office because it forces them to knowingly violate federal law or face discipline.

## FIRST CAUSE OF ACTION
## THE MEMORANDA VIOLATE 8 U.S.C. § 1225(b)(2)(A) WHICH REQUIRES THE DETENTION AND INITIATION OF REMOVAL OF ILLEGAL ALIENS ENCOUNTERED BY IMMIGRATION OFFICERS

155.    Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

156.    8 U.S.C. § 1225(a)(1) requires that "an alien present in the United States who has not been admitted … shall be deemed for purposes of this chapter an applicant for admission."  This designation triggers 8 U.S.C. § 1225(a)(3), which requires that all applicants for admission "shall be inspected by immigration officers."  This in turn triggers 8 U.S.C. § 1225(b)(2)(A), which mandates that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."  The proceedings under 8 U.S.C. § 1229a are removal proceedings in United States immigration courts.

157.    The February 18 and September 30 Memoranda violate the above-listed provisions of federal law by making discretionary the detention of certain aliens, when federal law clearly mandates that Defendants detain such aliens in order to place them into removal proceedings.

158.    The February 18 and September 30 Memoranda violate the above-listed provisions of federal law by making discretionary the placement of certain aliens into removal proceedings, when federal law clearly mandates that Defendants place such aliens into removal proceedings.

159.   The September 30 Memorandum's statement that, "[t]he fact an individual is a removable noncitizen … should not alone be the basis of an enforcement action against them" clearly violates the command of 8 U.S.C. § 1225(b)(2)(A), which mandates the detention and initiation of removal proceedings against every inadmissible alien encountered by CBP and ICE officers.

160.   Because Congress has by statute expressly limited the discretion of Defendants to not detain and initiate removal proceedings, any "prosecutorial discretion" that Defendants exercise must be consistent with 8 U.S.C. § 1225(b)(2)(A) and can only occur after an alien has been placed into removal proceedings as required by 8 U.S.C. § 1225(b)(2)(A), or under a provision of federal law expressly authorizing such "prosecutorial discretion."

161.   The CBP policy of issuing NTRs instead of NTAs to aliens apprehended at the border violates the mandatory command of 8 U.S.C. § 1225(b)(2)(A), by causing Border Patrol officers to decline to initiate a "a [removal] proceeding under section 1229a."

162.   The CBP policy of failing to detain illegal aliens apprehended at the southern border who are not expeditiously removed under 8 U.S.C. § 1225(b)(1)  or directed to remain in Mexico under 8 U.S.C. § 1225(b)(2)(C) violates the mandatory command that such aliens be detained. *See* 8 U.S.C. §§ 1225(b)(1)(B)(ii) (If it is determined that an alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum."); 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination

of credible fear of persecution and, if found not to have such a fear, until removed.");
1225(b)(2)(A) ("[I]f the examining immigration officer determines that an alien seeking
admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be
detained for a proceeding under section 1229a of this title.").

163.   The February 18 and September 30 Memoranda attempt to replace the
mandatory system imposed by Congress in 8 U.S.C. § 1225(b)(2)(A) with a discretionary
system created by executive decree.

164.   Defendant Mayorkas's authority under 8 U.S.C. § 1103(a)(5) and 8 C.F.R.
§ 2.1 does not authorize him to order his subordinate officers or employees to violate the
requirements of federal law set forth in 8 U.S.C. § 1225(b)(2)(A).

165.   Plaintiffs seek a declaratory judgment to these effects, together with
corresponding injunctive relief.

## SECOND CAUSE OF ACTION
## THE MEMORANDA VIOLATE 8 U.S.C. § 1226(c), WHICH
## MAKES THE DETENTION OF CERTAIN ILLEGAL ALIENS MANDATORY

166.   Plaintiffs reallege, adopt, and incorporate by reference all preceding
paragraphs as though fully set forth herein.

167.   8 U.S.C. § 1226(c) makes the detention of certain aliens mandatory.  The
categories of aliens whom DHS "shall take into custody" include "any alien convicted of
. . . a violation of (or a conspiracy or attempt to violate) any law or regulation of a State,
the United States, or a foreign country relating to a controlled substance." 8 U.S.C.
§ 1182(a)(2)(A)(i)(II), any alien convicted of a crime of moral turpitude, and any alien
convicted of certain firearms offenses.

168.     A mandatory duty to detain an alien that is expressly spelled out in federal law cannot be modified by a discretionary enforcement policy that requires immigration officers to seek preapproval before taking any enforcement action, or that requires immigration officers to weigh certain factors in order to decide whether or not to detain the alien.

169.     The February 18 Memorandum violates 8 U.S.C. § 1226(c) on its face, by making discretionary and difficult the detention of aliens who have been convicted of relevant crimes, but who fall outside of the priority enforcement categories.

170.     The September 30 Memorandum also violates 8 U.S.C. § 1226(c) on its face, by making discretionary the detention of aliens who have been convicted of relevant crimes and by forcing immigration officers to weigh aggravating and mitigating factors to make a discretionary determination of whether or not to detain such an alien, whereas 8 U.S.C. § 1226(c) makes the detention of the alien mandatory.  In fact, the September 30 Memorandum prohibits officers from relying solely on the fact that an illegal alien has been convicted of a qualifying crime:  "Our personnel should not rely on the fact of conviction or the result of a database search alone."  September 30 Memorandum, at 4.

171.     The February 18 and September 30 Memoranda attempt to replace the mandatory system imposed by Congress in 8 U.S.C. § 1226(c) with a discretionary system created by executive decree.

172.     Defendant Mayorkas's authority under 8 U.S.C. § 1103(a)(5) and 8 C.F.R. § 2.1 does not authorize him to order his subordinate officers or employees to violate the requirements of federal law set forth in 8 U.S.C. § 1226(c).

173.   Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

## THIRD CAUSE OF ACTION
## THE MEMORANDA VIOLATE 8 U.S.C. § 1231(a), WHICH MAKES THE REMOVAL OF CERTAIN ILLEGAL ALIENS MANDATORY

174.   Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

175.   8 U.S.C. § 1231(a) makes the removal of certain illegal aliens mandatory.

176.   Specifically, 8 U.S.C. § 1231(a)(5) mandates the removal of an alien who has reentered the United States illegally after having been removed: "[T]he alien *shall* be removed under the prior order at any time after the reentry."   *Id*. (emphasis added).

177.   The February 18 Memorandum violates 8 U.S.C. § 1231(a) on its face, by making discretionary the removal of aliens subject to a final order of removal who fall outside of the priority enforcement categories.  Doing so subverts a mandatory removal requirement found in federal statute and transforms it into a discretionary policy.

178.   The September 30 Memorandum violates 8 U.S.C. § 1231(a) on its face, by making discretionary the removal of all aliens subject to a final order of removal.  Doing so subverts a mandatory removal requirement found in federal statute and transforms it into a discretionary policy.

179.   The February 18 and September 30 Memoranda attempt to replace the mandatory system imposed by Congress in 8 U.S.C. § 1231(a) with a discretionary system created by executive decree.

180.   Defendant Mayorkas's authority under 8 USC § 1103(a)(5) and 8 CFR § 2.1 does not authorize him to order his subordinate officers or employees to violate the requirements of federal law set forth in 8 U.S.C. § 1231(a).

181.   Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

## FOURTH CAUSE OF ACTION
## THE MEMORANDA VIOLATE THE ADMINISTRATIVE PROCEDURE ACT

182.   Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

183.   The February 18 and September 30 Memoranda, together, constitute a final agency action that is reviewable under the APA: (1) the Memoranda consummate Defendants' policy decision; and (2) legal consequences flow from the decision because it changes the statutory obligations of ICE officers.

184.   As explained above, the February 18 and September 30 Memoranda violate three different federal statutes.  Plaintiffs accordingly ask this Court to "hold unlawful and set aside agency action" which is "not in accordance with law."   5 U.S.C. § 706(2)(A).

185.   The February 18 and September 30 Memoranda also violate the specific procedural requirements of the APA, described below.

186.   First, the APA requires that agencies implementing congressional statutes in whole or in part through an agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy do so through a rulemaking.

A rulemaking under the APA is defined as the agency process for formulating, amending, or repealing a rule through notice and comment procedures under the APA, 5 U.S.C. § 553. The INA delegates authority to the Secretary of Homeland Security and the Attorney General to implement its provisions through regulations. The Secretary has not promulgated any regulation that establishes the criteria or processes of the February 18 Memorandum or the September 30 Memorandum.

187. The September 30 Memorandum states categorically: "The fact an individual is a removable noncitizen … should not alone be the basis of an enforcement action against them." September 30 Memorandum, at 2. This is a substantive rule under the APA that binds immigration officers and is procedurally invalid because it was promulgated without the required notice and comment.

188. The September 30 Memorandum also states unconditionally that the fact that an alien has been convicted of any crime is insufficient to trigger an enforcement action: "Our personnel should not rely on the fact of conviction or the result of a database search alone." *Id.* at 2. This is a substantive rule under the APA that binds immigration officers and is procedurally invalid because it was promulgated without the required notice and comment.

189. Establishing classes of aliens who cannot be detained or removed except through a preapproval process is a rule under the APA, 5 U.S.C. § 551(4). The Secretary has not issued a notice of proposed rulemaking or promulgated a final rule implementing this policy in conformity with the APA.

190.    Defendant Mayorkas's authority under 8 U.S.C. § 1103(a)(5) and 8 C.F.R. § 2.1 does not include the authority to circumvent the terms of the Administrative Procedure Act by simply issuing a "Memorandum" that significantly transforms the enforcement of federal immigration law.

191.    The February 18 and September 30 Memoranda should be held "unlawful and set aside" because they were promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

192.    The February 18 and September 30 Memoranda violate the APA in a second respect because they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).

193.    The February 18 and September 30 Memoranda represent a sharp and significant departure from previous policy governing detainers, detention, and removal. Because Defendants do not sufficiently explain that sudden departure, the Memoranda are arbitrary and capricious.

194.    The February 18 and September 30 Memoranda do not represent reasoned decision making.

195.    DHS and ICE ignored the harms that failing to detain and remove illegal aliens will cause.   Neither the February 18 Memorandum nor the September 30 Memorandum analyzed the costs that predictably fall on local law enforcement entities such as Plaintiff sheriffs and counties.   Failing to consider important costs of a new policy renders that policy arbitrary and capricious.

196.    The February 18 and September 30 Memoranda also failed to consider alternative approaches that would have allowed a greater number of detentions and removals to occur, which would have offered greater protection to the public, caused less financial injury to Plaintiffs, and would have caused less of an influx of additional illegal immigration.

197.    Even if the Defendants had considered the harms caused by, and alternative approaches to, the February 18 and September 30 Memoranda, they did not explain or justify the grounds on which the Defendant agency proceeded to issue the Memoranda.

198.    Defendant Mayorkas's authority under 8 U.S.C. § 1103(a)(5) and 8 C.F.R. § 2.1 does not authorize him to circumvent the terms of the Administrative Procedure Act by simply issuing a "Memorandum" that significantly transforms the enforcement of federal immigration law.

199.    Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

**FIFTH CAUSE OF ACTION**
**THE MEMORANDA VIOLATE THE ARTICLE II, SECTION 3,**
**CONSTITUTIONAL OBLIGATION OF THE EXECUTIVE TO TAKE CARE**
**THAT THE LAWS ARE FAITHFULLY EXECUTED**

200.    Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

201.    Article II, section 3, of the United States Constitution requires that the President, by and through his executive branch officials, including Defendants, "shall take Care that the Laws be faithfully executed."

202.    The February 18 and September 30 Memoranda are unconstitutional because they direct executive officials not to faithfully execute federal law, and not to comply with federal statutes that impose *mandatory* obligations upon immigration officers.

203.    Unconstitutional agency action or inaction violates the APA.  *See* 5 U.S.C. § 706.

204.    Defendant Mayorkas's authority under 8 U.S.C. § 1103(a)(5) and 8 C.F.R. § 2.1 does not include the authority to order his subordinate officers or employees to decline to comply with federal statutes that impose mandatory obligations upon them.

205.    Constitutional violations are actionable independently of the APA.  Federal courts possess the power to enjoin federal officers from violating the Constitution.

206.    Plaintiffs seek a declaratory judgment to these effects, together with corresponding injunctive relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

A.    Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that the January 20, February 18, and September 30 Memoranda are unlawful and in violation of 8 U.S.C. § 1225(b)(2), 8 U.S.C. § 1226(c), and 8 U.S.C. § 1231(a) and vacate the Memoranda.

B.    Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(D) that the January 20, February 18, and September 30 Memoranda are unlawful and in violation of the Administrative Procedure Act as a rule

promulgated without conforming to the procedures described therein and vacate the Memoranda;

C.     Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that the January 20, February 18, and September 30 Memoranda are in violation of Article II of the Constitution of the United States, as in excess of executive authority and in contravention of the executive's duty to take care that the laws be faithfully executed, and vacate the Memoranda;

D.     Preliminarily enjoin and permanently enjoin Defendants and their subordinate officers, employees, and agents from implementing or enforcing the January 20, February 18, and September 30 Memoranda;

E.     Preliminarily enjoin and permanently enjoin Defendants and their subordinate officers, employees, and agents to fully comply with their statutory obligations to take enforcement actions against certain aliens, including taking custody of, detaining, and removing illegal aliens as mandated by 8 U.S.C. § 1225(b)(2)(A), 8 U.S.C. § 1226(c), and 8 U.S.C. § 1231(a).

F.     Preliminarily enjoin and permanently enjoin Defendants and subordinate officers, employees, and agents to take custody of all criminal illegal aliens whose detention is required by law and who are presented to them by local or state law enforcement agencies pursuant to a "287(g) agreement," under 8 U.S.C. § 1357(g).

G.     Preliminarily enjoin and permanently enjoin Defendants and subordinate officers, employees, and agents to reinstate all detainers that were

lifted pursuant to the January 20 Memorandum or the February 18 Memorandum, where the detention of such alien is required by 8 U.S.C. § 1225(b)(2), 8 U.S.C. § 1226(c), or 8 U.S.C. § 1231(a).

H.      Preliminarily enjoin and permanently enjoin Defendants and subordinate officers, employees, and agents to take custody of all illegal aliens whose detention or removal is required by 8 U.S.C. § 1225(b)(2), 8 U.S.C. § 1226(c), or 8 U.S.C. § 1231(a), and who have been arrested by local law enforcement agencies for the commission of state crimes, when such local law enforcement agencies seek to transfer custody of such aliens to ICE.

I.      Preliminarily enjoin and permanently enjoin CBP Defendants and subordinate officers, employees, and agents to cease issuing to illegal aliens NTRs and instead comply with their statutory obligation to issue NTAs to illegal aliens who are not immediately removed from the country through expedited removal.

J.      Preliminarily enjoin and permanently enjoin CBP Defendants and subordinate officers, employees, and agents to comply with 8 U.S.C. § 1225(b) and detain illegal aliens apprehended at the southern border who are not expeditiously removed under 8 U.S.C. § 1225(b)(1) or directed to remain in Mexico under 8 U.S.C. § 1225(b)(2)(C).

K.      Direct Defendants to pay all costs associated with this lawsuit; and

L.      Grant such other and further relief as this Court deems equitable, just, and proper.

Dated:  October 8, 2021          By:  _s/ Kris W. Kobach_____
**Kris W. Kobach** (*Attorney-in-charge*)
Kansas Bar No. 17280, admitted *pro hac vice*
Alliance for Free Citizens
P.O. Box 155
Lecompton, Kansas 66050
Telephone:  913-638-5567
kkobach@gmail.com

**Brent P. Smith**
Texas Bar No. 24080722, admitted *pro hac vice*
County Attorney, Kinney County, Texas
P.O. Box 365
Brackettville, Texas 78832
Telephone: 830-563-2240
bsmith@co.kinney.tx.us

**Christopher J. Hajec**
D.C. Bar No. 492551, admitted *pro hac vice*
Immigration Reform Law Institute
25 Massachusetts Avenue, N.W.
Suite 335
Washington, D.C. 20001
Telephone:  202-323-5590
info@irli.org

**Kimberly Kreider-Dusek**
Texas Bar No. 50511919
County Attorney, McMullen County, Texas
P.O. Box 237
Tilden, Texas 78072
kimberly.dusek@mcmullencounty.org

**Douglas Poole**
Texas Bar. No. 16115600
S.D. Texas Bar. No. 619
McLeod, Alexander, Powel, & Apffel, P.C.
802 Rosenberg
Galveston, Texas 77553
Telephone:  409-763-2481
dwpoole@mapalaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Motion for Leave to File Affidavit Under Seal was filed electronically and served on Defendants via the Court's CM/ECF system on this 8th day of October, 2021.

<u>/s Kris W. Kobach</u>
KRIS W. KOBACH