# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| SHERIFF BRAD COE, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 3:21-cv-00168 |
| | ) | |
| JOSEPH R. BIDEN, JR., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

# DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................ 2

I.     Statutory Framework. ................................................................................ 2

II.    Guidance Memoranda Concerning Immigration Enforcement. ................ 5

      *A. Issuance of Interim Guidance* ....................................................... 5

      *B. Litigation on Interim Guidance* ................................................... 7

      *C. New Guidance* .............................................................................. 10

III. Litigation History. .................................................................................. 11

ARGUMENT...................................................................................................... 11

I.     Plaintiffs' Challenge to the Interim Guidance is Moot. ......................... 12

II.    The Court Should Dismiss All Other Claims in the Second Amended
      Complaint. .............................................................................................. 14

      A.   *Plaintiffs lack Article III standing to sue.* ................................. 15

            1. The Sheriffs and Counties cannot demonstrate any redressable
              injury that is traceable to the New Guidance. ................................. 15

            2. Binding Fifth Circuit precedent precludes a finding of injury for
              the Federal Police Foundation or its members. ............................. 18

      B.   *Venue is improper in the Galveston Division of the Southern District
         of Texas.* ...................................................................................... 20

      C.   *Plaintiffs' claims fail to clear three threshold bars to APA lawsuits.* ......... 21

            1.   The challenged action is "committed to agency discretion by
               law." ....................................................................................... 22

            2.   The Memoranda are not "final agency actions" subject to
               APA review. ......................................................................... 27

            3.   Congress has precluded judicial review of these types of
               decisions. ............................................................................. 29

a.   APA challenges to DHS's application of enforcement priorities are precluded from review. ...................................29

b.   Plaintiffs' § 1225 challenge is specifically precluded from review........................................................................32

c.   Plaintiffs' § 1226(c) challenge is specifically precluded from review.................................................................32

d.   Plaintiffs' § 1231(a)(5) challenge is likewise specifically precluded...........................................................34

4.   Plaintiffs cannot proceed by asserting claims under the Declaratory Judgment Act.................................................35

III.   At Minimum, the Court Should Grant Defendants' Partial Motion to Dismiss. ........................................................................36

A.   The ICE Officers' claims are precluded from judicial review by the Civil Service Reform Act. ...........................................36

B.   The Court may not enjoin the President in his official duties.....................39

CONCLUSION ..........................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. ICE*,
  510 F.3d 1 (1st Cir. 2007) ..................................................................................... 30

*Alexander v. Trump*,
  753 F. App'x 201 (5th Cir. 2018),
  *cert denied*, 139 S. Ct. 1200 (2019) ..................................................................... 41

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ................................................................................................ 13

*Am. Fed'n of Gov't Emps. AFL-CIO v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) .............................................................................. 38

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Service*,
  940 F.2d 704 (D.C. Cir. 1991) .............................................................................. 37

*Arizona v. U.S. Dep't of Homeland Sec.*,
  No. CV-21-00186-PHX-SRB, 2021 WL 2787930 (D. Ariz. June 30, 2021) ................. 9, 23, 24

*Arizona v. United States*,
  567 U.S. 387 (2012) .................................................................................. 2, 18, 25, 33

*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997) ................................................................................................ 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................................. 21

*Ayuda, Inc. v. Reno*,
  7 F.3d 246 (D.C. Cir. 1993) .................................................................................. 32

*Bennett v. Spear*,
  520 U.S. 154 (1997) .............................................................................................. 27

*Block v. Cmty. Nutrition Inst.*,

    467 U.S. 340 (1984) ...................................................................................... 29, 31, 32

*Braspetro Oil Servs. Co. v. Modec (USA), Inc.*,

    240 Fed. App'x 612 (5th Cir. 2007) ...................................................................... 12

*Burke v. Barnes*,

    479 U.S. 361 (1987) ............................................................................................. 13

*California v. Texas*,

    141 S. Ct. 2104 (2021) ......................................................................................... 16

*Charlton Mem. Hosp. v. Sullivan*,

    816 F. Supp. 50 (D. Mass. 1993) ......................................................................... 22

*Cisco Sys., Inc. v. Telcordia Techs., Inc.*,

    590 F. Supp. 2d 828 (E.D. Tex. 2008) ................................................................. 24

*Crane v. Johnson*,

    783 F.3d 244 (5th Cir. 2015) ............................................................ 19, 25, 33, 37

*Crane v. Napolitano*,

    Civ. A. No. 3:12-CV-03247-O, 2013 WL 8211660 (N.D. Tex. Nov. 28, 2012.) ............... 37

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,

    704 F.3d 413 (5th Cir. 2013) ............................................................................... 13

*DaimlerChrysler Corp. v. Cuno*,

    547 U.S. 332 (2006) ............................................................................................. 18

*Dalton v. Specter*,

    511 U.S. 462 (1994) ............................................................................................. 41

*Demore v. Kim*,

    538 U.S. 510 (2003) ............................................................................................. 34

*Elgin v. Dep't of Treasury*,

    567 U.S. 1 (2012) ................................................................................................. 36

iv

*Energy Transfer Partners, L.P. v. Fed. Energy Regul. Comm'n,*

    567 F.3d 134 (5th Cir. 2009) .................................................................. 29

*Fleming v. Spencer,*

    718 F. App'x 185 (4th Cir. 2018) ..................................................... 37, 38

*Florida v. United States,*

    No. 8:21-CV-541-CEH-SPF, 2021 WL 1985058 (M.D. Fla. May 18, 2021) .......... 9, 23, 24, 28

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.,*

    463 U.S. 1 (1983) ............................................................................ 36

*Franklin v. Massachusetts,*

    505 U.S. 788 (1992) ............................................................ 39, 40, 41

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*

    528 U.S. 167 (2000) ................................................................. 15, 18

*FTC v. Standard Oil Co. of Cal.,*

    449 U.S. 232 (1980) ........................................................................ 29

*Graham v. Dyncorp Int'l, Inc.,*

    973 F. Supp. 2d 698 (S.D. Tex. 2013) ................................................. 12

*Harkness v. Sec'y of Navy,*

    858 F.3d 437 (6th Cir. 2017),

    *cert denied*, 138 S. Ct. 2648 (2018) ............................................. 22, 23

*Harris Cnty. v. MERSCORP Inc.,*

    791 F.3d 545 (5th Cir. 2015) ............................................................. 36

*Heckler v. Chaney,*

    470 U.S. 821 (1985) ................................................................. 23, 24

*Hernandez-Avalos v. INS,*

    50 F.3d 842 (10th Cir. 1995) ....................................................... 35, 36

*Hill v. Rsch. Inst. of Am. Grp.,*

    209 F.3d 719  (5th Cir. 2000) ............................................................ 17

*Hooks v. Landmark Indus., Inc.*,

    797 F.3d 309 (5th Cir. 2015) ................................................................. 12

*In re S. Recycling, L.L.C.*,

    982 F.3d 374 (5th Cir. 2020) ................................................................. 12

*J.E.F.M. v. Lynch*,

    837 F.3d 1026 (9th Cir. 2016) ............................................................... 30

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,

    58 F. Supp. 3d 1191 (D.N.M. 2014) ............................................... 23, 32

*Jennings v. Rodriguez*,

    138 S. Ct. 830 (2018) ............................................................... 3, 4, 34

*Johansen v. Trico Marine Int'l, Inc.*,

    No. CV H-07-3767, 2008 WL 11390861 (S.D. Tex. Aug. 29, 2008) ....................................... 24

*Judges v. McHenry*,

    477 F. Supp. 3d 466 (E.D. Va. 2020) ....................................................... 39

*Karahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*,

    489 U.S. 527 (1989) ............................................................................... 38

*Kendall v. U.S. ex rel. Stokes*,

    37 U.S. (12 Pet.) 524 (1838) ................................................................. 40

*Knox v. Serv. Emps. Int'l Union, Local 1000*,

    567 U.S. 298 (2012) ............................................................................... 13

*Leal v. Woodley & McGillivary*,

    No. H-08-cv-345, 2009 WL 1704311 (S.D. Tex. June 17, 2009) ........................................... 38

*Lewis v. Cont'l Bank Corp.*,

    494 U.S. 472 (1990) ............................................................................... 12

*Lexmark Int'l, Inv. v. Static Control Components, Inc.*,

    572 U.S. 118 (2014) ............................................................................... 35

vi

*Lincoln v. Vigil*,

    508 U.S. 182 (1993) ........................................................................................... 23

*Linda R.S. v. Richard D.*,

    410 U.S. 614 (1973) ........................................................................................... 15

*Louisiana v. U.S. Army Corps of Eng'rs*,

    834 F.3d 574 (5th Cir. 2016) ............................................................................. 28

*Lujan v. Nat'l Wildlife Fed'n*,

    497 U.S. 871 (1990) ........................................................................................... 35

*M.M.V. v. Garland*,

    1 F.4th 1100 (D.C. Cir. 2021) ........................................................................... 30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

    567 U.S. 209 (2012) ........................................................................................... 35

*Melot v. Bergami*,

    970 F.3d 596 (5th Cir. 2020) ............................................................................. 24

*Miller v. Albright*,

    523 U.S. 420 (1998) ........................................................................................... 20

*Mississippi v. Johnson*,

    71 U.S. (4 Wall.) 475 (1866) ...................................................................... 40, 41

*Nat'l Ass'n of Agric. Emps. v. Trump*,

    462 F. Supp. 3d 572 (D. Md. May 21, 2020) ................................................... 38

*Nat'l Ass'n of Immigr. Judges v. McHenry*,

    477 F. Supp. 3d 466 (E.D. Va. 2020),

    *appeal filed*, No. 20-1868 (4th Cir. Aug. 12, 2020) ...................................... 39

*Newdow v. Bush*,

    355 F. Supp. 2d 265 (D.D.C. 2005) ................................................................. 40

*Newdow v. Roberts*,

    603 F.3d 1002 (D.C. Cir. 2010) ........................................................................ 39

*Nielsen v. Preap*,

   139 S. Ct. 954 (2019) ............................................................................ 4, 27, 34

*Niz-Chavez v. Garland*,

   141 S. Ct. 1474 (2021) ...................................................................................... 33

*Norfolk S. Ry. Co. v. City of Alexandria*,

   608 F.3d 150 (4th Cir. 2010) ............................................................................ 13

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,

   324 F.3d 726 (D.C. Cir. 2003) .......................................................................... 28

*Renne v. Geary*,

   501 U.S. 312 (1991) .......................................................................................... 12

*Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC")*,

   525 U.S. 471 (1999) ................................................................................... *passim*

*Skelly Oil Co. v. Phillips Petroleum Co.*,

   339 U.S. 667 (1950) .......................................................................................... 36

*Spell v. Edwards*,

   962 F.3d 175 (5th Cir. 2020) ............................................................................ 13

*Summers v. Earth Island Inst.*,

   555 U.S. 488 (2009) .......................................................................................... 15

*Swan v. Clinton*,

   100 F.3d 973 (D.C. Cir. 1996) .......................................................................... 40

*Tenth St. Residential Ass'n ("TSRA") v. City of Dallas*,

   968 F.3d 492 (5th Cir. 2020) ............................................................................ 20

*Texas v. Biden*,

   No. 21-10806, 2021 WL 5882670 at *38 (5th Cir. Dec. 13, 2021) ................. 24

*Texas v. United States*,

   809 F.3d 134 (5th Cir. 2015),

   *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) ........................... 16, 22, 23

*Texas v. United States*,

___ F. Supp. 3d ___, 2021 WL 3683913 (S.D. Tex. Aug. 19, 2021) ...................................... 31

*Texas v. United States*,

14 F.4th 332 (5th Cir. 2021),

*opinion vacated on rehearing en banc* (Nov. 30, 2021) ("*Texas* Stay Op.")..................... *passim*

*Thompson v. N. Am. Stainless, LP*,

562 U.S. 170 (2011).................................................................................................................. 35

*Town of Castle Rock v. Gonzales*,

545 U.S. 748 (2005).................................................................................................................. 24

*Trump v. Int'l Refugee Assistance Project*,

138 S. Ct. 353 (2017)................................................................................................................ 13

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,

578 U.S. 590 (2016).................................................................................................................. 27

*United States v. Fausto*,

484 U.S. 439 (1988)............................................................................................. 29, 32, 36, 38

*Wayte v. United States*,

470 U.S. 598 (1985).................................................................................................................. 23

*Whitmore v. Arkansas*,

495 U.S. 149 (1990)............................................................................................................ 15, 16

*Zadvydas v. Davis*,

533 U.S. 678 (2001)............................................................................................................... 4, 6

**Statutes**

5 U.S.C. § 701(a)(1).................................................................................................................. 22, 29

5 U.S.C. § 701(a)(2).................................................................................................................. 22, 23

5 U.S.C. § 702............................................................................................................................ 35, 41

5 U.S.C. § 704............................................................................................................................ 22, 27

5 U.S.C. § 706(2)(B) ................................................................................................ 22

5 U.S.C. § 2302(b)(9)(D) ......................................................................................... 37

5 U.S.C. § 7104 ........................................................................................................ 37

5 U.S.C. § 7121 ........................................................................................................ 38

6 U.S.C. § 202(5) ......................................................................................... 25, 27, 33

8 U.S.C. § 1103(a)(3) ......................................................................................... 25, 27

8 U.S.C. § 1182(a)(2) ................................................................................................. 8

8 U.S.C. § 1225 .......................................................................................................... 3

8 U.S.C. § 1225(a)(1) ................................................................................................. 3

8 U.S.C. § 1225(b) ..................................................................................................... 2

8 U.S.C. § 1226 .......................................................................................................... 5

8 U.S.C. § 1226(c) ...................................................................................................... 8

8 U.S.C. § 1226(c)(1) ................................................................................................. 4

8 U.S.C. § 1226(c)(2) ................................................................................................. 4

8 U.S.C. § 1226(e) .................................................................................................... 33

8 U.S.C. § 1229(a) ................................................................................................ 2, 33

8 U.S.C. § 1229a(a) .................................................................................................... 3

8 U.S.C. § 1229a(a)(2) ............................................................................................... 2

8 U.S.C. § 1231(a)(1)(B)(i) ....................................................................................... 4

8 U.S.C. § 1231(a)(1)(C) ........................................................................................... 4

8 U.S.C. § 1231(a)(2) ................................................................................................. 8

8 U.S.C. § 1231(a)(5) ................................................................................................. 5

8 U.S.C. § 1231(h) .............................................................................................. 34, 35

8 U.S.C. § 1252 .................................................................................................... 29, 30

8 U.S.C. § 1252(a)(2)(A) ..................................................................................... 30, 32

8 U.S.C. § 1252(a)(5) ................................................................................................. 3

8 U.S.C. § 1252(b)(9) .......................................................................................... 30, 31

x

8 U.S.C. § 1252(e)(2)......................................................................................... 32

8 U.S.C. § 1252(g)............................................................................................... 25

28 U.S.C. § 1391(e)....................................................................................... 20, 21

28 U.S.C. § 1406.................................................................................................. 22

28 U.S.C. § 2201.................................................................................................. 35

**Rules**

Fed. R. Civ. P. 12(b)(1).................................................................................. 12, 17

Fed. R. Civ. P. 12(b)(3)....................................................................................... 12

**Regulations**

8 C.F.R. § 239.1.................................................................................................... 2

8 C.F.R. § 287.7(a)............................................................................................... 5

8 C.F.R. § 1003.1(b).............................................................................................. 3

8 C.F.R. § 1003.6(a).............................................................................................. 3

8 C.F.R. § 1208.31(e)............................................................................................ 2

8 C.F.R. § 1240.12................................................................................................ 3

**Other Authorities**

Aaron Nelson, Kinney County Has Embraced Greg Abbott's Operation Lone Stare Like

    Nowhere Else. It's Fueling the Hysteria of Some Locals, Texax Monthly (Oct. 29, 2021),

    texasmonthly.com/news-politics/operation-lone-star-kinney-county/....................... 5

ICE Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration

    Officers, *available at* https://www.ice.gov/sites/default/files/documents/

    Document/2017/10074-2.pdf (last visited Dec. 15, 2021) .................................. 5

Party, *Black's Law Dictionary* (11th ed. 2019).......................................................... 34

## INTRODUCTION

In early 2021, the Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE") adopted interim immigration enforcement priorities to focus their limited enforcement resources on those noncitizens who posed the greatest risk to national security, border security, and public safety. These interim priorities were to remain in effect, pending Department-wide review of policies and practices, until DHS issued revised immigration enforcement guidelines. After careful consideration and engagement with agency personnel, the Secretary of Homeland Security issued a new memorandum to guide officials in prioritizing noncitizens for apprehension and removal. The New Guidance retains the three priorities of national security, border security, and public safety, but gives greater discretion to line officers to assess the totality of the facts and circumstances, including aggravating and mitigating factors, in determining whether an individual poses a current threat and should be subject to an enforcement action.

Plaintiffs—a group of Texas counties and sheriffs as well as an organization claiming ICE officers as its members—have brought suit challenging both the Interim Guidance and the New Guidance, arguing that DHS's enforcement priorities conflict with statutory provisions that, in their view, unconditionally require the undifferentiated arrest and detention of entire classes of noncitizens, regardless of their individualized circumstances, regardless of the safety and security consequences, and regardless of the feasibility and negative consequences on other agency operations.

Plaintiffs' Second Amended Complaint fails to clear multiple threshold hurdles and thus should be dismissed. First, Plaintiffs' challenge to the Interim Guidance is moot.

1

Second, Plaintiffs fail to allege a plausible injury traceable to DHS's New Guidance. Third, the Galveston Division of the Southern District of Texas is an improper venue for this lawsuit. Fourth, the Administrative Procedure Act bars Plaintiffs' claims in multiple ways, including because immigration enforcement prioritization is committed to agency discretion by law. Finally, the Court should at minimum dismiss Plaintiffs' request for relief against the President, because the Court lacks authority to grant declaratory or injunctive relief against him, and the claims of the Federal Police Foundation, which are barred by the Civil Service Reform Act.

## BACKGROUND

### I. Statutory Framework.

The Immigration and Nationality Act ("INA") establishes the framework for arresting, detaining, and removing noncitizens who are unlawfully present or otherwise removable from the United States. A "principal feature of th[is] removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).[1]

The removal process typically begins when DHS, in its discretion, initiates a removal proceeding against a noncitizen. *See* 8 U.S.C. § 1229(a); 8 C.F.R. § 239.1; *see also, e.g.*, 8 U.S.C. §§ 1225(b); 1228(b); 1187(b)(2); 1231(a)(5); 8 C.F.R. § 1208.31(e) (instances of more limited proceedings in specific circumstances). DHS has discretion to choose which charges of removability to pursue. *See* 8 U.S.C. § 1229a(a)(2). If the

---

[1] Internal quotation marks and citations are omitted throughout this brief, unless otherwise stated.

noncitizen is placed into proceedings before an immigration judge ("IJ"), the IJ ultimately determines whether the noncitizen is removable on the charged grounds, and if so, whether to enter an order of removal. *See* 8 U.S.C. § 1229a(a); 8 C.F.R. § 1240.12. A noncitizen subject to a removal order from an IJ may file an appeal before the Board of Immigration Appeals ("BIA"), 8 C.F.R. §§ 1003.1(b), 1240.15, and the removal order is stayed pending the appeal, 8 C.F.R. § 1003.6(a). If the BIA dismisses the appeal, the noncitizen may then petition for review in a federal court of appeals, and request a further stay of removal pending review. 8 U.S.C. § 1252(a)(5). Once an order of removal is final, *see id.* § 1101(a)(47)(B), and absent a stay, the noncitizen is subject to removal, *see id.* §§ 1231(a)(1)(A), (a)(B)(ii). "At each stage" of this removal process, "the Executive has discretion to abandon the endeavor." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 483 (1999).

This case concerns 8 U.S.C. §§ 1225, 1226, and 1231. Sections 1225 and 1226 establish procedures by which DHS "decide[s] (1) who may enter the country and (2) who may stay here after entering." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). Section 1225 authorizes certain actions, including expedited removal, with regard to a noncitizen who is an "applicant[] for admission," that is, a noncitizen who is "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . . )." 8 U.S.C. § 1225(a)(1). Section 1226, which "governs the process of arresting and detaining" noncitizens, "distinguishes between two different categories of aliens." *Jennings*, 138 S. Ct. at 837. Section 1226(a) applies generally to authorize the arrest and detention of noncitizens, pending a determination on removal from

the United States. Section 1226(c) specifically covers noncitizens "who fall[] into one of several enumerated categories involving criminal offenses and terrorist activities," *id.*, and notes that DHS "shall take" these noncitizens "into custody . . . when [they are] released[]" from criminal confinement. 8 U.S.C. § 1226(c)(1). Importantly, § 1226(c) does not envision that covered noncitizens will always be arrested *immediately* following release. *See Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (§ 1226(c)'s instruction that officials "shall act" is meant to "exhort[] [DHS] to act quickly," but does not preclude arrests "well after their release[]"). And § 1226(c) only precludes release of covered noncitizens once they are taken into custody and proceedings are initiated. 8 U.S.C. § 1226(c)(2).

Once a removal order becomes final, § 1231 sets out DHS's detention and removal authority. Section 1231(a) sets a "removal period" of 90 days that begins when the removal order becomes "administratively final," judicial review staying the removal concludes, or the noncitizen "is released from [criminal or non-immigration] detention or confinement," whichever comes latest. 8 U.S.C. § 1231(a)(1)(B)(i)-(iii). Section 1231(a)(2) authorizes detention during the removal period and mandates it for certain criminal noncitizens. *Id.* § 1231(a)(2). Congress, however, "doubt[ed]" that "all reasonably foreseeable removals could be accomplished" within the 90-day period, *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001), and so § 1231 permits—but does not require—detention and removal after the removal period. *Id.*; *see* 8 U.S.C. §§ 1231(a)(1)(C), (a)(6). Generally, outside those authorities, a noncitizen subject to a final order of removal may be released on an order of supervision. *Id.* § 1231(a)(3).

Section 1231(a)(5), which is at issue here, applies when a noncitizen who has

4

previously been removed (or voluntarily departed "under an order of removal") reenters the United States illegally. That provision curtails any statutory right to relief the noncitizen otherwise would have had, and states that the noncitizen "shall be removed under the prior order at any time." 8 U.S.C. § 1231(a)(5).

To take custody of removable noncitizens, DHS may use a number of enforcement tools, including immigration detainers. Through a detainer, DHS notifies a State or locality that DHS intends to take custody of a removable noncitizen detained by the State or locality upon his or her release, and asks the State or locality to (1) notify DHS of the noncitizen's release date; and (2) hold the noncitizen for up to 48 hours, until DHS can take custody. *See* 8 C.F.R. § 287.7(a) (describing notification of release), (d) (describing temporary detention request); ICE Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers ¶ 2.7, *available at* https://www.ice.gov/sites/default/files/ documents/Document/2017/10074-2.pdf (last visited Dec. 15, 2021) ("ICE Policy No. 10074.2"). Since April 2, 2017, ICE detainers must be accompanied by a signed administrative warrant of arrest issued under 8 U.S.C. §§ 1226 or 1231(a), and may be issued only to noncitizens arrested for criminal offenses and whom immigration officers have probable cause to believe are removable. *See* ICE Policy No. 10074.2 ¶¶ 2.4-2.6. The 2017 policy further provides that should ICE officers determine not to take custody of a noncitizen, the officers must immediately rescind the detainer. *Id.* ¶ 2.8.

## II.   Guidance Memoranda Concerning Immigration Enforcement.

### A. Issuance of Interim Guidance

On January 20, 2021, then-Acting Secretary of Homeland Security David Pekoske

issued a memorandum titled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities." *See* Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021), ECF No. 33-1 (the "Pekoske Memo"). The Pekoske Memo made note of DHS's inherent resource limitations and the "significant operational challenges" it faces due to the COVID-19 pandemic, and, in light of these considerations, called upon DHS "components to conduct a review of policies and practices concerning immigration enforcement." *Id.* at 1. Consistent with longstanding historical practice, Acting Secretary Pekoske instructed DHS components to develop recommendations concerning, among other things, "policies for prioritizing the use of enforcement personnel, detention space, and removal assets[]" and "policies governing the exercise of prosecutorial discretion[.]" *Id.* at 2.

The Pekoske Memo also adopted two interim measures. First, the Pekoske Memo directed DHS to focus its enforcement efforts on individuals implicating (1) national security; (2) border security; or (3) public safety. *Id.* At the same time, it expressly authorized enforcement activities outside of those categories. *Id.* at 3. Second, the Pekoske Memo paused most removals for 100 days while DHS reviewed its policies. *Id.* Another court in this district preliminarily enjoined this second measure but it has, regardless, since expired on its own terms.

On February 18, 2021, ICE issued a memorandum to operationalize the enforcement priorities in the Pekoske Memo. *See* Memorandum from Tae Johnson, Acting Dir. of U.S. Immigration and Customs Enf't, *Interim Guidance: Civil Immigration Enforcement and*

*Removal Priorities* (Feb. 18, 2021), ECF No. 33-2 (the "ICE Interim Guidance"). The ICE Interim Guidance confirmed that "ICE operates in an environment of limited resources," and "necessarily must prioritize[]" certain "enforcement and removal actions over others" in order to "most effectively achieve" its "critical national security, border security, and public safety mission[.]" *Id.* at 2-3. The ICE Interim Guidance then catalogued the three priority groups identified in the Pekoske Memo, as slightly modified, and reiterated that the interim priorities do not "prohibit the arrest, detention, or removal of any noncitizen." *Id.* at 3. Enforcement actions outside the presumed priorities could proceed when warranted by the circumstances, and generally subject to a local supervisor's approval.

While the ICE Interim Guidance was in effect, DHS was able to shift resources to both focus on those posing greater public safety threats and other important agency missions. As just one example, "arrests of those with aggravated felonies—priority #3 (public safety)—were up by roughly 2,000 from the prior year; they now account for one in five arrests." *Texas v. United States*, 14 F.4th 332, 335 (5th Cir. 2021), *opinion vacated on rehearing en banc* (Nov. 30, 2021) ("*Texas* Stay Op.").

### B. Litigation on Interim Guidance

Four lawsuits were brought challenging the Pekoske Memo and the ICE Interim Guidance (collectively "the Interim Guidance"). In this Court, Plaintiffs brought a motion seeking to preliminary enjoin the Interim Guidance. Also in the Southern District, the States of Texas and Louisiana sought an injunction on substantially similar claims. That court granted the preliminary injunction, but, in a unanimous published decision, the Fifth Circuit largely stayed that injunction pending appeal. *Texas* Stay Op., 14 F.4th 332. In

7

doing so, the Fifth Circuit disagreed with the district court's conclusion that two detention provisions "override the deep-rooted tradition of enforcement discretion when it comes to decisions that occur before detention, such as who should be subject to arrest, detainers, and removal proceedings." *Id*. at 340; *id*. at 338 ("What is more, in the quarter century that IIRIRA has been on the books, no court at any level previously has held that sections 1226(c)(1) or 1231(a)(2) eliminate immigration officials' discretion to decide who to arrest or remove."). The Fifth Circuit stayed the injunction except to the extent it prevented DHS "from relying on the memos to *release* those who are facing enforcement actions and fall within the mandatory detention provisions," seeing "no basis for upsetting it at this stage as that is what the statutes govern." *Id*. at 337 (emphasis added). Indeed, consistent with longstanding DHS practice, DHS does not as a general matter release individuals who are in ICE custody and who (i) are in removal proceedings and fall under 8 U.S.C. § 1226(c); or (ii) have final removal orders, are in the removal period, and, pursuant to 8 U.S.C. § 1231(a)(2), have been found inadmissible under 8 U.S.C. §§ 1182(a)(2) or 1182(a)(3)(B) or deportable under §§ 1227(a)(2) or 1227(a)(4)(B). After the Interim Guidance was revoked and superseded by the New Guidance, the Fifth Circuit granted rehearing en banc and vacated the opinion and stay. *See* Order, *Texas v. United States*, No. 21-40618 (5th Cir. Nov. 30, 2021). The court did not specify the grounds upon which its vacatur rested.

Two other suits also sought to preliminarily enjoin the Interim Guidance. A Florida district court denied Florida's motion for preliminary injunction, holding that the Interim Guidance is not final agency action and, in any event, is committed to agency discretion. *See Florida v. United States*, No. 8:21-CV-541-CEH-SPF, 2021 WL 1985058, at *9 (M.D.

Fla. May 18, 2021) ("The policies do not change anyone's legal status nor do they prohibit the enforcement of any law or detention of any noncitizen."); *id*. at *10 ("Even if the Court were to conclude the agency action is final reviewable action, the Court agrees with Defendants that the memoranda reflect discretionary agency decisions related to the prioritization of immigration enforcement cases, which are presumptively not subject to judicial review."). Florida appealed, and the matter was fully submitted to the Eleventh Circuit. After the Eleventh Circuit directed the parties to file supplemental briefs addressing whether the New Guidance mooted Florida's challenge to the Interim Guidance, Florida filed an unopposed motion to dismiss its appeal as moot and for vacatur of the district court opinion.

Next, an Arizona district court dismissed Arizona and Montana's suit and denied their motion for preliminary injunction, finding that immigration enforcement priorities are committed to agency discretion and, therefore, not subject to judicial review. *See Arizona v. U.S. Dep't of Homeland Sec.*, No. CV-21-00186-PHX-SRB, 2021 WL 2787930, at *10 (D. Ariz. June 30, 2021) ("While [the States] may not agree with this prioritization scheme, [the States'] allegations in their Amended Complaint do not 'rise to a level that would indicate' that the Government is *abdicating* its responsibility to remove noncitizens with final orders of removal from the United States.") (emphasis in original). The Ninth Circuit twice denied Arizona's and Montana's motions for an injunction pending appeal. *See Arizona v. United States*, Case No. 21-16118 (9th Cir. July 30, 2021, and Sept. 3, 2021). Defendants recently filed a motion to dismiss the appeal, and the States have not yet taken a position on the motion.

*C. New Guidance*

On September 30, 2021, the Secretary issued the memorandum at issue here, "Guidelines for the Enforcement of Civil Immigration Law" ("New Guidance"). *See* New Guidance, ECF No. 58-1. The seven-part "memorandum provides guidance for the apprehension and removal of noncitizens." *Id*. at 1. The New Guidance does not cover detention. The first part explains the foundational principle of the exercise of prosecutorial discretion. *See, e.g.*, *id.* at 2 (underscoring how it is "well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders"). The next part provides the substantive provisions prioritizing national security, public safety, and border security. *Id*. at 3-4. The third part seeks to ensure that DHS exercises its "discretionary authority in a way that protects civil rights and civil liberties." *Id*. at 5. Fourth, the New Guidance guards against the "use of immigration enforcement as a tool of retaliation." *Id*. Fifth, through training, data collection, and quality review mechanisms, DHS seeks to ensure that line officers apply the New Guidance with integrity and quality while leaving "the exercise of prosecutorial discretion to [their] judgment." *Id*. at 5-6. Sixth, the New Guidance set November 29, 2021, as the effective date, which also served to rescind the Pekoske Memo and the ICE Interim Guidance. *Id*. at 6-7. And, last, the New Guidance contains a statement that it confers no "right or benefit." *Id*. at 7.

For the substantive provisions in Part II, the New Guidance maintains the three categories from the Interim Guidance—national security, border security, and public safety—but the New Guidance functions in a distinctively different manner, particularly

with respect to the public-safety category. *See id.* at 3-4. Rather than creating presumed priority categories, the New Guidance avoids "bright lines or categories" and instead "requires an assessment of the individual and totality of the facts and circumstances." *Id.* at 3. With this as the backdrop, the New Guidance then includes a non-exclusive list of aggravating factors (*e.g.*, "the gravity of the conviction and sentence imposed[]" or "the sophistication of the criminal offense[]") and mitigating factors (*e.g.*, "military service" or "time since an offense and evidence of rehabilitation[]"). *Id.* at 3-4. Further, in emphasizing discretion in this realm, the New Guidance notes that "[t]he overriding question is whether the noncitizen poses a current threat to public safety." *Id.* at 4. Likewise, for border security, the New Guidance underscores that "[DHS] personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly." *Id.*

**III. Litigation History.**

Plaintiffs filed their Complaint challenging the Interim Guidance on July 1, 2021, and their Second Amended Complaint challenging both the Interim Guidance and the New Guidance on October 8, 2021.[2] In their Second Amended Complaint, Plaintiffs assert claims under the INA, the Administrative Procedure Act ("APA"), and the Take Care Clause of the Constitution.

## ARGUMENT

Defendants move to dismiss the Second Amended Complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Rule 12(b)(1) dismissal is required if the court

---

[2] Plaintiffs filed a motion for preliminary injunction against the Interim Guidance on July 8, 2021.

"lacks the statutory or constitutional power to adjudicate the case." *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). The plaintiff bears the burden of "demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Renne v. Geary*, 501 U.S. 312, 316 (1991). In assessing its jurisdiction, a court may rely upon: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (5th Cir. 2020).

The Court should also dismiss for improper venue. Fed. R. Civ. P. 12(b)(3). "[T]he plaintiff has the burden of demonstrating that the chosen venue is proper." *Graham v. Dyncorp Int'l, Inc.*, 973 F. Supp. 2d 698, 700 (S.D. Tex. 2013). "[T]he court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff," when assessing venue. *Id.* (quoting *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 Fed. App'x 612, 615 (5th Cir. 2007) (per curiam)).

## I.     Plaintiffs' Challenge to the Interim Guidance is Moot.

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies," and do not have "the power 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when

the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). In other words, "[m]ootness applies when intervening circumstances render the court no longer capable of providing meaningful relief to the plaintiff." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013).

Here, intervening circumstances preclude the Court from providing any meaningful relief to Plaintiffs on their challenge to the Interim Guidance. Plaintiffs' challenge to the January 20 and February 18 Memoranda became moot once those memoranda "expired by [their] own terms." *Trump v. Int'l Refugee Assistance Project*, 138 S. Ct. 353 (2017); *Burke v. Barnes*, 479 U.S. 361, 363 (1987) (challenge to validity of bill became moot when "that bill expired by its own terms"); *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) (holding that "a law's automatic expiration" moots the case); *see Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (claim is moot where it would be impossible for plaintiffs to obtain "any effectual relief" even if they were to prevail on their claims); *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010) (when a court's "resolution of an issue could not possibly have any practical effect on the outcome of the matter," case must be dismissed). In the January 20, 2021, Memorandum, the Acting Secretary of Homeland Security stated that the Department's interim guidance in Section B, *i.e.*, the Interim Guidance challenged here, would "remain in effect until superseded by revised priorities developed in connection with the review directed in section A." *See* Pekoske Memo at 3. Likewise, because the February 18 Memorandum implemented the January 20 Memorandum, it also expired by its own terms when new superseding guidance

13

took effect. *See* ICE Interim Guidance at 1 ("This memorandum establishes interim guidance in support of the interim civil immigration enforcement and removal priorities that Acting Secretary Pekoske issued on January 20, 2021."). The New Guidance did just that: It stated explicitly that upon its effective date of November 29, 2021, "this guidance will serve to rescind (1) the January 20, 2021 Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities issued by then-Acting Secretary David Pekoske, and (2) the Interim Guidance: Civil Immigration Enforcement and Removal Priorities issued by Acting ICE Director Tae D. Johnson." *See* New Guidance at 6.

Accordingly, the Interim Guidance is no longer in effect and Plaintiffs' challenge to it is now moot. This Court should dismiss Plaintiffs' challenge to the Interim Guidance.[3]

## II.   The Court Should Dismiss All Other Claims in the Second Amended Complaint.

The Court should dismiss all of Plaintiffs' claims related to the New Guidance for any of multiple independent reasons. First, the Plaintiffs cannot establish Article III standing to sue, and the Court therefore lacks jurisdiction. Second, venue in the Southern District of Texas is improper. Third, the Plaintiffs' claims are barred by multiple threshold requirements of the APA. These same defects would also bar Plaintiffs' challenge to the Interim Guidance to the extent this Court finds that those claims are not moot. Accordingly, the Court should dismiss the Second Amended Complaint in full.

---

[3] With the consent of the Plaintiff States, Defendants have moved to dismiss their appeal in the Fifth Circuit of the preliminary injunction entered against the Interim Guidance. *See* Consent Motion, *Texas v. United States*, No. 21-40618 (5th Cir. Dec. 6, 2021).

A.    *Plaintiffs lack Article III standing to sue.*

Plaintiffs—six Texas sheriffs, seven Texas counties, and the Federal Police Foundation (the "Foundation")—fail to establish that they will suffer any cognizable injury due to the New Guidance. To establish standing to "seek injunctive relief, a plaintiff must show that" it "is under threat of suffering" an "actual and imminent" injury caused by "the challenged action," and that "a favorable judicial decision will prevent" that injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Any "threatened injury must be *certainly impending* to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added). Additionally, to establish redressability, a plaintiff must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

1. The Sheriffs and Counties cannot demonstrate any redressable injury that is traceable to the New Guidance.

The Plaintiff Sheriffs and Counties assert that the New Guidance will increase the number of removable or detainable noncitizens in their respective counties, resulting in an increase in crimes (and related costs). *See* Second Amend. Compl. ¶¶ 118-43, ECF No. 59 ("SAC"). As a threshold matter, a litigant "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Regardless, this theory relies on a speculative chain of events involving independent actions by third parties, and does not show that any injury is "*certainly* impending." *Whitmore*, 495 U.S. at 158 (emphasis added); *see California v. Texas*, 141 S.

15

Ct. 2104, 2117 (2021) ("[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party," standing is "ordinarily substantially more difficult to establish."). Even assuming that the New Guidance will result in a drop in some enforcement actions, Plaintiffs' theory hinges on the unsupported allegation that the noncitizens spared from enforcement actions due to the New Guidance will not only commit crimes but will commit crimes that require *more* resources than those who, because the priorities focus resources on them, are apprehended instead.[4]

Plaintiffs fail to adequately allege that the purported increase in criminal activity in the Counties is attributable to noncitizens who were spared from immigration enforcement actions due to immigration enforcement prioritization. As an initial matter, Plaintiffs simply allege that certain counties have recently experienced an increase in arrests of noncitizens over the last year due to the commission of unspecified crimes. Although the Complaint alleges an increase in *arrests* of noncitizens by the Counties, that does not necessarily mean there has been an increase in *criminal activity* by noncitizens. Indeed, the lead Plaintiff, Sheriff Brad Coe, was recently quoted explaining his efforts to encourage local landowners to report property crimes that previously went unreported.[5] Moreover,

---

[4] In *Texas v. United States*, the Fifth Circuit noted that a Court may consider "offsetting benefits that are of the same type and arise from the same transaction as the costs." 809 F.3d 134, 155 (5th Cir. 2015), as revised (Nov. 25, 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016). Here, the offsetting "benefits" (the apprehension, due to the New Guidance, of noncitizens likely to pose a threat to society) is "of the same type" as Plaintiffs' alleged injury (the non-apprehension of other criminal noncitizens) and arise from the same event (the New Guidance).

[5] *See* Aaron Nelson, Kinney County Has Embraced Greg Abbott's Operation Lone Star Like Nowhere Else. It's Fueling the Hysteria of Some Locals, Texas Monthly (Oct. 29, 2021), texasmonthly.com/news-politics/operation-lone-star-kinney-county/. In considering a motion

Sheriff Coe also explained that he could not attribute the recent increase in crime to noncitizens—that it "could be part of illegal alien trafficking or it could just be local meth heads."[6] By the parties' own admission, then, Plaintiffs cannot plausibly allege an increase in crime caused by something other than their own conduct—much less an increase in crimes committed by noncitizens—much less crimes committed by noncitizens who otherwise would have been priorities, but for the challenged Guidance.

More broadly, to support their injury theory, the Sheriffs and Counties allege that the *Interim Guidance* resulted in an increase in crime in their respective counties. But even assuming this speculative assertion were true, it does not show that the *New Guidance* will increase crime in the Counties. In fact, there are material differences between the Interim Guidance and the New Guidance. For example, the New Guidance provides enforcement officials with *more* discretion to take enforcement actions against noncitizens deemed to pose a public safety threat. Although the Interim Guidance focused on those convicted of aggravated felonies or participated in certain criminal organizations, *see* ICE Interim Guidance, at 4-5, the New Guidance generally calls on officials to prioritize enforcement actions against those who "pose[] a current threat to public safety." New Guidance, at 3.

Finally, even assuming that any Sheriff or County could establish both an impending injury and a fairly traceable causal link from that injury to the New Guidance, Plaintiffs fail to show that their alleged injuries would "likely" be redressed by a favorable decision.

---

under FRCP 12(b)(1), a court can consider evidence outside the complaint without converting the motion to one for summary judgment. *See Hill v. Rsch. Inst. of Am. Grp.*, 209 F.3d 719 n.1 (5th Cir. 2000).

[6] *See id.*

*Laidlaw*, 528 U.S. at 181. Due to resource constraints, *every* Administration must inevitably prioritize certain enforcement actions over others; the only question is *how* it prioritizes. *See Arizona*, 567 U.S. at 396. Thus, even if the Court enjoins the New Guidance, DHS would still have to adopt some prioritization scheme, whether explicitly (through central guidance) or implicitly (by forcing local immigration officials to engage in ad hoc prioritization given the reality of limited resources). Plaintiffs do not allege that the resulting prioritization scheme would result in a decrease in crime—much less that crime would decrease in their respective jurisdictions. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) ("redressability [that] requires speculat[ion]" is insufficient to support standing). Thus, it is purely speculative that a favorable ruling would address Plaintiffs' alleged injuries.

### 2. Binding Fifth Circuit precedent precludes a finding of injury for the Federal Police Foundation or its members.

The Foundation asserts two injuries due to the New Guidance. First, it contends that its ICE-officer members may suffer an injury because either they will have to follow the New Guidance and allegedly violate their oaths, or they will resist following the New Guidance and be subject to discipline. *See* SAC ¶¶ 153-54. Second, the Foundation tries to establish standing based on a supposed injury from having to advise its members on compliance with the New Guidance. *See* SAC ¶¶ 150-52. Neither injury is cognizable under Fifth Circuit precedent.

The first theory—an "associational standing" theory based on injuries allegedly born by the Foundation's members—fails under the Fifth Circuit's decision in *Crane v.*

18

*Johnson*, 783 F.3d 244, 253-55 (5th Cir. 2015) (ICE officers and Mississippi lacked standing to challenge DACA). There, the ICE officers asserted that DACA would "compel[] [them] to violate their oath to uphold the laws of the United States," and subject them to potential "employment sanctions if they do not follow the Directive." *Id*. at 253. The Fifth Circuit rejected these theories, noting that (i) an "agent's subjective belief that complying with" a policy "will require him to violate his oath is not a cognizable injury," and (ii) officers could not show they would be subjected to "employment sanctions" since DACA states that "[a]gents shall exercise their discretion in deciding to grant deferred action," making it "unlikely that the agency would impose an employment sanction against an employee who exercises his discretion to detain an illegal alien." *Id*. at 253-55.

The same reasoning applies here. An officer's subjective belief that following the New Guidance will conflict with his oath "is not a cognizable injury," and the New Guidance expressly vests the officers with discretion to make judgment calls on a case-by-case basis, making it "unlikely" that DHS would impose "employment sanction[s]" on any officer who exercises that discretion. Thus, as a matter of law, the Foundation cannot establish associational standing based on either postulated injury to its members.

The Foundation's second theory—an "organizational standing" theory based on financial costs borne by the Foundation—likewise fails. To establish standing based on an organization's voluntary expenditures, the organization must show that it had to expend "significant resources" in a manner inconsistent with its mission. *Tenth St. Residential Ass'n ("TSRA") v. City of Dallas*, 968 F.3d 492, 495 (5th Cir. 2020). A "setback to the organization's abstract social interests" does not constitute "an injury-in-fact." *Id*. Here,

the Foundation has not shown that it will expend any resources, let alone *significant* resources, as a result of the New Guidance. Rather, the Foundation merely asserts that it has had to "advis[e]" its members over the priorities guidance. *See* SAC ¶ 150. Further, investing funds towards educating its members falls squarely within the Foundation's pre-existing mission. Indeed, Plaintiffs specifically allege that one of the Foundation's "purposes" is "informing federal law enforcement officers." SAC ¶ 46. Thus, the Foundation has not established an injury-in-fact necessary for organizational standing.

> B.   *Venue is improper in the Galveston Division of the Southern District of Texas.*

In the alternative, this Court should dismiss the Second Amended Complaint because the Southern District of Texas is an improper venue for Plaintiffs' claims. *See* 28 U.S.C. § 1391(e); *see generally* Mot. to Transfer, ECF No. 32 ("Defs.' Transfer Mot.").[7]

Plaintiffs may not establish venue in a district based on the location of plaintiffs who lack standing. *See Miller v. Albright*, 523 U.S. 420, 426-27 (1998). Although Defendants believe that no party has standing to challenge the New Guidance, the allegations of harm to Galveston County and McMullen County and its Sheriff—the Plaintiffs that reside in the Southern District of Texas—are particularly untethered to the policy being challenged here. For McMullen County and its Sheriff, the operative Complaint claims that there has been an eight-fold increase in the number of arrests in 2021 compared to 2020. SAC ¶ 129. And for to Galveston County, the operative Complaint alleges that overall crime is up because 30% more criminals have been booked into the

---

[7] Defendants reprise their arguments from their pending transfer motion to preserve them.

County jail in 2021. SAC ¶ 134. Plaintiffs' most specific allegations of harm to Galveston and McMullen Counties do not distinguish at all between noncitizens and citizens and lawful residents, and so cannot be attributable to the New Guidance. While Plaintiffs assert that the increases in arrests and bookings are due to noncitizens unlawfully present in the country, the Court must disregard this unsupported conclusion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009). To the extent that the Court determines that any of the Plaintiffs have adequately alleged injury, it should dismiss the Plaintiffs whose allegations do not support their claim to injury, namely Galveston County and McMullen County and its Sheriff.

Further, Plaintiffs cannot establish venue by referring to Foundation members who serve in the Southern District of Texas because this Court plainly lacks jurisdiction over their claims under the CSRA, *see infra* III.A, and, in any event, those members lack standing, *see supra* II.A.2. Thus, although Defendants contend that no Plaintiff has standing, *see supra* II.A, to the extent the Court finds that any Plaintiff has standing to challenge the New Guidance, it would presumably be Kinney County and its Sheriff, whose claim cannot proceed in this District. *See* 28 U.S.C. § 1391(e).

Thus, the Court should dismiss this action for improper venue. Alternatively, Defendants have filed a motion to transfer this action to the Western District of Texas, in part under 28 U.S.C. § 1406, to cure this jurisdictional defect. Defs.' Transfer Mot. The Court could thus alternatively dismiss this action for improper venue or transfer it to the Western District of Texas.

### C.   *Plaintiffs' claims fail to clear three threshold bars to APA lawsuits.*

Three limitations imposed by the APA each independently bars the Plaintiffs'

claims. First a court cannot review immigration enforcement priorities because such action is "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). Second, the New Guidance is not "final agency action" subject to review under the APA because it does not alter legal rights or obligations. *See* 5 U.S.C. § 704. Third, numerous provisions of the INA narrowly circumscribe the mechanisms and procedures for judicial review of immigration policies and thereby "preclude judicial review" under the APA. *See* 5 U.S.C. § 701(a)(1).

As an initial matter, all of Plaintiffs' claims—including their claim under the Take Care Clause—are brought pursuant to the APA. Judicial review under the APA expressly includes claims that agency action is "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Plaintiffs may not plead their way around the fundamental principles governing review of agency action by relying on constitutional arguments. *See Charlton Mem. Hosp. v. Sullivan*, 816 F. Supp. 50, 51 (D. Mass. 1993) (plaintiff's equal protection claim "cannot so transform the case that it ceases to be primarily a case involving judicial review of agency action"); *Harkness v. Sec'y of Navy*, 858 F.3d 437, 451 n.9 (6th Cir. 2017) (noting that a constitutional claim "is properly reviewed on the administrative record"), *cert. denied*, 138 S. Ct. 2648 (2018) (mem.); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1232 (D.N.M. 2014) ("The presence of a constitutional claim does not take a court's review outside of the APA [action].").

        1.    <u>The challenged action is "committed to agency discretion by law."</u>

As the Supreme Court has explained, the Executive's "broad discretion" in enforcement decisions is "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). The reasons for judicial modesty in this sphere "are greatly

magnified in the deportation context." *AADC*, 525 U.S. at 490. As district courts in Florida and Arizona explained in rejecting two other recent challenges to DHS's immigration enforcement priorities, immigration enforcement prioritization is committed to agency discretion by law and not reviewable under the APA. *See Florida*, 2021 WL 1985058, at *10; *Arizona*, 2021 WL 2787930, at *11.

Plaintiffs' challenge to the New Guidance therefore fails. The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2). One such category which has long been recognized as unreviewable includes enforcement and nonenforcement decisions. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *Wayte*, 470 U.S. at 607. That is because, as the Supreme Court has explained, such decisions inherently require "a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise," including "whether agency resources are best spent on this violation or another," "whether the particular enforcement action requested best fits the agency's overall policies," and "whether the agency has enough resources to undertake the action at all." *Chaney*, 470 U.S. at 831. There can be no doubt that this general presumption of nonreviewability applies. But Plaintiffs' Second Amended Complaint suggests that §§ 1225(b)(2)(A), 1226(c), and 1231(a) displace this presumption by using the word "shall." The argument fails here, as the Fifth Circuit recently explained with regard to

§§ 1226(c) and 1231(a).[8]

The word "shall" does not eliminate immigration officials' discretion. *See Texas Stay Op.*, 14 F.4th at 337; *Florida*, 2021 WL 1985058, at *10; *Arizona*, 2021 WL 2787930, at *11. Rather, the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory legislative commands." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005). Thus, in *Castle Rock*, a statute provided that law enforcement "shall arrest . . . or . . . seek a warrant" for the arrest of any violator of a restraining order, but the Supreme Court rejected the notion this imposed a mandatory duty because to be "a true mandate of police action would require some stronger indication" of legislative intent than the bare "shall." *Id.*

So too here. Nothing provides the "stronger indication" necessary to displace

---

[8] As explained above, this Fifth Circuit decision was vacated after the ICE Interim Guidance and Pekoske Memo were rescinded. It is therefore no longer binding as precedent, but it still serves as persuasive authority. *See Melot v. Bergami*, 970 F.3d 596, 599 n.11 (5th Cir. 2020) (finding a "thoughtful [circuit court] opinion" persuasive even though it had been "vacated as moot on rehearing"); *Johansen v. Trico Marine Int'l, Inc.*, No. CV H-07-3767, 2008 WL 11390861, at *8 (S.D. Tex. Aug. 29, 2008) ("the reasoning underlying" a vacated "decision remains persuasive authority."). In another context, a different Fifth Circuit panel recently remarked that the Interim Guidance created a "class-based priority scheme" that would be reviewable under the APA. *See Texas v. Biden*, No. 21-10806, 2021 WL 5882670 at *38 (5th Cir. Dec. 13, 2021). Even if this dicta was binding—it is not—the New Guidance makes no "class-based" immigration enforcement distinction. To the contrary, it requires immigration officers to make *case-by-case* "totality of the facts and circumstances" determinations of whether to take certain civil immigration enforcement and removal actions, and thus, even under the Fifth Circuit's analysis in *Texas*, it guides the exercise of prosecutorial discretion and is presumably unreviewable. *See id.* at *36 (the "executive [is] free to leave the law unenforced in particular instances and at particular moments in time"). The New Guidance discarded the presumed priority framework, which presumably created the "classes" referenced by panel, in favor of a totality analysis for officers to decide whether to take an enforcement action. *See* New Guidance at 4 (rejecting "categorical determination[s]"). Accordingly, under either Fifth Circuit panel's analysis, the New Guidance establishes a framework to make individualized determinations in a manner committed to agency discretion.

enforcement discretion. Quite the opposite: The statutory and practical context here confirm that none of § 1225(b)(2), § 1226(c), or § 1231(a) impose an enforceable mandate in this context. *See Crane*, 783 F.3d at 247 (explaining in the context of a challenge brought pursuant to § 1225(b)(2), that "the concerns justifying criminal prosecutorial discretion are 'greatly magnified in the deportation context'") (quoting *AADC*, 525 U.S. at 490).[9] Congress constructed a removal system that has as a "principal feature" the "broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. That system gives the Executive the discretion to decide "whether it makes sense to pursue removal at all," *id.*, and allows the Executive "to abandon the endeavor" at "each stage" of the process, *AADC*, 525 U.S. at 483. Consistent with that sweeping grant of discretion, Congress empowered the Secretary to establish "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to "issue such instructions" and "perform such other acts as he deems necessary for carrying out his authority" under the INA, 8 U.S.C. § 1103(a)(3).

To underscore the extent of the Executive's enforcement discretion, Congress provided that, generally, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary] to commence

---

[9] A Fifth Circuit panel recently held that, once removal proceedings are initiated, § 1225 requires that DHS detain arriving noncitizens at the border or return them to a contiguous territory, and that in combination with § 1182(d)(5), permits DHS to parole them into the United States case-by-case in certain circumstances. *See Texas v. Biden*, 2021 WL 5882670 at *47. That holding applies only to noncitizens "attempting to enter the United States." *Id.* at *46. Even in the context of noncitizens apprehended at the border, the panel acknowledged that DHS "lacks the resources to detain" this class of noncitizens, *id.* at *48, and thus it stands to reason that DHS certainly lacks the resources to detain the broader class of noncitizens that Plaintiffs believe are covered by the statute in the interior. In any event, this is entirely beside the point given that the New Guidance does not even apply to detention. *See* New Guidance at 1 (applying to apprehension and removal).

proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). That provision reflects Congress's desire to "protect[] the Executive's discretion from the courts" in general and from "attempts to impose judicial constraints upon prosecutorial discretion" in particular. *AADC*, 525 U.S. at 485-86, 485 n.9. Together with the Executive's longstanding enforcement prerogative, these statutes unmistakably establish that Congress committed immigration enforcement decisions to the Executive's unreviewable discretion. It is thus unsurprising that "in the quarter century that IIRIRA has been on the books, no court at any level previously has held that sections 1226(c)(1) or 1231(a)(2) eliminate immigration officials' discretion to decide who to arrest or remove." *Texas* Stay Op., 14 F.4th at 338.

As the Fifth Circuit recently discussed, Plaintiffs cannot rely on cases such as *Preap*, *Demore,* and *Guzman Chavez* to support their notion that the use of the word "shall" eliminates prosecutorial discretion. Although those cases use seemingly mandatory language to describe the statutes all are "ones in which detainees subject to enforcement action were seeking their release" from custody and in none of them did the Supreme Court "consider whether the statutes eliminate the government's traditional prerogative to decide who to charge in enforcement proceedings (and thus who ends up being detained)." *Texas* Stay Op., 14 F.4th at 338-39.[10] Indeed, in *Preap*, the Supreme Court expressly *rejected* the

---

[10] The only mandates in §§ 1226(c) and 1231(a)(2) are that DHS not release from detention certain covered noncitizens in certain circumstances. As explained above, the New Guidance does not govern decisions about detention or release. In any event, longstanding DHS practice of detaining covered noncitizens who are taken into custody is consistent with these detention mandates: section 1226(c) mandates that once a covered criminal noncitizen is arrested and detained, and in

argument that Congress wanted the supposedly mandatory language in § 1226(c) to be "*enforced by courts*" against the government; rather, the Supreme Court explained, that language served only to "exhort[]"—that is, to encourage—"the Secretary to act quickly." 139 S. Ct. at 969 & n.6. Moreover, resource constraints, relations with local authorities, and the fundamental difficulty of determining *ex ante* whether a particular noncitizen's conviction triggers the statutory criteria all make it practically impossible to detain every noncitizen whose detention is directed by §§ 1225(b)(2), 1231(a), or 1226(c).

In sum, Congress vested the Secretary with broad discretion to set immigration enforcement priorities. 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). The Secretary has exercised that discretion here to focus agency resources on cases that fall within the priority categories, while permitting other enforcement actions when justified by the facts. This Court lacks jurisdiction to review the establishment of enforcement priorities.

2.    The Memoranda are not "final agency actions" subject to APA review.

Plaintiffs' challenge fails for yet another reason. Only "final agency action" is subject to judicial review under the APA. 5 U.S.C. § 704. Agency action is "final" only if it both is "the consummation of the agency's decisionmaking process" and also determines "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). Here, the New Guidance does not determine or alter any individual noncitizen's rights or obligations, nor is it an action

---

removal proceedings, DHS may release them "only if" narrow exceptions are met; section 1231(a) provides that "[u]nder no circumstance" shall DHS release certain noncitizens who are detained during the removal period. Section 1225(b)(2) lacks the same truly-mandatory language; a mere "shall" does not displace the Executive's discretion.

"from which legal consequences will flow." *See id.* Indeed, in rejecting Florida's request to preliminarily enjoin the Interim Guidance, the district court in the Middle District of Florida found that the challenged agency's enforcement guidance did not constitute final agency action. *See Florida*, 2021 WL 1985058, at *9.

The New Guidance sets out procedures for and the manner in which ICE will take enforcement actions—some of which may result in later "final agency action" subject to review through the INA. Only those later, final agency actions—*e.g.*, the issuance of a final order of removal—"alter" a noncitizen's "legal rights or obligations" or create "legal consequences." The guidance does not itself change any person's legal status, confer any legal benefits, or have any "legal consequences." It is similar to the prosecutor's policy of focusing on bank robberies—such a policy of course does not make pickpocketing lawful or provide a pickpocket with a defense to avoid prosecution. Indeed, the New Guidance expressly advises that it does not "create any right or benefit, substantive or procedural, enforceable at law." New Guidance at 7.

To be sure, the New Guidance may have downstream consequences. Perhaps DHS will take enforcement action against one noncitizen it otherwise would not have, and perhaps DHS will defer enforcement action against a different noncitizen it otherwise might not have. But "any such consequences are practical, as opposed to legal, ones." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 583 (5th Cir. 2016); *see also Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). And it is only *legal* consequences that establish finality for purposes of the APA. Thus, for example, the decision to initiate an enforcement action is the

28

quintessential example of non-final agency action, notwithstanding that it will have the immediate practical effect of requiring the target to participate in related proceedings, and may later result in a legally binding order or judgment. *See, e.g.*, *Energy Transfer Partners, L.P. v. Fed. Energy Regul. Comm'n*, 567 F.3d 134, 141 (5th Cir. 2009); *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241 (1980). The New Guidance here is further removed even from that: it does not itself initiate (or terminate) any proceeding but instead merely sets internal procedures for doing so in discrete cases.

> 3.   Congress has precluded judicial review of these types of decisions.

Consistent with the broad enforcement discretion afforded DHS, Congress enacted "*many* provisions . . . aimed at protecting the Executive's discretion from the courts." *AADC*, 525 U.S. at 486. Those provisions independently preclude judicial review here.

> a.   *APA challenges to DHS's application of enforcement priorities are precluded from review.*

An action cannot proceed under the APA when another statute precludes judicial review. 5 U.S.C. § 701(a)(1). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). A detailed mechanism for review of some claims by some plaintiffs is "strong evidence that Congress intended to preclude [other types of plaintiffs] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

Congress has set out a detailed statutory review scheme for claims pertaining to the

INA. *See* 8 U.S.C. § 1252; *id.* § 1229. That review scheme is the exclusive means of judicial review and precludes statutory claims that do not fall within its parameters. *See, e.g.*, *id.* § 1252(a)(5) ("For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, [those terms] include . . . review pursuant to any other provision of law (statutory or nonstatutory)"). Section 1252(b)(9) channels judicial review of all "decisions and actions leading up to or consequent upon final orders of deportation," including "non-final order[s]," into one proceeding exclusively before a court of appeals. *AADC*, 525 U.S. at 483, 485.

A separate—and even more limited—scheme governs judicial review of expedited removal orders. *See* 8 U.S.C. § 1252(a)(2)(A); *id.* § 1252(e). With respect to removal proceedings under § 1229a, these provisions circumscribe district court jurisdiction over "*any* issue—whether legal or factual—arising from *any* removal-related activity," which "can be reviewed *only* through the [statutorily defined] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029–31 (9th Cir. 2016); *see Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (similar). That includes "policies-and-practices challenges," *J.E.F.M.*, 837 F.3d at 1035, arising from any "action taken or proceeding brought to remove an alien," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all, *J.E.F.M.*, 837 F.3d at 1032. Thus, § 1252(b)(9) is an "unmistakable zipper clause" that means "no judicial review in deportation cases unless this section provides judicial review." *AADC*, 525 U.S. at 482-83. And as to expedited removal determinations under § 1225(b)(1), "no court shall have jurisdiction to review" any challenge to "procedures and policies adopted by the [Secretary] to implement the

30

provisions of section 1225(b)(1)," subject to minor exceptions, in the District Court for the District of Columbia. 8 U.S.C. § 1252(a)(2)(A)(iv), (e)(3); *M.M.V. v. Garland*, 1 F.4th 1100, 1109 (D.C. Cir. 2021).

The claims here "arise[] from" "action[s] taken or proceeding[s] brought to remove an alien" under § 1229a, 8 U.S.C. § 1252(b)(9), and "procedures and policies" implementing § 1225(b)(1). 8 U.S.C. § 1252(a)(2)(A)(iv). Plaintiffs challenge what they allege to be DHS's practice regarding (1) the initiation of either expedited removal proceedings, *id.* § 1225(b)(1), or full removal proceedings "under section 1229a," *id.* § 1225(b)(3)(A); (2) detention of certain noncitizens "pending [a] decision" on removal, *id.* § 1225(b)(3)(B); § 1226(a); and (3) the removal "at any time" of noncitizens with reinstated orders of removal, *id.* § 1231(a)(5). Because § 1252 provides the sole mechanism for review of all "decisions and actions leading up to or consequent upon final orders of deportation," *AADC*, 525 U.S. at 485, and because Plaintiffs cannot invoke § 1252, their claims necessarily fail.

As Justice Scalia explained in *Fausto*, when Congress provides for review by specific plaintiffs, but not by others, the excluded plaintiffs cannot obtain judicial review.[11] 484 U.S. at 448. That is precisely what Congress did here. In *Block*, for example, Congress provided a specific review scheme for "dairy handlers" but said nothing at all about

---

[11] The district court that addressed the Interim Guidance thus erred in its understanding of § 1252's import for claims brought outside its strictures. Rather than making *Block* and *Fausto* "irrelevant," *Texas v. United States*, ___ F. Supp. 3d ___, 2021 WL 3683913 at *20 (S.D. Tex. Aug. 19, 2021), the fact that the INA provides review only for noncitizens confirms that *Fausto* and *Block* are directly on point.

"consumers." 467 U.S. at 346-47. This did not mean that milk consumers could resort to the APA to challenge the agency action; it meant they could not challenge the action at all. *Id.* at 347. Here, by providing a detailed and limited review scheme for noncitizens' claims, Congress has implicitly precluded claims by other persons or entities, including by these plaintiffs, under the APA or otherwise. *Cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding that organizational plaintiff could not challenge INS policies "that bear on an alien's right to legalization").

> b.   *Plaintiffs' § 1225 challenge is specifically precluded from review.*

Even setting aside the broad preclusion of APA claims under § 701(a)(1) and the Supreme Court's precedents in *Fausto* and *Block*, Congress specifically precluded the challenges Plaintiffs raise here. Plaintiffs contend that the New Guidance violates § 1225(b)(1)'s supposed mandate for the expedited removal of certain noncitizens and the ordinary removal proceedings for other noncitizens. *See* Pls.' Mot. for Prelim. Inj. Relief at 6, ECF No. 7. But Congress has explicitly precluded judicial review of this claim: "[N]o court shall have jurisdiction to review" "procedures and policies adopted by the [Secretary] to implement the provisions of section 1225(b)(1)." 8 U.S.C. § 1252(a)(2)(A), (A)(iv);[12] *see id*. § 1252(b)(9) (precluding all such challenges as those brought here under § 1225(b)).

> c.   *Plaintiffs' § 1226(c) challenge is specifically precluded from review.*

In addition, Congress expressly precluded judicial review over the Plaintiffs'

---

[12] Section 1252(e) restores jurisdiction in two circumstances, neither of which applies here: a habeas challenge by a noncitizen to their expedited removal order, 8 U.S.C. § 1252(e)(2), and a facial challenge to a regulation or policy implementing § 1225(b)(1) "instituted in the United States District Court for the District of Columbia." *Id.* § 1252(e)(3)(A).

§ 1226-related claim. Congress provided that the Secretary's "discretionary judgment regarding the application of this section shall not be subject to review." 8 U.S.C. § 1226(e). Here, the Secretary's determinations under § 1226(c) are discretionary since he may detain a noncitizen under § 1226—under either (a) or (c)—only "pending a decision" on removal. Detention authority is thus contingent on the Secretary's separate, predicate, and discretionary decision to commence removal proceedings in the first instance, by issuing a notice to appear. *See id.* § 1229(a); *Crane*, 783 F.3d at 249; *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1482 (2021) ("A notice to appear serves as the basis for commencing a grave legal proceeding" and "is like an indictment in a criminal case."). Even crediting a judicially enforceable mandate in § 1226(c) for detention "pending a decision" on removal, it would not disrupt the Executive's "broad" discretion to decide who should face removal proceedings in the first place. *Arizona*, 567 U.S. at 396; *Texas* Stay Op., 14 F.4th at 337.

The policy Plaintiffs challenge here—which does not dictate which noncitizens DHS may detain, but instead simply establishes internal procedures that help DHS target its apprehension and removal resources—is still deeper within the Secretary's discretion. Put otherwise, Congress vested the Secretary with discretion to decide who to pursue for removal in the first instance, 8 U.S.C. § 1229(a), and derivatively whom to take into custody and detain pending removal, *id.* § 1226(a); Congress also vested the Secretary with discretion to set "national immigration enforcement polices and priorities," 6 U.S.C. § 202(5); and Congress also provided that such detention decisions "shall not be subject to [judicial] review," 8 U.S.C. § 1226(e). The Court therefore lacks jurisdiction to review the Secretary's discretionary decision to structure enforcement priorities as he has here.

33

To be sure, the Supreme Court has held that this section does not preclude a habeas petitioner from challenging either the constitutionality of the statutory scheme or that his detention is not authorized by that scheme. *Demore v. Kim*, 538 U.S. 510, 517 (2003). That is so because Congress must speak more clearly when it seeks to preclude constitutional claims or habeas review. *Id.* In subsequent cases, a plurality of the Court similarly found jurisdiction over constitutional challenges to the statutory framework or to claims contending that detention was *not* authorized by that framework. *Preap*, 139 S. Ct. at 962 (plurality); *Jennings*, 138 S. Ct. at 841 (plurality). *But see Preap*, 139 S. Ct. at 974-75 (Thomas, J., concurring in part) (finding that § 1226(e) bars even those claims); *Jennings*, 138 S. Ct. at 857 n.6 (Thomas, J., concurring in part) (same). Here, Plaintiffs' APA claims are neither constitutional claims nor habeas claims, nor are they arguing that the Secretary lacks the power to detain certain noncitizens under § 1226(c). The "text of the statute contains no [similar] exception" for APA claims. *Preap*, 139 S. Ct. at 975 (Thomas, J., concurring in part). Because these claims do not implicate the special rules of construction related to constitutional or habeas claims, § 1226(e) precludes review.

> d.   *Plaintiffs' § 1231(a)(5) challenge is likewise specifically precluded.*

Section 1231 similarly precludes judicial review of Plaintiffs' challenge based on that section. Plaintiffs contend that § 1231(a)(5) requires DHS to remove *all* noncitizens who have reentered illegally. Setting aside whether that interpretation is correct, *see* Defs.' Mem. of P.&A. in Opp'n to Pls.' Mot. for a Prelim. Inj. at 34-47, ECF No. 33 (explaining why Plaintiffs' statutory interpretation is wrong), Plaintiffs cannot enforce that provision. Congress provided, in no uncertain terms, that "[n]othing in [§ 1231] shall be construed to

create any substantive or procedural right or benefit that is legally enforceable by any party against the United States." 8 U.S.C. § 1231(h). Whatever the meaning of § 1231(a)(5), it is not subject to judicial enforcement, by "*any* party." *See* Party, *Black's Law Dictionary* (11th ed. 2019) ("One by or against whom a lawsuit is brought."). Section 1231(h), like its statutory ancestor, "makes clear that Congress intended that *no one* be able to bring suit to enforce" it. *Hernandez-Avalos v. INS*, 50 F.3d 842, 844 (10th Cir. 1995).

Finally, for similar reasons, Plaintiffs do not come within the relevant zone of interests. An APA plaintiff must show that it is "aggrieved . . . within the meaning of a relevant statute," 5 U.S.C. § 702, meaning the plaintiff "may not sue unless he 'falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint,'" *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011) (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883 (1990)); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Whether a plaintiff is within the zone of interests is a question answered "using traditional tools of statutory interpretation" to decide "whether [the plaintiff] falls within the class of plaintiffs Congress has authorized to sue" under the applicable statute. *Lexmark Int'l, Inv. v. Static Control Components, Inc.*, 572 U.S. 118, 127-28 (2014). As explained above, Congress was clear that no entity can enforce § 1231, and therefore no entity is within the "zone of interests" of § 1231. *See* 8 U.S.C. § 1231(h); *Hernandez-Avalos*, 50 F.3d at 844.

4. <u>Plaintiffs cannot proceed by asserting claims under the Declaratory Judgment Act.</u>

For each of their claims, Plaintiffs also rely on the Declaratory Judgment Act, 28

U.S.C. §§ 2201-02. *See* SAC ¶ 58, Prayers for Relief ¶¶ A-C. But "[t]he operation of the Declaratory Judgment Act is procedural only." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 15 (1983). Although the Act "enlarged the range of remedies available in the federal courts," it did not create a cause of action, or a new right, to seek those remedies. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); *see also Harris Cnty. v. MERSCORP Inc.*, 791 F.3d 545, 552- 53 (5th Cir. 2015). Thus, the Act does not salvage Plaintiffs' claims.

## III.  At Minimum, the Court Should Grant Defendants' Partial Motion to Dismiss.

At minimum, should this Court not dismiss this entire action, it should dismiss for lack of jurisdiction (1) the claims brought by the Foundation as precluded by the Civil Service Reform Act, and (2) Plaintiffs' claims against the President.

### A.   *The ICE Officers' claims are precluded from judicial review by the Civil Service Reform Act.*

Even if this Court finds that any of the plaintiffs have standing, the Civil Service Reform Act (the "CSRA") precludes this Court's jurisdiction over any claims brought by the Foundation. The CSRA review scheme is the exclusive means for redressing federal employment disputes, even when plaintiffs style them as constitutional claims. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10-15 (2012); *Fausto*, 484 U.S. at 455. The exhaustive scheme of the CSRA covers the entire scope of the federal employment relationship, even beyond personnel actions, and is exclusive for federal employment claims regardless of the nature of available review. *Id.* at 443-44, 448-49 (CSRA precluded jurisdiction even though the particular action at issue could not give rise to either administrative or judicial review).

Here, the allegations brought by the Foundation for purposes of associational

standing—that ICE officers risk disciplinary action if they ignore the New Guidance—are substantially the same allegations the district court in *Crane v. Napolitano* dismissed as precluded by the CSRA. *See* Civ. A. No. 3:12-CV-03247-O, 2013 WL 8211660, at *3 (N.D. Tex. July 31, 2013) (O'Connor, J.).[13] There, the law enforcement plaintiffs asserted that DACA required them to "either comply with federal law and face disciplinary actions, or ignore the requirements of federal law and participate in the administration of an illegal program." *See Crane v. Napolitano* ("Pls.' Brief"), 2012 WL 6633750 (N.D. Tex. Nov. 28, 2012.). The court found that this alleged injury amounted to an employment dispute, and the CSRA barred plaintiffs from raising their challenge in court. *See Crane*, 2013 WL 8211660 at 3 n.3.[14] The same conclusion applies here, notwithstanding Plaintiffs' effort to avoid this jurisdictional bar by bringing employees' claims in the Foundation's name.

As to the Foundation's claim to organizational standing, Plaintiffs similarly cannot evade the limits of the CRSA. By Plaintiffs' own description, the Foundation is serving a function of a union by advising its members concerning the terms of their federal employment. *See* SAC ¶ 46 ("The purposes of the Federal Police Foundation include, *inter alia*, conducting research, *informing federal law enforcement officers about legal and policy issues affecting their work*, and informing the public about federal law enforcement

---

[13] In affirming the district court's dismissal, the Fifth Circuit did not address the CSRA because it found that the ICE officers lacked standing. *See Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015).

[14] Whether there is ultimately Article III judicial review of the Foundation's constitutional claim is of no import; all administrative remedies under the CSRA must be exhausted. *See Fleming v. Spencer*, 718 F. App'x 185, 189 (4th Cir. 2018) (concluding "that the CSRA precludes judicial review of constitutional claims for equitable relief when an employee has failed to exhaust administrative remedies available under the CSRA"). Here, there has been no such showing of pursuing such claims, such as those provided by 5 U.S.C. § 2302(b)(9)(D).

matters.") (emphasis added); *id*. (claiming ICE officers as members). But a federal employee union would not be able to bring this claim in this court. *See American Postal Workers Union, AFL-CIO v. U.S. Postal Service*, 940 F.2d 704, 708-709 (D.C. Cir. 1991) (holding that CSRA preempts claim brought by union as well as employees). Rather, collective bargaining procedures are part of the CSRA's comprehensive scheme. *See Karahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*, 489 U.S. 527, 533-34 (1989) (holding Congress created an exclusive scheme to address unfair labor practice claims); *accord Leal v. Woodley & McGillivary*, No. H-08-cv-345, 2009 WL 1704311 at *3 (S.D. Tex. June 17, 2009). The CSRA provides "a dispute-resolution mechanism for the various foreseeable issues that might arise during the collective bargaining process or as part of a final collective bargaining agreement." *Nat'l Ass'n of Agric. Emps. v. Trump*, 462 F. Supp. 3d 572, 576, (D. Md. May 21, 2020) (citing 5 U.S.C. §§ 7104-5, 7116, 7118-19, 7121-22, 7132). Indeed "[a]dministrative review is provided by the Federal Labor Relations Authority (FLRA), a three-member agency charged with adjudicating federal labor disputes, including 'negotiability' disputes and 'unfair labor practice' disputes." *Am. Fed'n of Gov't Emps. AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) (quoting 5 U.S.C. § 7105(a)); *accord Nat'l Ass'n of Immigr. Judges v. McHenry*, 477 F. Supp. 3d 466, 472 (E.D. Va. 2020), *appeal filed*, No. 20-1868 (4th Cir. Aug. 12, 2020); *see also* 5 U.S.C. § 7121 (collective bargaining grievance procedures). Thus, as with employees' claims, the CSRA provides the sole remedy for disputes between a union and its members' employer.

It stands to reason that an association advising its members concerning their federal employment can have no more right to review in this Court than would the members'

formal, recognized union. Rather, as explained above, the CSRA's comprehensive and exhaustive scheme covers the entire federal employment relationship. *See Fausto*, 484 U.S. at 445 (the CSRA "replaced the [previous] patchwork system with an integrated scheme of administrative and judicial review, Accordingly, regardless of whether the Foundation establishes associational or organizational standing, its claims are precluded by the CSRA.

> B.    *The Court may not enjoin the President in his official duties.*

Whatever claims Plaintiffs may have against the other federal defendants, neither injunctive nor declaratory relief is proper against the President in his official capacity. "With regard to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *see Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)); *Swan v. Clinton*, 100 F.3d 973, 976 n.1, 978 (D.C. Cir. 1996) (courts lack the authority to enjoin the President in the performance of his official duties and "similar considerations" restrict a court's power to issue a declaratory judgment against the President); *Foley v. Biden*, No. 21-cv-01098 (N.D. Tex. Oct. 6, 2021), Order on Prelim. Inj. at 3, ECF No. 18 ("Thus, the Court cannot remedy Plaintiff's alleged injury because the Court has no declaratory or injunctive power against President Biden."). An "apparently unbroken historical tradition supports the view, . . . implicit in the separation of powers established by the Constitution, that the principals in whom the executive and legislative powers are ultimately vested . . . may not be ordered to perform particular executive or legislative acts

at the behest of the Judiciary." *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part) ("For similar reasons," courts "cannot issue a declaratory judgment against the President.")

The reasons for this rule are "painfully obvious." *Swan*, 100 F.3d at 978. The judiciary ordering a co-equal branch of government to perform specific executive acts "at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Id*.; *accord Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 610 (1838) ("The executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power."). The *Mississippi* Court further warned of its lack of "power to enforce its process" to support any injunction against the President. 71 U.S. at 501. The Court concluded that an attempt by the judiciary "to enforce the performance of [executive and political] duties by the President [is] . . . an absurd and excessive extravagance." *Id*. at 499.

Even if the Constitution permitted Plaintiffs to seek relief against the President, Plaintiffs would still need to identify a relevant waiver of sovereign immunity. Plaintiffs cannot rely on the APA, *see* 5 U.S.C. § 702, as "the President's actions [are] not reviewable under the APA, because the President is not an 'agency' within the meaning of the APA," *Dalton v. Specter*, 511 U.S. 462, 469 (1994) (citing *Franklin*, 505 U.S. at 801). Plaintiffs identify no other waiver, and the claims against the President must be dismissed. *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018), *cert denied*, 139 S. Ct. 1200 (2019).

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Second Amended Complaint.

Dated: December 15, 2021       Respectfully submitted,

       BRIAN M. BOYNTON
       Acting Assistant Attorney General

       BRIGHAM J. BOWEN
       Assistant Branch Director

       */s/ Brian Rosen-Shaud*
       BRIAN C. ROSEN-SHAUD
       Attorney-in-charge
       ME Bar No. 006018
       ADAM D. KIRSCHNER
       IL Bar. No. 6286601
       Senior Trial Counsel
       MICHAEL F. KNAPP
       CA Bar No. 314104
       KUNTAL CHOLERA
       DC Bar No. 1031523
       Trial Attorneys
       United States Department of Justice
       Civil Division, Federal Programs Branch
       Tel: (202) 305-7667
       Fax: (202) 616-8460
       Email: Brian.C.Rosen-Shaud@usdoj.gov
            Adam.Kirschner@usdoj.gov
            Michael.F.Knapp@usdoj.gov
            Kuntal.Cholera@usdoj.gov

       <u>Mailing Address</u>:
       Post Office Box 883
       Washington, D.C. 20044

       <u>Courier Address</u>
       1100 L Street NW
       Washington, D.C. 20005

       EREZ REUVENI
       CA Bar No. 264124
       Assistant Director
       U.S. Department of Justice
       Civil Division, Office of Immigration Litigation
       P.O. Box 868, Ben Franklin Station
       Washington, D.C. 20044

202-307-4293 (telephone)
Email: Erez.R.Reuveni@usdoj.gov

*Counsel for Defendants*


DANIEL DAVID HU
Assistant United States Attorney
Chief, Civil Division
State Bar No. 10131415
S.D. I.D. 7959
Southern District of Texas
1000 Louisiana, Suite 2300 Houston, TX 77002
Tel: (713) 567-9000
Fax: (713) 718-3300
Daniel.Hu@usdoj.gov

*Local Counsel*

42

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed

electronically (via CM/ECF) on December 15, 2021.

*/s/ Brian Rosen-Shaud*
BRIAN C. ROSEN-SHAUD


**CERTIFICATE OF CONFERENCE**

I certify that the undersigned conferred with Plaintiffs' counsel in compliance with

Rule 6 of the Galveston District Court Rules of Practice and that Plaintiffs did not timely

amend their pleading.

*/s/ Brian Rosen-Shaud*
BRIAN C. ROSEN-SHAUD