**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| BRAD COE, *et al*., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Civil Action No. |
| v. | ) | 3:21-CV-00168 |
| | ) | |
| JOSEPH R. BIDEN, JR., *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' RESPONSE TO**
**MOTION TO DISMISS**

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

ARGUMENT AND AUTHORITIES ...................................................................................2

I.   **The September 30 Memorandum Does Not Render this Case Moot** ...........................2

    A.   **Nothing of Significance has Changed in ICE Procedures** ...................................2

    B.   **Defendants' Mootness Theory is Legally Infirm** ..................................................6

II.   **The Sheriff and County Plaintiffs Possess Standing** ..................................................9

    A.   **Injury-in-Fact** ......................................................................................................9

    B.   **Traceability** ........................................................................................................10

    C.   **Redressability** ....................................................................................................15

III.   **The Federal Police Foundation Possesses Standing** .................................................16

IV.   **The Federal Police Foundation Claims Are Not Precluded by the CSRA** .................19

V.   **Venue is Proper in this Court** ...................................................................................21

VI.   **APA Review is Not Barred** ......................................................................................23

    A.   The Challenged Action is not Committed to Agency Discretion by Law .............23

        1.   Defendants Mischaracterize the Statutory Framework ...................23

        2.   8 U.S.C. § 1225(b) is Mandatory and Removes Agency Discretion ........................................................................................25

        3.   8 U.S.C. § 1226(c) is Mandatory and Removes Agency Discretion ........................................................................................27

        4.   8 U.S.C. § 1231(a) is Mandatory and Removes Agency Discretion ........................................................................................29

        5.   Defendants Apply *Heckler* Incorrectly ............................................29

    B.   **Nothing in the INA Precludes Judicial Review** .................................................31

    C.   **The Memoranda are Final Agency Actions Subject to Review** .........................36

      **D.**      **Review Outside of the APA is Also Possible**................................................39

**VII.**   **The Inclusion of the President as a Defendant**.............................................40

CONCLUSION........................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Adams v. Richardson,*
    480 F.2d 1159 (D.C. Cir. 1973) (*en banc*) ............................................................ 26

*Am. Sch. of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 108 (1902) ........................... 40

*Arizona v. United States,* 567 U.S. 387 (2012) .......................................................... 23, 24

*Bennett v. Spear,* 520 U.S. 154, 178 (1997) ...................................................................... 38

*Block v. Cmty. Nutrition Inst.,* 467 U.S. 340, 345 (1984) .................................................. 32

*Clinton v. City of N.Y.,* 524 U.S. 417, 430-32 (1998) .......................................................... 9

*Cole v. General Motors Corp.,* 484 F.3d 717, 723 (5th Cir. 2007) ..................................... 16

*Collins v. Mnuchin,* 938 F.3d 553, 573-74 (5th Cir. 2019) ................................................. 37

*Crane v. Johnson,* 783 F.3d 244 (5th Cir. 2015) ................................................................ 19

*Crane v. Napolitano,* 2013 U.S. Dist. LEXIS 187005 (N.D. Tex. July 31,
    2013) ............................................................................................................................ 20

*Demore v. Kim,* 538 U.S. 510, 518 (2003) ......................................................................... 15

*Dep't of Commerce v. New York,* 139 S. Ct. 2551 (2019) .................................................. 14

*Dickinson v. Zurko,* 527 U.S. 150, 154-55 (1999) ............................................................. 32

*El Paso Cty. v. Trump,* 982 F.3d 332, 343-45 (5th Cir. 2020) ........................................... 18

*Ex parte Young,* 209 U.S. 123, 160 (1908) ....................................................................... 40

*FTC v. Standard Oil Co.,* 449 U.S. 232, 240 (1980) .......................................................... 37

*Galvan v. Press,* 347 U.S. 522, 531 (1954) ...................................................................... 25

*Ghazanfar Hussein Qureshi v. Holder,* 663 F.3d 778, 781 (5th Cir. 2011) ............... 37, 38

*Giddings v. Chandler,* 979 F.2d 1104, 1109 (5th Cir. 1992) ............................................. 36

*Harmon v. Brucker,* 355 U.S. 579, 581-82 (1958) ........................................................... 40

*Heckler v. Chaney*, 470 U.S. 821, 833 (1985)............................................................25, 30

*INS v. St. Cyr*, 533 U.S. 289, 313 (2001) ........................................................... 33

*J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) .................................... 33

*Jennings v. Rodriguez,* 138 S. Ct. 830, 837 (2018) ............................................ 28

*Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2284 (2021) ................................ 30

*Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298,307 (2012) ............................ 8

*Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 689
     (1949) ........................................................................................................... 40

*Ligon Specialized Hauler, Inc. v. Interstate Commerce Comm'n*, 587 F.2d
     304, 314 (6th Cir. 1978) ............................................................................. 39

*Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 304-06 (5th Cir.
     2000) ............................................................................................................ 18

*Mississippi v. Johnson*, 71 U.S. 475, 499 (1867) ............................................... 40

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182
     (5th Cir. 2015) ............................................................................................ 16

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662
     (2007) ........................................................................................................... 32

*Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) ............................. 40

*Ng Fung Ho v. White*, 259 U.S. 276, 280 (1922) ............................................... 25

*Nielsen v. Preap*, 139 S. Ct. 954 (2019)..............................................28, 33, 35

*Northeastern Fla. Chapter of the Assoc. Gen. Contractors of Am. v.
     Jacksonville*, 508 U.S. 656, 662 (1993) ..................................................... 9

*Schlesinger v. Councilman*, 420 U.S. 738, 752 (1975) ...................................... 32

*Stewart v. Lubbock Cnty.*, 767 F.2d 153, 155 n.3 (5th Cir. 1985)..................... 41

*Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir.
     2020)............................................................................................................. 18

*Texas and Louisiana v. United States*, 2021 U.S. Dist. LEXIS 156642
     (S.D. Tex. Aug. 19, 2021) ....................................................15, 28, 29, 35

*Texas v. Biden*, 2021 U.S. App. LEXIS 36689, __ F. 4th __ (5th Cir. Dec. 13, 2021) ......................................................................................... passim

*Texas v. United States*, 14 F. 4th 322 (5th Cir. 2021), (*vacated by Texas v. United States*, 2021 U.S. App. LEXIS 35336 (5th Cir. Nov. 30, 2021)) ......................................................................................................... 29

*Texas v. United States*, 524 F. Supp. 3d 598 (S.D. Tex. 2021) ................................. passim

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ..................................................... 9, 12

*United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) ......................................................................................................... 37

*United States v. Fausto*, 484 U.S. 439, 455 (1988) .................................................. 20, 32

## **Statutes**

5 U.S.C. § 7103(a)(4) ........................................................................................................ 22

8 U.S.C. § 1158 ................................................................................................................. 24

8 U.S.C. § 1225(b) ................................................................................................ 25, 26, 27

8 U.S.C. § 1225(b)(2)(A) .................................................................................................... 4

8 U.S.C. § 1225(b)(2)(C) .................................................................................................. 27

8 U.S.C. § 1226(b) ........................................................................................................... 34

8 U.S.C. § 1226(c) ............................................................................................... 27, 28, 29

8 U.S.C. § 1226(c)(1) .................................................................................................... 4, 34

8 U.S.C. § 1226(c)(2) ....................................................................................................... 34

8 U.S.C. § 1226(e) ...................................................................................................... 33, 34

8 U.S.C. § 1229a(c)(4) ..................................................................................................... 24

8 U.S.C. § 1229b ............................................................................................................... 24

8 U.S.C. § 1229c ............................................................................................................... 24

8 U.S.C. § 1231(a) ............................................................................................................ 29

8 U.S.C. § 1231(a)(1) ............................................................................................ 3

8 U.S.C. § 1231(a)(2) ............................................................................................ 4

8 U.S.C. § 1231(a)(5) .......................................................................................... 30

8 U.S.C § 1231(h) .......................................................................................... 35, 36

8 U.S.C. § 1252(a)(2)(A)(iv) ............................................................................. 34

8 U.S.C. §§ 1252(a)(5) ...................................................................................... 32

8 U.S.C. § 1252(b)(9) ................................................................................... 32, 33

8 U.S.C. § 1252(e)(3)(A) .................................................................................. 34

Immigration and Nationality Technical Corrections Act of 1994
    ("INTCA"), Pub. L. No. 103-416, 108 Stat. 4305 (Oct. 25, 1994) ...................... 36

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    110 Stat. 3009-546 (1996) ................................................................................. 18

## **Other Sources**

Edwin Borchard, Declaratory Judgments, 787-88, 909-10 (1941) .................................... 39

*ICE Annual Report*, *FY 2020* ...................................................................................... 11, 16

*Immigration Detention Quick Facts*, TRACImmigration (2021) ...................................... 9

Ronald Dworkin, *The Model of Rules*, 35 U. Chi. L. Rev 14 (1967) ............................... 20

William J. Hughes, Federal Practice §25387 (1940 & Supp. 1945) ................................. 39

## INTRODUCTION

In their Motion to Dismiss, Defendants restate many of the same arguments addressed in earlier briefs—regarding standing, venue, and CSRA preclusion.  Now Defendants add yet another threshold jurisdictional challenge to the rest.  They claim that their issuance of the third in a series of interrelated, duplicative Memoranda on September 30, 2021—which follows the January 20 Memorandum and the February 18 Memorandum—somehow renders this case moot.[1]  Of course, the February 18 Memorandum, by its own terms, was designated "interim guidance" that would be replaced by a final iteration of the policies.  Importantly, Defendants fail to inform this Court that *essentially nothing has changed* in what ICE is actually doing.  Indeed, Defendants misleadingly suggest the opposite, claiming that the September 30 Memorandum "functions in a distinctively different manner."  Mot. to Dismiss ("MTD") 10.  That is false. The actual work of ICE agents on the ground has not changed, nor has their inability to detain or remove those illegal aliens whom federal law mandates they "shall" detain or remove.  It is imperative that this Court have an accurate picture of what is actually happening.  To that end, this Response begins with a description of what little change the September 30 Memorandum has brought, substantiated by affidavit evidence.  The legal infirmities in Defendants' mootness claim are addressed thereafter.

---

[1] On September 30, 2021, Defendant DHS Secretary Alejandro Mayorkas issued a Memorandum entitled "Guidelines for the Enforcement of Civil Immigration Laws" available at https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf ("September 30 Memorandum").  The September 30 Memorandum stated that it would take effect on November 29, 2021, and would on that date serve to rescind the January 20 and February 18 Memoranda.  *See id*. at 6.

## ARGUMENT AND AUTHORITIES

I. **The September 30 Memorandum Does Not Render this Case Moot**

    A. **Nothing of Significance has Changed in ICE Procedures**

Contrary to the unsupported suggestion of Defendants, the September 30 Memorandum has not changed anything of substance in the day-to-day operations of ICE. Virtually all of the protocols put in place under the February 18 Memorandum remain in place. Most importantly, all of the violations of federal law at the center of this case are continuing; in every instance where federal law says that ICE officers "shall" detain or remove an illegal alien, Defendants continue to replace the statutory command with a discretionary regime. As the Federal Police Foundation affidavit filed under seal with this Response makes clear, the September 30 Memorandum has produced no significant changes in ICE procedures or enforcement actions. FPF Jan. 2022 Aff. ¶ 20.

The Arrest Authorization Request Tool (AART) system, which was put in place shortly after the February 18 Memorandum to formalize the process by which final preapproval of all enforcement action occurs, is still being utilized by ICE. The software has gone through several upgrades, but it remains essentially the same. *Id.* ¶ 6, 10. Not long after the AART system was created, ICE also added a pre-AART screening of enforcement requests by supervisors. Officers were directed to email their superiors enforcement requests; and those requests were often denied prior to any AART entry being made. This sleight of hand allows ICE to report AART approval numbers that appear to be higher, when in fact the vast majority of requests are denied prior to any entry into AART. This pre-AART screening process remains the same as well. *Id.* ¶ 8.

Importantly, the vast majority of preapproval requests continue to be denied, either in the pre-AART screening phase or through the AART system, even in cases where federal statute commands that detention or removal "shall" occur.  *Id*. ¶ 11.  This has not changed since the issuance and implementation of the September 30 Memorandum.  As a result, it continues to be the case that many ICE officers no longer even bother to make enforcement requests at all, knowing that doing so is futile.  *Id*. ¶ 12.

All of the unlawful practices described in the pending Motion for Preliminary Injunction have continued under the September 30 Memorandum.  Before the January 20 and February 18 Memoranda, it was common for ICE officers to place detainers on illegal aliens known to be in custody in local jails whenever federal law required the detention and/or removal of such aliens.  That practice did not resume with the September 30 Memorandum or its implementation on November 29, 2021.  *Id*. ¶ 16.

Similarly, before the January 20 and February 18 Memoranda, it was the normal practice for ICE officers to place detainers on (and remove) virtually all fugitive aliens— those who were already subject to a removal order from an immigration judge but had disobeyed that order—discovered by ICE.  Doing so is required by 8 U.S.C. § 1231(a)(1) (DHS "shall remove the alien from the United States") and 8 U.S.C. § 1231(a)(2) ("during the removal period, [DHS] shall detain the alien").  That practice essentially ended with the January 20 and February 18 Memoranda.  It did not resume with the issuance of the September 30 Memorandum or its implementation.  FPF Jan. 2022 Aff. ¶ 17.  It continues to be the case that *every single alien removal* must go through the pre-AART screening and the AART removal assessment.  As a result, ICE continues to ignore the orders of

immigration judges, regardless of whether the judge recently ordered the alien in question to be removed or the judge did so years earlier.  *Id.* ¶ 15.

Similarly, ICE's unlawful practice of declining to detain and deport illegal alien criminals being released from prison facilities continues.  After the January 20 and February 18 Memoranda were issued, ICE officers were no longer permitted to detain and remove such aliens—even if 8 U.S.C. § 1226(c)(1) required the detention of the criminal alien.  The September 30 Memorandum changed nothing in this regard.  ICE's disregard of statutory commands and the resulting release of dangerous alien criminals onto the streets continues.  FPF Jan. 2022 Aff. ¶ 18.

Similarly, ICE's unlawful practice of declining to detain and commence removal proceeding regarding aliens they encounter for the first time continues.  After the January 20 and February 18 Memoranda were issued, the mandatory detention and removal of such aliens commanded by 8 U.S.C. § 1225(b)(2)(A) was ignored.  The mandatory requirement of federal law was replaced by an unlawful discretionary regime under which detention and/or removal rarely occurred.  Neither the September 30 Memorandum nor its November 29, 2001, implementation changed this unlawful regime.  FPF Jan. 2022 Aff. ¶ 19.

Finally, consider the two aspects in which Defendants try to highlight a difference between the September 30 Memorandum and the February 18 Memorandum: the treatment of the three priority categories for enforcement (national security, border security, and public safety) and detention decisions.  With respect to the three priority categories, Defendants claim that things have changed, making enforcement even in those categories more discretionary.  *See* MTD 10-11.  However, contrary to Defendants' suggestion, the

February 18 Memorandum also made enforcement actions in those priority categories discretionary ("As a preliminary matter, it is vitally important to note that the interim priorities do not require or prohibit the arrest, detention, or removal of any noncitizen. Rather, officers and agents are expected to exercise their discretion thoughtfully…." Feb. 18 Memo. 3).   In addition—and Defense counsel may be unaware of this—the three priority categories remain as they were inside the AART system.   AART version 3.0 continues to treat the three priority categories the same as before.   FPF Jan. 2022 Aff. ¶ 13.

With regard to detention decisions, Defendant's supposition that something is different under the September 30 Memorandum is simply incorrect.   Defendants claim that "[t]he New Guidance does not cover detention."   MTD 10.   However, Defendants offer no support for this statement.   *See id*.   In fact, the September 30 Memorandum states that it applies to enforcement actions concerning the "apprehension" of aliens no less than *seven* times.   Sept. 30 Memo. 1, 3, 4.   The decision to detain or not detain is the principal enforcement decision made at the time an alien is apprehended.   In addition, the September 30 Memorandum expressly refers to officers' discretion "to decide who should be subject to arrest, *detainers*, removal proceedings, and the execution of removal orders."   *Id*. at 2 (emphasis added).   More importantly, regardless of the terms used by the Memoranda, the practice on the ground is that both the February 18 Memorandum and the September 30 Memorandum transformed the ICE detention decisions that were previously mandatory into discretionary decisions.   Nothing has changed since the September 30 Memorandum with respect ICE detention decisions.   FPF Jan. 2022 Aff. ¶¶ 5, 11, 16-20.   Defendants do not, and cannot, present any evidence from ICE officers indicating that the discretionary

regime created by the Memoranda no longer applies to detentions.  That is simply not what is happening in ICE field offices across the country.  In sum, nothing of significance has changed since the issuance of the September 30 Memorandum.  It merely reiterated the practices that were already in place following the February 18 Memorandum.  The mere restatement of Defendants' unlawful discretionary regime does not render this case moot.

Finally, as procedural matter, it should be noted that the September 30 Memorandum was fully addressed in Plaintiffs' Second Amended Complaint.  All of Plaintiffs' claims are just as pertinent to the September 30 Memorandum as they were to the February 18 Memorandum.  In addition, the September 30 Memorandum was incorporated into the pending Motion for Preliminary Injunctive Relief, when Plaintiffs expressly requested that the same arguments should be applied to any successor Memorandum, and that preliminary injunctive relief should be granted "restraining and enjoining Defendants from implementing or enforcing the February 18 Memorandum, or its predecessor January 20 Memorandum, Section B, *or any similar successor Memorandum*."  Pl. Mot. for Prelim. Inj., Doc. 7, at 30 (emphasis added).

### B.    Defendants' Mootness Theory is Legally Infirm

Defendants filed their Motion to Dismiss on December 15, 2021.  However, two days earlier, on December 13, 2021, the Fifth Circuit had issued a decision that thoroughly and emphatically rejected Defendants' mootness theory in *Texas v. Biden*, 2021 U.S. App. LEXIS 36689, __ F. 4th __ (5th Cir. Dec. 13, 2021).  Defendants were evidently aware of this decision; because they mention it once in their Motion to Dismiss, in a footnote.  *See* MTD 24 n.8.  However, they completely ignore the Fifth Circuit's lengthy discussion of

the mootness issue when the government issues a series of memoranda setting policy on the same subject.  It is easy to see why Defendants would like to ignore it.

In that case, just as in this one, the same Defendants issued a series of Memoranda beginning on the same day as the initial Memorandum in this case—January 20, 2021. Those Memoranda first suspended the Migrant Protection Protocol ("MPP"), which required aliens who were apprehended crossing the border with Mexico but not detained to remain in Mexico pending review of their claims in immigration courts, then terminated the MPP on June 1, 2021, and then purported to "re-terminate" the MPP with two Memoranda on October 29, 2021.  *Id*. at *4-*5.  The final Memoranda, like the September 30 Memorandum here, purported to "rescind" the previous Memoranda.  *Id*. at *42; Sept. 30 Memo. at 6.  The Defendants in that case then declared, as they do in the instant case, that the latest Memoranda operated to render the case moot.  The Fifth Circuit did not mince words in rejecting Defendants' mootness argument:

> A few hours later, the Government informed our court that, in its view, the October 29 Memoranda had mooted this case. Never mind that a case is moot only when the controversy between the parties is dead and gone, and the controversy between these parties is very much not dead and not gone. Never mind that the new memoranda simply reaffirmed the Termination Decision that the States had been challenging all along. And never mind that the Government's theory of mootness would allow an administrative agency to permanently avoid judicial review by issuing an endless litany of new memos to "moot" every adverse judicial ruling. … DHS's proposed approach is as unlawful as it is illogical. Under Supreme Court and Fifth Circuit precedent, this case is nowhere near moot.

*Id*. at *5-*6.

The same is true in this case.  The controversy between the parties is not dead and not gone.  The September 30 Memorandum is substantially the same as the February 18

Memorandum in attempting to transform the mandatory detention and removal directives of federal law into discretionary decisions.  Defendants' theory would allow the government to evade judicial review by issuing an endless litany of new memos.  As the Fifth Circuit said: "In the Government's view, posting a new PDF document on the internet can moot a case as easily as a statute that's undergone bicameralism and presentment. … To describe the Government's position is demonstrate its absurdity."  *Id*. at *41.

The Fifth Circuit went on to explain why the requirements of mootness were not met.  A case is moot if 'it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Id*. at *45 (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298,307 (2012)).  "But when a government repeals the challenged action and replaces it with something substantially similar, the injury remains.  In such a case, the court can still 'grant … effectual relief … to the prevailing party,' *Knox*, 567 U.S. at 307 (quotation omitted), and the case is not mooted."  *Id*. at *45-*46.  For the same reasons, the requirements of mootness are not met here.  The injuries caused by the Defendants' non-detention and non-removal of criminal aliens remain; the September 30 Memorandum is substantially similar to the February 18 Memorandum in replacing statutory mandates with a discretionary regime, and this Court can still grant effectual relief to Plaintiffs.

Nor can Defendants separate the harms cause by the February 18 Memorandum from the harms cause by the September 30 Memorandum (as they do in their standing analysis, explained infra in section II.B.).  They are part of one continuous policy.  The Fifth Circuit explained it as follows: "the Government's purported line between harms-caused-by-the-June-1-Memorandum and harms-caused-by-the-October-29-Memoranda is

a distinction without a difference. This kind of faux-metaphysical quibbling ignores the 'gravamen' of the States' challenge to the Termination Decision.  DHS cannot moot this case by reaffirming and perpetuating the very same injury that brought the States into court." *Id.* at *49 (citation omitted).  The same is true here.  Defendants cannot moot this case by reaffirming and perpetuating the same injury that brought Plaintiffs into court.

## II.    **The Sheriff and County Plaintiffs Possess Standing**

### A.    **Injury-in-Fact**

Defendants challenge the constitutional standing of Plaintiff Texas sheriffs and counties.  However, Defendants appear to concede that Plaintiffs' increased detention costs and related criminal enforcement costs satisfy the injury-in-fact requirement of standing. *See* MTD 15.  Defendants would have difficulty disputing this point. As this Court held in *Texas and Louisiana v. United States*, an "injury to state or local financial interests predicated on the actions of the federal government" is sufficient to establish standing. 2021 U.S. Dist. LEXIS 156642, *35 (S.D. Tex. Aug. 19, 2021) (*citations omitted*).  Like Plaintiffs here, Texas alleged that "the Memoranda will lead to an unanticipated rise in criminal activity from aliens the federal government would otherwise detain." *Id.* at *37. This Court found Texas's claimed injury from unanticipated detention costs to be "sufficiently concrete and imminent," noting that "[i]f even one alien not detained due to the Memoranda recidivates, Texas's costs 'will increase' in accordance with its current cost per inmate." *Id.* at *38.  Similarly, in *Texas v. United States*, where Texas challenged the Biden Administration's attempted 100-day pause in removals, this Court held that "unanticipated detention costs" constitute an injury-in-fact that is "sufficiently concrete

and imminent" to establish standing. 524 F. Supp. 3d 598, 620 (S.D. Tex. 2021).

### B.      Traceability

Unable to deny that the fiscal costs imposed upon Plaintiff sheriffs and counties constitute sufficient injury-in-fact, Defendants instead argue that it is speculation that these costs are traceable to the standdown in enforcement stemming from the Memoranda and that it is based on the actions of third parties.   MTD 15.   Defendants offer four frail arguments in this regard.

First, Defendants argue without any support that perhaps the increased amount of criminal activity caused by the non-detention and non-removal of illegal aliens under the Memoranda could be offset by the detention and removal of other aliens.   MTD 16.   The most obvious flaw in this argument is the fact that the total number of ICE enforcement actions has declined precipitously since the January 20 and February 18 Memoranda.   In other words, there can be no offsetting enforcement actions to compensate for the non-enforcement when the total number of enforcement actions has declined by approximately two-thirds.   Relevant numbers are presented in the Second Amended Complaint at ¶ 10. Data is now available for the entirety of 2021, and it shows a consistent, lasting reduction in ICE arrests in the wake of the January 20 and February 18 Memoranda.   In February-December of 2021, ICE averaged only 3,246 arrests per month.[2]   That compares to an

---

[2] There were 35,707 arrests for the 11-month period.  *Immigration Detention Quick Facts*, TRACImmigration, available at https://trac.syr.edu/immigration/detentionstats/ book_in_agen_program_table.html (last visited Jan. 11, 2022).

average of 8,634 arrests per month in FY 2020.[3]   And FY 2020 was an unusually low year in ICE activity due to the arrival of the COVID pandemic and the initial lockdowns across the country.  In FY 2019, ICE was arresting an average of 11,424 aliens per month.[4]  So, depending on which year the current rates are compared to, post-January 20, 2021, ICE arrest numbers dropped to either 28% or 38% of their normal rate.  The implementation of Defendants' Memoranda has consequently resulted in a larger number of criminal illegal aliens on the streets not just in Plaintiff counties, but throughout the country.

An additional flaw in this argument is that it is contradicted by multiple affidavits presented by Plaintiffs describing what is happening in their counties.  The refusal of ICE to take custody of criminal aliens in Plaintiff counties, when prior to January 20, 2021, ICE routinely did so, is virtually without exception.   Thus, there have been no offsetting increase in the detentions of other aliens by ICE in Plaintiff counties.  *See* Guthrie Aff. ¶¶ 12, 15-17; Coe Aff. ¶¶ 13-14, 16-17.  Defendants disregard this affidavit evidence and offer no support for their assertion to the contrary.

Most importantly, the same offset argument has already been rejected by the Fifth Circuit.  The "standing analysis is not an accounting exercise." *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015) (internal quotation omitted). Absent a "tight[] nexus" between the alleged "benefits" and the "costs" of the Memoranda, there can be no "offset." *Id.*  The Victoria Division of this Court has also rejected the same argument, holding that

---

[3] There were 103,603 arrests for the year. *ICE Annual Report*, *FY 2020* at 4 (available at: https://www.ice.gov/doclib/news/library/reports/annual-report/iceReportFY2020.pdf).
[4] There were 137,084 arrests for the year.  *Id*. at 7.

Defendants' "offset" argument is of no moment even if it were factually true. "[E]ven if the Government could demonstrate that increased enforcement in the prioritized categories might displace a drop in the total number of detained aliens resulting from the deprioritized categories, this 'offset' would be irrelevant as a matter of law." *Texas and Louisiana*, 2021 U.S. Dist. LEXIS 156642, *57-*58.

Defendants' second traceability argument is equally flawed. Defendants claim the following: "Although the Complaint alleges an increase in *arrests* of noncitizens by the Counties, that does not necessarily mean there has been an increase in *criminal activity* by noncitizens." MTD 16 (emphasis in original). At the outset, the absurdity of this argument should be noted; it suggests that law enforcement officers prior to January 20, 2021, ignored criminal activity and declined to make arrests, but then after that date suddenly became interested in stopping crimes that they previously ignored. Defendants' theory contains two suppositions: that there has been no increase in the number of crimes committed, and that perhaps the crimes were not committed by aliens. However, the Affidavits already presented in this case disprove both suppositions. There has been a dramatic increase in crimes in each Plaintiff county. And those crimes were either committed by illegal aliens or were associated with alien smuggling. Edwards County saw a 62 percent increase in crimes leading to arrests after the February 18 Memorandum, and the average number of inmates doubled. Guthrie Aff. ¶¶ 5 7. As Sheriff Guthrie stated, "The vast majority of detainees that my office has arrested since February 2021 are either illegal aliens or persons involved in activity relating to illegal immigration." *Id.* ¶ 9.

Similarly, in Kinney County, the number of crimes committed by illegal aliens

halfway through 2021 was already more than double the number for the entire year of 2020. Coe Aff. ¶ 7.   The overwhelming majority of people arrested in Kinney County after January 20, 2021 were illegal aliens or people involved in the smuggling of illegal aliens. *Id*. ¶ 10. And McMullen County saw a *more than eight-fold increase* in the number of crimes committed.  Shelton Aff. ¶ 6.  That increase was attributable to the increase in the number of crimes committed by illegal aliens and by those trafficking illegal aliens.  *Id*. ¶ 10.  For example, the number of people charged with alien smuggling increased from one in February-July 2020 to 26 in February-July 2021.  *Id.* ¶ 7.

Defendants' third traceability argument is also a specious one.   They declare that even if this increase in criminal activity were due to the February 18 Memorandum, "it does not show that the *New Guidance* will increase crime in the counties."  MTD 17.  Once again, Defendants seem oblivious to the fact nothing of substance has changed in ICE procedures with the implementation September 30 Memorandum.  As described *supra* in Section I.A., ICE officers remain unable to detain or deport the vast majority of illegal aliens whose detention and/or deportation is mandated by federal law.  Defendants offer no support whatsoever for their suggestion that detentions and removals have increased— much less returned to pre-January 20, 2021, levels—following the implementation of the September 30 Memorandum.  In fact, available statistics indicate that the opposite has occurred.  Monthly ICE detention numbers dropped significantly in December 2021 to 2,422—the lowest number since March 2021.  And that wasn't a seasonal variation; the

December number in 2020 was 6,068, and the December number in 2019 was 9,900.[5]

Fourth, Defendants argue that the injury suffered is the results of the independent actions of third parties. MTD 16. However, the traceability of Plaintiff sheriffs' and counties' detention-cost injuries is established by the fact that illegal alien criminals are likely to recidivate. Therefore, declining to remove such criminal aliens necessarily increases state and local detention costs. In *Texas v. United States*, this Court addressed that very question, holding that "[n]o matter how one looks at it, a significant portion of criminal aliens and state offenders 'historically' recidivate." 524 F. Supp. 3d at 626 (citing *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019)). As the Supreme Court held, there is a traceable link between government actions and aliens' future unlawful behavior when the evidence establishes that aliens have "historically" behaved in a particular manner. *Dep't of Commerce*, 139 S. Ct. at 2566. Traceability in such cases is not "mere speculation;" instead it stems from a "predictable effect of the Government action on the decisions of third parties." *Id*.

This Court reiterated that conclusion once again on August 19, 2021, with respect to the same Memoranda at issue in this case: "If even one alien not detained due to the Memoranda recidivates, Texas's costs 'will increase' in accordance with its current costs per inmate." *Texas and Louisiana*, 2021 U.S. Dist. LEXIS 156642, *38. Because criminal aliens, as a group, have a strong propensity to recidivate, the link between the government's failure to detain criminal aliens and Plaintiffs' alleged injury due to increased crime is

---

[5] *Immigration Detention Quick Facts*, TRACImmigration, available at
https://trac.syr.edu/immigration/detentionstats/book_in_agen_program_table.html.

"virtually unassailable." *See id.* at *54 (noting evidence from a Texas Sheriff's Office showing that a group of 209 recently held criminal alien inmates with detainers had a recidivism rate of 73.68% and a 2018 study from the United States Department of Justice showing that criminal offenders generally recidivate); *Demore v. Kim*, 538 U.S. 510, 518 (2003) ("[D]eportable criminal aliens who remain[] in the United States often commit[] more crimes before being removed.") (citing Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 101st Cong., 1st Sess., 54, 52 (1989)). That holding is also supported by factual evidence presented in this case.  Of the eight cases of illegal alien criminals described in the first Federal Police Foundation Affidavit, seven were cases of recidivism following prior violations of law.  FPF July 2021 Aff. ¶ 18.

## C.    Redressability

Defendants finally argue that Plaintiffs' injury-in-fact cannot be redressed because if this Court enjoins the September 30 Memoranda, "DHS would still have to adopt some prioritization scheme." [6]  Defendants' argument ignores the fact that Congress has already prioritized the removal of illegal border crossers and criminal aliens by mandating very specifically that such aliens *must* be detained and removed.  8 U.S.C. § 1225(b); 8 U.S.C. § 1226(c); 8 U.S.C. § 1231(a).  "When considering whether a plaintiff has Article

---

[6] Defendants' reliance on *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), *see* MTD 15, is misplaced. In *Linda R.S.*, the Court held that a "private citizen lacks a judicially cognizable interest in the [criminal] prosecution or nonprosecution of another" because the prosecution of the illegitimate child's father under a criminal statute for failure to pay child support "would result only in the jailing of the child's father," not payment of child support. *Id*. at 618-19. Thus, the requested remedy would not redress the injury suffered.

III standing, a federal court must assume *arguendo* the merits of his or her legal claim." *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (quotation omitted).  If Defendants are enjoined to comply with those federal statutes, that will ensure that additional criminal aliens are detained and removed in Plaintiff counties. This Court agreed on August 19, 2021, when it rejected the same argument raised by the same Defendants:  "[C]onformance with the strictures set by Congress in Sections 1226(c) or 1231(a)(2) as practiced prior to the issuance of the Memoranda would result in a reduction of the volume of criminal aliens moving freely within the interior of the States." *Texas and Louisiana*, 2021 U.S. Dist. LEXIS 156642, *63.

Finally, if Defendants simply resumed pre-Memoranda removal practices, thereby increasing removal numbers to pre-Memoranda levels, that too would redress Plaintiffs' injury-in-fact with respect to criminal aliens.  In FY 2019, ICE removed 267,258 aliens; and in FY 2020, ICE removed 185,884 aliens.  *ICE Annual Report*, *FY 2020* at 20.  Because of the Memoranda, ICE has been removing aliens at a pace far below what it was prior to January 20, 2021, with the *majority* of removals that would previously have occurred being prevented. FPF July 2021 Aff. ¶ 8. This Court has already held that redressability may be deduced by looking at the publicly-available removal numbers prior to the challenged ICE policy.  If removal levels return to the normal, pre-January 20, 2021, levels, then Plaintiffs' detention-cost injuries would be redressed.  *Texas*, 524 F. Supp. 3d at 622-23.

## III.   **The Federal Police Foundation Possesses Standing**

The injury-in-fact suffered by Plaintiff Federal Police Foundation is principally the diversion and expenditure of resources caused by Defendants' actions.   Defendants

challenge the Foundation's standing in this regard, claiming that the amount of resources expended is not "significant" enough to give the foundation standing. Def Mot. 19-20. Defendants' argument is incorrect with respect to both the facts and the law.

As was made clear in the second Federal Police Foundation Affidavit, the Foundation has expended significant resources in addressing the Memoranda and their consequences for its ICE officer members. The Foundation has had to devoted more than 50 percent of its time in the wake of the February 18 Memorandum to the Memoranda and their impact on members' ability to comply with the requirements of federal law and is spending $1,017.48 per year in communications with members regarding the Memoranda. FPF Aug. 2021 Aff. ¶¶ 9, 11.  In addition, because of this diversion of resources for non-routine actions, the Foundation had to forgo planned efforts in public education campaigns to educate the public on issues faced by federal law enforcement officers, in negotiating with third-party venders to obtain product discounts and insurance discounts for members, and in taking other actions related to the operation of the organization.  *Id*. at ¶ 10. These facts easily satisfy Fifth Circuit precedent on diverted-resource organizational standing.

Ample Fifth Circuit precedent recognizes that the diversion of resource constitutes injury-in-fact in this context.  "[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010); *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 304-06 (5th Cir. 2000).  The diverting of "significant resources" must "perceptibly impaired" an association's mission. *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020).  "An organization suffers an injury in fact if

a defendant's actions 'perceptibly impair[]' the organization's activities and consequently drain the organization's resources." *El Paso Cnty. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020). All of those elements are present here. The Foundation had to divert significant resources in order to counteract Defendants' conduct. What is significant depends of course on the context. The Foundation is a small, fledgling organization without substantial assets. FPF Aug. 2021 Aff. ¶¶ 6, 8. Spending over $1,000 per year is significant; and Defendants' actions have unquestionably drained those resources. The draining of those resources has perceptibly impaired the Foundation's mission. More importantly, the diversion of the *majority* of Foundation man-hours to dealing with the Memoranda has certainly perceptibly impaired the Foundation's mission. The Foundation's non-routine actions taken in order to respond to Defendants' unlawful policies compelled it to forgo planned activities.

The Foundation's organizational standing is sufficient for it to proceed, but the Foundation also possesses associational standing, based on injury to the organization's members. Defendants claim that no such injury exists, attempting to apply the decision in *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) to this case. In that case, ICE officers maintained that failing to follow the Deferred Action for Childhood Arrivals ("DACA") Directive would result in potential employment sanctions. *Id*. at 253. The court found that because of the discretion granted to ICE officers in the DACA Directive, it was "unlikely that the agency would impose an employment sanction against an employee who exercises his discretion…." *Id*. at 255.

What Defendants fail to acknowledge is that the Memoranda in the instant case operate very differently.  Where in DACA an ICE officer could act independently with respect to deciding what to do with respect to a DACA alien, here there is no such independent action.  *Every* enforcement action *must* be run through an officer's superiors.  First, the officer must submit the desired enforcement action to pre-AART screening by his supervisor.  FPF Jan. 2022 Aff. ¶ 7.  Then, only if the supervisor agrees that enforcement is appropriate, the supervisor (not the officer) enters the request into the AART system.  *Id.* At that point, a Field Office Director or other superior makes the final decision on whether the enforcement action will be permitted.  Thus, unlike with DACA, there is no independent discretion exercised by the officer.  Each enforcement action must gain two levels of approval before it can occur.  If any officer were to take an enforcement action that had been rejected during pre-AART screening or during the AART process, he would be directly disobeying the orders of his superiors.  The discretion is not his.  It belongs to his superior officers.  If any officer attempted to take an enforcement action that had been rejected by his superiors, it is certain that he would be disciplined.  *See* FPF July 2021 Aff. ¶ 15.  Consequently, the facts surrounding the DACA case do not apply here.  The threat of adverse employment action against Foundation members is very real.  Therefore, the Foundation possesses associational standing, in addition to its organizational standing.

## IV.  <u>The Federal Police Foundation Claims Are Not Precluded by the CSRA</u>

Defendants also argue that the Foundation's claims are precluded from judicial review by the Civil Service Reform Act ("CSRA").  MTD 36-39.  Here, Defendants simply restate their flawed analysis from their Response to the pending Motion for Preliminary

Injunction.  Defendants do not address the rejoinder provided by Plaintiffs in the Reply to the Response.  For the convenience of the Court, Plaintiffs will briefly reiterate why the CSRA preclusion claim must fail.

Defendants are trying to fit a square peg into a round hole.  The CSRA has nothing to do with this court's jurisdiction over a claim brought by a non-profit association.  Rather, the CSRA governs employer-employee workplace claims, and, as the Supreme Court has described it, establishes a "system for reviewing personnel action taken against federal employees."  *United States v. Fausto*, 484 U.S. 439, 455 (1988).  That system is completely inapposite to the instant case.  The Foundation *is not an employee*; as such, it could not possibly bring any claim before the Merit Systems Protection Board created by the CSRA.  *Nor has there been any personnel action* that could be reviewed under the CSRA.  Defendants' effort to draw support from the preclusion holding of *Crane v. Napolitano*, 2013 U.S. Dist. LEXIS 187005 (N.D. Tex. July 31, 2013), is unavailing for the same reason.   That case involved a claim brought by individual ICE officers who feared termination or other adverse employment action.  One of the individual officers had already suffered disciplinary action, and the others faced the threat of disciplinary action.  *Id*. at *7-*8.   In contrast, the Foundation cannot possibly face adverse employment action, because it is not an employee.

Perhaps realizing that their CSRA preclusion argument is a weak one, Defendants resort to mischaracterizing what the Foundation is.  They declare that "the Foundation is serving a function of a union by advising its members concerning the terms of their federal employment."  MTD 37.  Defendants even suggest that the Foundation might be involved

in collective bargaining, noting that "collective bargaining procedures are part of the CSRA's comprehensive scheme." *Id*. 38.  Once again, Defendants are well off the mark. The Foundation is not a union, *it does not represent employs in workplace disputes or grievances, and it engages in no collective bargaining whatsoever*.  FPF Aug. 2021 Aff. ¶ 12.  Moreover, the ICE officers who are in the Foundation are already represented by a union—the National ICE Council 118.  To liken the Foundation to a union is absurd. Federal statute makes this clear.  Under 5 U.S.C. § 7103(a)(4), a "labor organization" is "an organization composed in whole or in part of employees, in which employees participate and pay dues, and which has as a purpose the dealing with an agency concerning grievances and conditions of employment."  Because the Foundation does not collect dues from employees and does not deal with any agency concerning grievances and conditions of employment, it is not a "labor organization."  For these reasons, Defendants' CSRA preclusion claim must fail.

## V.   Venue is Proper in this Court

Once again, Defendants briefly raise their venue challenge, which is the subject of a different motion.  MTD 18-19.  Although Plaintiffs have already responded in full to that motion, it is worth reiterating the principal flaw in Defendants' reasoning.  Defendants hypothesize that the injuries suffered by the three Plaintiff counties in the Southern District of Texas (McMullen County, Live Oak County, and Galveston County) could be less significant than those suffered by the other four counties.  The problem with Defendants' theory is that *all* of the Texas counties and sheriffs in this litigation face similar detention costs and related injuries-in-fact stemming from the standdown in immigration

enforcement caused by the Memoranda.  Although the scale of the injuries varies from county to county, all Plaintiff counties have alleged that the crimes committed by illegal aliens and crimes associated with the smuggling of aliens have substantially increased, resulting in an increase in detentions and other law-enforcement costs.  That includes the Plaintiff counties that are in the Southern District.  In densely-populated Galveston County with its already-large jail population, the increase in detentions has been 30 percent.  The County maintains that the increase in crimes committed by illegal aliens contributed significantly to this surge.  Sec. Am. Complt. ¶¶ 132, 134.  Sparsely-populated McMullen County has seen a more-than-eightfold increase in criminal arrests during February-July 2021, as compared to the same period in 2020.  Shelton Aff. ¶ 6.  This massive increase has been driven by the criminal aliens and crimes associated with alien smuggling.  *Id*. ¶¶ 5, 7.  For example, the number of vehicle pursuits caused by the smuggling of illegal aliens has more than tripled.  *Id*. ¶ 8.  Neighboring Live Oak County has also alleged that a there has been a significant increase in the number of crimes committed by illegal aliens following the implementation of the January 20 and February 18 Memoranda, and that detention costs have risen accordingly.  Sec. Am. Complt. ¶¶ 138, 139.  The Plaintiff counties in the Southern District possess standing that is just as firm as that of the other Plaintiff counties.

Importantly, every one of the counties involved in this litigation is part of the state disaster area caused by the immigration crisis that was declared by the Texas governor.  The governor did not select the affected counties randomly, and the counties did not agree to be part of the declared area without reason.  The elected leadership of the state and of

the counties concurred that those were the places suffering the greatest injuries from the surge in illegal immigration. Defendants continue to ignore that reality. For these reasons, as well as those detailed in Plaintiffs' Response to Defendants' Motion to Transfer Venue, the venue of this case should remain in the Galveston Division of the Southern District.

## VI.   APA Review is Not Barred

### A.   The Challenged Action is not Committed to Agency Discretion by Law

#### 1.   Defendants Mischaracterize the Statutory Framework

Defendants include in their Motion a description of the statutory framework of immigration enforcement. *See* MTD 2-5. They claim that executive discretion exists at *every* stage of the enforcement process and in *every* case. They also claim that wherever Congress used the term "shall," Congress really intended to say "may." *See id*. 24-25. Defendants' description completely mischaracterizes the applicable statutes.

Defendants rest their theory principally on one sentence of *dicta* in the introductory section of *Arizona v. United States*, 567 U.S. 387 (2012), a preemption case concerning a state law and a case that did not involve executive branch compliance with federal statutory commands. *See* MTD 2, 25, 33. Nor did it concern any of the federal statutes at issue here. The Court simply said: "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. Two sentences later, the *Arizona* Court offered some examples of the discretion it was referring to, including relief from removal under 8 U.S.C. § 1229a(c)(4), cancellation of removal under 8 U.S.C. § 1229b, voluntary departure under 8 U.S.C. § 1229c, and asylum under 8 U.S.C. § 1158. *Arizona*, 567 U.S. at 396. All of these are statutory off-ramps defining discretionary

alternatives to removal.  The executive branch has the discretion to take them in certain cases, but only according to the terms of the statutory provisions.  Contrary to the suggestion of Defendants, nothing in *Arizona* indicated that DHS was free to disregard Congress's use of the term "shall" in mandating certain enforcement actions.

A more accurate description of the statutory framework is as follows.  Absent a specific provision mandating enforcement in certain cases, Congress generally left the determination of whether to seek removal of specific aliens in the discretion of DHS.  For example, DHS has relatively unconstrained discretion concerning whether nonimmigrant aliens who overstay their visas should be removed.  That group represents approximately forty percent of aliens unlawfully present in the United States.  Congress further provided for the statutory off-ramps described above.  Thus, it is fair to say, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).  Discretion certainly exists in those respects.

Congress did not, however, leave executive discretion in immigration enforcement unbounded, and Congress has primacy in setting immigration policy. *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . . ."); *Ng Fung Ho v. White*, 259 U.S. 276, 280 (1922) (describing the Court's task as "merely to ascertain the intention of Congress."). Among others, Congress singled out at least three classes of aliens against for who mandatory detention and/or removal is required—aliens who have entered the United States without a visa or other authorization who must be detained and removed under 8 U.S.C. § 1225(b)(2), criminal aliens described under 8 U.S.C. § 1226(c) who must be

detained, and every alien who has been ordered removed and therefore must be detained and removed under 8 U.S.C. § 1231(a). With respect to each of these classes, Congress used the word "shall" in mandating that enforcement must occur. These are the three statutes at the center of this case. Thus, far from vesting the decision whether to initiate removal proceedings in the discretion of the executive branch, the Immigration and Nationality Act requires the executive to detain and/or remove certain aliens.

Congress can, and frequently does, enact statutes that eliminate executive discretion in enforcement: "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Heckler v. Chaney*, 470 U.S. 821, 833 (1985). "Discretion, like the hole in a doughnut, does not exist except as an area left open by a surrounding belt of restriction." Ronald Dworkin, *The Model of Rules*, 35 U. Chi. L. Rev 14, 32 (1967). Unfettered discretion ceases to exist where federal law "not only requires the agency to enforce the Act, but also sets forth specific enforcement procedures." *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (*en banc*). The three statutes at issue in this case are all instances where Congress eliminated the discretion that previously existed with respect to those classes of aliens.

2. 8 U.S.C. § 1225(b) is Mandatory and Removes Agency Discretion

By enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009-546 (IIRIRA), Congress circumscribed the executive branch's discretion *not* to detain and remove illegal aliens who are encountered by immigration officers. The interlocking provisions of 8 U.S.C. §§ 1225(a)(1), (a)(3), (b)(1), and

(b)(2)(A) provide clear statutory direction to DHS. If an alien is encountered by an ICE or CBP officer, an inspection *must* occur, and if that alien is not entitled to be admitted to the United States, he or she *must* be either removed expeditiously, detained and placed in removal proceedings, or detained pending consideration of an asylum application in a removal proceeding. A fourth option, is that when an alien arrives on land "from a foreign territory contiguous to the United States," DHS "may return the alien to that territory pending a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(C). This option illustrates how Congress specifically removed executive discretion, only allowing DHS to choose between the specified options. "Congress give DHS no fifth choice. … By [giving itself a fifth alternative], DHS contradicted § 1225's statutory scheme." *Texas v. Biden*, 2021 U.S. App. LEXIS 36689 at *141.

The Fifth Circuit in *Texas v. Biden* unequivocally held that the statutory command is *mandatory*:

> § 1225(b)(2)(A) uses mandatory language ('the alien shall be detained') to require DHS to detain aliens pending removal proceedings. … the Supreme Court has given provision the same gloss. *See Jennings [v. Rodriguez]*, 138 S. Ct. 830, 837 (2018) ('Read most naturally, §§ 1225(b)(1) and (b)(2) … mandate detention of applicants for admission until certain proceedings have concluded.').

2021 U.S. App. LEXIS 36689 at *137-38. The Court reiterated that 8 U.S.C. § 1225(b)(2)(A) "sets forth a general, *plainly obligatory* rule: detention for aliens seeking admission." *Id.* at *140 (emphasis added).

The Fifth Circuit also held, in concluding it was reviewable under the APA, that the detention decision was clearly *not* a decision committed to agency discretion. "Section

1225(b)(2)(A) provides that, under certain circumstances, 'the alien shall be detained' during her removal proceeding. *That's obviously a mandatory statutory command*—not a commitment to agency discretion." *Id*. at *94 (emphasis added). Defendants offer no response whatsoever to this holding of the Fifth Circuit. Indeed, they fail to mention it.

3.      8 U.S.C. § 1226(c) is Mandatory and Removes Agency Discretion

In enacting 8 U.S.C. § 1226(c), Congress similarly removed agency discretion—in this instance with respect to the detention of criminal aliens. The statute makes the detention of large categories of criminal aliens who have been convicted of crimes mandatory: DHS "shall take into custody any alien [in the listed categories] … when the alien is released…." 8 U.S.C. § 1226(c). The Victoria Division of this Court held that the State plaintiffs were likely to prevail on their similar claim under § 1226(c). "[T]he Court applies the caselaw … and holds that the 'shall' found in Sections 1226(c) and 1231(a)(2) means 'must,' imposing on the Government a duty to detain certain criminal aliens…." *Texas and Louisiana*, 2021 U.S. Dist. LEXIS 156642 at *98.

The Supreme Court has also held that the language in 8 U.S.C. § 1226(c) is mandatory: "Section 1226(c), however, carves out a statutory category of aliens who may *not* be released under §1226(a). Under §1226(c), the 'Attorney General shall take into custody any alien' who falls into one of several enumerated categories involving criminal offenses and terrorist activities. §1226(c)(1)." *Jennings v. Rodriguez,* 138 S. Ct. 830, 837 (2018) (emphasis in original). In *Nielsen v. Preap*, 139 S. Ct. 954 (2019), the Supreme Court observed that it was Congress's intent to keep relevant criminal aliens behind bars:

Section 1226(c) was enacted as part of the Illegal Immigration Reform and

Immigrant Responsibility Act of 1996, and it sprang from a "concer[n] that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Demore* v. *Kim*, 538 U. S. 510, 513 (2003). To address this problem, Congress mandated that aliens who were thought to pose a heightened risk be arrested and detained without a chance to apply for release on bond or parole.

139 U.S. at 960.  The Court reiterated that 8 U.S.C. § 1226(c) imposes a "mandatory-detention requirement."  *Id*.

Faced with this caselaw, Defendants resort to misconstruing *Preap*.  They seize on the word "exhorting" in *Preap* and take it out of context, claiming that the Court did not really hold that the detention requirement was mandatory.  Instead, Defendants claim it was merely encouragement to act.  *See* MTD 27.  But the entire sentence shows exactly what the Court meant:  "The 'when … released' clause also serves another purpose:  exhorting the Secretary to act quickly."  139 U.S. at 969.  The Court was interpreting the "when released" phrase specifically, because the case involved criminal aliens who were detained sometime after their release from state custody and argued that § 1226(c) therefore didn't apply.  But regardless, the obligation to detain is mandatory.  As the Court reiterated four sentences later:  "the Secretary's failure to make an arrest immediately upon a covered alien's release would not have exempted the alien from *mandatory detention* under §1226(c)." *Id*. at 970 (emphasis added).  The *Preap* Court held that if DHS failed to meet its obligation to detain immediately, the statute did not prohibit it from meeting its obligation later.  *See id*. at 965.  Defendants also attempt to draw support from the vacated panel opinion in *Texas v. United States*, 14 F. 4th 322 (5th Cir. 2021), (*vacated by Texas v. United States*, 2021 U.S. App. LEXIS 35336 (5th Cir. Nov. 30, 2021)).

-28-

See MTD 26.  But that vacated opinion has no precedential effect.  Thus, Defendants have

no valid argument against the mandatory language of 8 U.S.C. § 1226(c).

4.    <u>8 U.S.C. § 1231(a) is Mandatory and Removes Agency Discretion</u>

8 U.S.C. § 1231(a) similarly removes agency discretion—in this instance with

respect to the removal of aliens who have been ordered removed by an immigration judge.

This Court has twice held that the language of this section is mandatory.  "[T]he Court has

determined that 'shall' in section 1231(a)(1)(A) means *must*."  *Texas v. United States*, 524

F. Supp. 3d 598, 652 (S.D. Tex. 2021) (emphasis in original).  "These interpretations of

'shall' as mandatory in other parts of Section 1231 are yet further indication the 'shall' in

Section 1231(a)(2) bears the same meaning, because 'a word or phrase is presumed to bear

the same meaning throughout a text.'"  *Texas and Louisiana*, 2021 U.S. Dist. LEXIS

156642, *109 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The

Interpretation of Legal Texts* 170 (2012)).

The Supreme Court has likewise held that the language of 8 U.S.C. § 1231(a) is

mandatory.  "Those reinstated orders are not subject to reopening or review, nor are

respondents eligible for discretionary relief under the INA. Instead, they 'shall be removed

under the prior order at any time after the reentry.'"  *Johnson v. Guzman Chavez*, 141 S.

Ct. 2271, 2284 (2021) (quoting 8 U.S.C. § 1231(a)(5)).  Defendants are not permitted to

"undermine Congress's judgment regarding the detention of different groups of aliens who

posed different risks of flight…."  *Id.* at 2290.  The only discretion left to DHS is the timing

of when the removal is executed.

5.    <u>Defendants Apply *Heckler* Incorrectly</u>

-29-

Defendants cite *Heckler v. Chaney* in support of their sweeping claim that all agency enforcement and nonenforcement actions are unreviewable.  MTD 23.  However, they erroneously conflate the discretion to decline to take an enforcement action in a particular instance with the establishment of a prospective rule of general applicability precluding enforcement actions against certain classes of aliens.  As the Fifth Circuit recently held, *Heckler*'s non-reviewability presumption with respect to nonenforcement decisions does not apply to rules of general applicability and is instead limited only to the government's "discretion to do nothing in a particular case."  *Texas v. Biden*, 2021 U.S. App. LEXIS 36689 at *105-06.  The Fifth Circuit distinguished between a "rule," which is prospective and of general applicability, and an "order," which is a final disposition of a particular matter at a particular moment in time, and held that *Heckler*'s presumption is inapplicable to "rules" and only applied to "orders."  *See id.* at **105-09. There is no question that the enforcement guidelines at issue here are rules.  *See id.* at *112 (describing the Memoranda at issue as "undisputedly rules").

Addressing the reviewability of agency rules, the Fifth Circuit recounted how the "take care" clause of the Constitution, Art. II, sec. 3, derived from the prohibition in the English Bill of Rights against the English kings' prerogatives to suspend or dispense with the laws, *see id.* at *95-105, and concluded that:

> Congress *can* rebut the common-law presumption that nonenforcement discretion is unreviewable. Specifically, "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." [*Heckler*, 470 U.S.] at 832-33. In other words, the executive *cannot* look at a statute, recognize that the statute is telling it to enforce the law in a particular way or against a particular entity, and tell Congress to pound sand. So *Heckler* expressly embraces the common

law's condemnation of the dispensing power. ... Moreover, the Court emphasized that nothing in the *Heckler* opinion should be construed to let an agency "consciously and expressly adopt[] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Heckler*, 470 U.S. at 833 n.4 (quotation omitted). This, of course, is a condemnation of the suspending power.

2021 U.S. App. LEXIS 36689 at *106-107 (emphases in original).

Here, Congress mandated that DHS must enforce the immigration laws in specific ways (mandatory detention) against specific classes of aliens (illegal border crossers, criminal aliens, and aliens with a final removal order). Insofar as DHS's Memoranda prevent immigration officers from enforcing the detention and removal mandates specified by Congress, they violate the prohibition against dispensing with the law. And to the extent that the Memoranda announce DHS's intention not to enforce a specific aspect of the law against anyone prospectively, the Memoranda violate the prohibition against suspending the law. Either way, the enforcement guidelines of the Memoranda are unlawful.

### B. Nothing in the INA Precludes Judicial Review

Defendants argue that Plaintiffs' claims are precluded from judicial review by certain provisions of the INA. At the outset, it must be noted that Defendants' APA preclusion argument conflicts with the APA itself, which requires *express* preclusion for statutes enacted after the APA's enactment in 1946: "No subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly." Pub. L. No. 79-404, § 12, 60 Stat. 237, 244 (1946); accord 5 U.S.C. § 559; *Dickinson v. Zurko*, 527 U.S. 150, 154-55 (1999).  Because Plaintiffs had a cause of action prior to the 1996 INA provisions that Defendants find

preclusive, the judicial review provided in those provisions to individual removable aliens—but not to Plaintiffs—does not *expressly* preclude this action as § 559 requires. It also would work a disfavored repeal by implication as to Plaintiffs; "clear and manifest" legislative intent is required. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007). Indeed, "this canon of construction applies with particular force when the asserted repealer would remove a remedy otherwise available." *Schlesinger v. Councilman*, 420 U.S. 738, 752 (1975).[7] Each of Defendants' preclusion arguments fails for other reasons, as well.

First, Defendants assert that 8 U.S.C. §§ 1252(a)(5) and (b)(9) create an exclusive mechanism for reviewing any agency action related to the removal of an alien and that such judicial review is available only to individual aliens challenging a removal order. MTD 29-32. However, Defendants gloss over the fact that Plaintiffs are not challenging any order of removal. The Supreme Court has held that 8 U.S.C. § 1252(b)(9), which channels review of issues arising from any agency action taken to remove an alien from the United States, "applies only '[w]ith respect to review of an order of removal under subsection (a)(1).'" *INS v. St. Cyr*, 533 U.S. 289, 313 (2001) (quoting 8 U.S.C. § 1252(b)); *see J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) ("[W]hile [sections 1252(a)(5) and (b)(9)] limit *how* immigrants can challenge their removal proceedings, they are not jurisdiction-stripping statutes that, by their terms, foreclose *all* judicial review of agency

---

[7] The two cases that Defendants cite are wholly inapposite. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (concerning the pre-APA Agricultural Marketing Agreement Act of 1937); *Fausto*, 484 U.S. at 448 (concerning a non-APA claim for monetary damages under the Back Pay Act).

actions. Instead, the provisions channel judicial review over final orders of removal to the courts of appeals.").  Here, instead of challenging an order of removal as contemplated by 8 U.S.C. § 1252, Plaintiffs' claim that DHS's Memoranda establish a rule that violates certain statutory mandates and thereby "dispute the extent of the statutory authority that the Government claims." *Preap*, 139 S. Ct. at 962.  In *Preap*, the Supreme Court held that neither 8 U.S.C. § 1226(e) nor 8 U.S.C. § 1252(b)(9) precluded judicial review of respondents' challenge to the government's detention authority under 8 U.S.C. § 1226 because respondents "are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal as opposed to the decision to deny them bond hearings; and they are not even challenging any part of the process by which their removability will be determined." *Id.* (internal quotations omitted). As the Fifth Circuit recently observed, "the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens," and to read that section as precluding APA review of an agency rule as set forth in DHS's enforcement memoranda, "would bury an awfully large elephant in a really small mousehole." *Texas v. Biden,* 2021 U.S. App. LEXIS 36689 at *93 & n.11.  This Court has reached the same conclusion. *Texas v. United States,* 524 F. Supp. 3d at 640-41 (holding sections 1252(a)(5) and (b)(9) do not bar APA claims challenging an agency rule of general applicability).

Second, Defendants contend that 8 U.S.C. § 1252(a)(2)(A)(iv) precludes review of Plaintiffs' claim that the Memoranda violate 8 U.S.C. § 1225(b). MTD 32. This argument is erroneous because nothing in DHS's Memoranda purports to "implement the provisions of section 1225(b)(1)," 8 U.S.C. § 1252(a)(2)(A)(iv), so review is not restricted to the D.C.

District Court. *See* 8 U.S.C. § 1252(e)(3)(A) (permitting challenges to the validity of expedited removal process to be filed in the D.C. District Court). Moreover, Plaintiffs challenge the DHS's policy of *not* complying with the statutory mandates of 8 U.S.C. § 1225(b), which the Fifth Circuit has recently upheld as both reviewable and obligatory. *See Texas v. Biden*, 2021 U.S. App. LEXIS 36689 at *140-41.

Next, Defendants argue that Plaintiffs' claim regarding 8 U.S.C. § 1226(c) is precluded by 8 U.S.C. § 1226(e), which prohibits review of DHS's "discretionary judgment regarding the application" of that section. MTD 32-34. There are two fatal flaws with this argument. First, the phrase to "discretionary judgment of this section" is plainly referring to the several places in the section where Congress expressly preserved discretion by using the word "may" (as opposed to where it removed discretion in 8 U.S.C. § 1226(c)(1) by using the word "shall." For example, DHS "*may* revoke bond or parole" in § 1226(b), and DHS "*may* release an alien … only if release of the alien from custody is necessary to provide protection to a witness…." in § 1226(c)(2) (emphasis added).

Second, as this Court has already held, subsection (e) "'applies only to discretionary decisions about the application of § 1226 to *particular cases,*'" and "'does not block lawsuits over the extent of the Government's detention authority under the statutory framework as a whole.'" *Texas and Louisiana*, 2021 U.S. Dist. LEXIS 156642, *72-73 (emphasis added by J. Tipton) (quoting *Preap*, 139 S. Ct. at 962) (other internal quotations omitted). Plaintiffs in this case allege that Defendants do not have the discretion to decline to detain criminal aliens under section 1226(c), so "the general extent of the Government's authority under § 1226(c) is precisely the issue here." *Preap*, 139 S. Ct. at 962. Thus, this

is not a dispute about whether DHS must detain a specific alien under specific circumstances, but rather a dispute about whether DHS can fashion a prospective policy that violates Congress's directive to detain certain classes of aliens.

Finally, Defendants argue that 8 U.S.C. § 1231(h) precludes review of Plaintiffs' claims with respect to mandatory detention or removal under 8 U.S.C. § 1231(a). MTD 34-35. 8 U.S.C. § 1231(h) provides that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." According to Defendants, "any party" is all encompassing, and therefore "no one" can bring a suit to enforce § 1231 or fall within the zone of interests protected by that section. MTD 35.

However, the Victoria Division of this Court has already rejected this same argument.  Judge Tipton analyzed the "text, context, structure, and history" of § 1231(h) and determined that "party … is not ambiguous and means the alien involved in the immigration removal proceeding detailed in that specific section." means "aliens who have been ordered removed from the U.S." *Texas v. United States*, 524 F. Supp. 3d at 637. Judge Tipton observed that in 1986, Congress enacted former 8 U.S.C. § 1252(i), which mandated the expeditious removal of criminal aliens to further the purposes "of reducing prison overcrowding and cost to the government." *Giddings v. Chandler*, 979 F.2d 1104, 1109 (5th Cir. 1992); *see Texas v. United States*, 524 F. Supp. 3d at 635. Following the enactment of that provision, aliens began filing suit under that provision seeking to have expedited deportation so as to avoid serving prison terms. *Id.* at 635. In response to this unintended consequence of former section 1252(i), Congress enacted section 225 of the

Immigration and Nationality Technical Corrections Act of 1994 ("INTCA"), Pub. L. No. 103-416, 108 Stat. 4305 (Oct. 25, 1994), which was designed to prohibit aliens from attempting to compel the government to deport them by relying on section 1252(i)'s mandate. *See Texas v. United States*, 524 F. Supp. 3d at 636. Then "[i]n 1996, Congress transferred the essence of section 1252(i)'s removal mandate…. Congress created a brand new section 1231(h) whose language is virtually identical to section 225." *Id.* at 636-37. Based on this analysis, Judge Tipton determined that "party" as used in 8 U.S.C § 1231(h) has a narrow meaning and refers only to aliens in removal proceedings.  *Id.* at 637.

Judge Tipton further recognized that Texas's contrary-to-law claim fell squarely within the zone of interests Congress meant to protect when enacting the removal mandate, which was intended to reduce costs to state and local jails. *See id.* at 639. [8]  Plaintiffs' 8 U.S.C. § 1231(a) contrary-to-law claim, just like Texas's claim in that case, falls within the zone of interests protected by § 1231, and this Court should adopt Judge Tipton's conclusion and reject Defendants' zone of interest argument.

### C.    The Memoranda are Final Agency Actions Subject to Review

Defendants claim that the Memoranda are not final agency action, arguing that Defendants act finally only with respect to their actions in removing individual aliens.

---

[8]  Congress limited the availability of an APA cause of action to those who allege an injury that is "arguably" within the "zone of interests" to be protected or regulated by the relevant statute. *Collins v. Mnuchin*, 938 F.3d 553, 573-74 (5th Cir. 2019), *aff'd in part, vacated in part, rev'd in part sub nom. Collins v. Yellen*, 141 S. Ct. 1761 (2021). The zone of interest test is not "especially demanding" and "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Collins*, 938 F.3d at 574 (internal quotations omitted).

MTD 27-29. Because the Memoranda and their implementing actions definitively set the process and terms for Defendants' pursuing removals and injure Plaintiffs within the meaning of both the INA and Article III, those actions are "final" now and are "directly reviewable" for any plaintiff who is not a removable alien. 5 U.S.C. § 704.[9] The test for finality is "'flexible'" and "pragmatic." *FTC v. Standard Oil Co.*, 449 U.S. 232, 240 (1980) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 150 (1967)); *Ghazanfar Hussein Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011). Defendants' arguments ignore the substantive invalidity of their rule and the fact that Plaintiffs have no later cause of action in these removal proceedings. As to *these* Plaintiffs, Defendants' actions are final.

To be "final" for purposes of judicial review, the Supreme Court requires an agency action to reflect "the consummation of the agency's decisionmaking process," either determining "rights or obligations" or "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). This Court has supplemented that test further to include other facets of the § 704 inquiry: (1) the legal and practical effect of the agency action; (2) the definitiveness of the ruling; (3) the availability of an administrative solution; (4) the likelihood of unnecessary review; and (5) the need for effective enforcement of the Act. *Qureshi*, 663 F.3d at 781 n.7 (internal quotation marks omitted). There is no question that Defendants have consummated the decision-making process as to the lawfulness and

---

[9] Removable aliens could challenge "preliminary, procedural, or intermediate agency action" as part of the judicial review of the ultimate "final agency action" in a removal proceeding. *Id.* Unlike Plaintiffs here, removable aliens also have an adequate remedy in their ultimate removal action, and that adequate alternate remedy further renders the APA inapposite to removable aliens. *United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) (citing § 704). Plaintiffs have no alternate remedy.

contours of the non-enforcement policy outlined in the Memoranda, and Defendants cannot credibly argue otherwise. *Texas and Louisiana*, 2021 U.S. Dist. LEXIS 156642 at *76-80. Instead, Defendants argue that final action happens only when their policy is applied to remove an alien or to terminate removal proceedings. MTD 29.   However, all of the characteristics of final agency actions are present in the Memoranda.

First, under *Bennett*, the Memoranda and the implementing policies have the "legal consequence" of purportedly changing the authority and "obligations" of ICE officers; and non-enforcement "flows" from that change. The legal consequence is that ICE officers cannot initiate enforcement actions without prior approval, which would impermissibly delay ICE enforcement even if the pre-approval process were not stacked against enforcement. Thus, the Memoranda alter obligations and have the legal consequence of non-enforcement and restricting permissible ICE officer actions.   Second, under *Qureshi*, Plaintiffs have no alternate administrative review, and Defendants would—without this Court's review—be able to dispense with the statutory requirements mandating the detention and/or removal of certain illegal aliens. Finally, because the Memoranda are *substantively* contrary to the INA, Defendants cannot evade review by classifying the Memoranda as mere procedural rules that a court can review only as part of reviewing an ultimate final action (*e.g.*, removal).   That facet of finality applies only to procedural rules not "directly reviewable" now, 5 U.S.C. § 704, and courts need not accept the agency's characterization. *Ligon Specialized Hauler, Inc. v. Interstate Commerce Comm'n*, 587 F.2d 304, 314 (6th Cir. 1978).

Importantly, as the Fifth Circuit recently observed regarding the series of MPP

enforcement Memoranda, earlier Memoranda do not become retroactively nonfinal by virtue of a new Memorandum. "[S]ubsequent events can't un-finalize a final agency action. ...The Government's contrary view would never allow a court to make a final determination that any given agency action is final. We would be stuck in eternal limbo...." *Texas v. Biden*, 2021 U.S. App. LEXIS 36689 at *38. The Fifth Circuit forcefully rejected the government's argument, which Defendants make again here.

### D.     Review Outside of the APA is Also Possible

Although the APA applies, *see* Sections VI.A.-C., *supra*, pre-APA review would also be available, even if APA review were not. Long before the APA provided a cause of action in 1946 and the APA's 1976 amendments waived federal sovereign immunity, judicial review was available in equity suits against federal officers: "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions." *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949); *Ex parte Young*, 209 U.S. 123, 160 (1908). Unlike the agencies for which they work, the officer Defendants lack sovereign immunity. "The acts of all [federal] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902). Significantly, the availability of declaratory relief against federal officers predates the APA, William J. Hughes, Federal Practice §25387 (1940 & Supp. 1945); Edwin Borchard, Declaratory Judgments, 787-88, 909-10 (1941); and the APA did not displace that relief. *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958). Because Plaintiffs allege an ongoing violation of federal law, longstanding

equity practice allows the suing of federal officers who act beyond their lawful authority, and such suits provide a basis for declaratory relief.

## VII.    <u>The Inclusion of the President as a Defendant</u>

Finally, Defendants argue that this Court lacks jurisdiction to enjoin the President and should dismiss Plaintiffs' claims against the President.  MTD 39-40.  However, the cases cited by Defendants stand for the limited proposition that the judiciary has no authority to direct the exercise of *executive or political discretion* by the President. *See Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) ("This case, however, challenges no statutory power, but rather a decision committed to the executive discretion of the President …."); *Mississippi v. Johnson*, 71 U.S. 475, 499 (1867).  Here, Plaintiffs do not seek an order directing the President to exercise executive discretion in any particular way, but instead seek injunctive and declaratory relief holding the President and other Defendants to clear statutory mandates.   Under the Constitution, the President has no executive power to suspend the law. *Texas v. Biden*, 2021 U.S. App. LEXIS 36689 at *96- 105.  Moreover, the Fifth Circuit in *Texas v. Biden* exercised jurisdiction over the President, along with the other Defendants in this case, in a similar instance of executive suspension of statutory mandates. *Id*.  An Article III court must address any defect in its jurisdiction *sua sponte* if the parties do not raise it. *Stewart v. Lubbock Cnty.*, 767 F.2d 153, 155 n.3 (5th Cir. 1985).  Presumably, the Fifth Circuit concluded that such jurisdiction existed.

## CONCLUSION

For these reasons, the Court should deny Defendants' Motion to Dismiss and proceed to rule on Plaintiffs' pending Motion for Preliminary Injunctive Relief.

Respectfully submitted,

Dated:  January 14, 2022    By:  s/ Kris W. Kobach
**Kris W. Kobach** (*Attorney-in-charge*)
Kansas Bar No. 17280, admitted *pro hac vice*
Alliance for Free Citizens
P.O. Box 155
Lecompton, Kansas 66050
Telephone:  913-638-5567
kkobach@gmail.com

**Brent P. Smith**
Texas Bar No. 24080722, admitted *pro hac vice*
County Attorney, Kinney County, Texas
P.O. Box 365
Brackettville, Texas 78832
Telephone: 830-563-2240
bsmith@co.kinney.tx.us

**Christopher J. Hajec**
D.C. Bar No. 492551, admitted *pro hac vice*
Immigration Reform Law Institute
25 Massachusetts Avenue, N.W.
Suite 335
Washington, D.C. 20001
Telephone:  202-323-5590
info@irli.org

**Kimberly Kreider-Dusek**
Texas Bar No. 50511919
County Attorney, McMullen County, Texas
P.O. Box 237
Tilden, Texas 78072
kimberly.dusek@mcmullencounty.org

**Douglas Poole**
Texas Bar. No. 16115600
S.D. Texas Bar. No. 619
McLeod, Alexander, Powel, & Apffel, P.C.
802 Rosenberg
Galveston, Texas 77553

Telephone:  409-763-2481
dwpoole@mapalaw.com


*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Motion for Preliminary Injunctive Relief has been served on Defendants by operation of the Court CM/ECF system on this 14th day of January, 2022.

<u>/s Kris W. Kobach</u>
KRIS W. KOBACH