**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| **SHERIFF BRAD COE in his official capacity and KINNEY COUNTY, TEXAS; SHERIFF J.W. GUTHRIE in official capacity and EDWARDS COUNTY, TEXAS; SHERIFF EMMETT SHELTON in his official capacity and MCMULLEN COUNTY, TEXAS; SHERIFF ARVIN WEST in his official capacity and HUDSPETH COUNTY, TEXAS; SHERIFF LARRY BUSBY in his official capacity and LIVE OAK COUNTY, TEXAS; SHERIFF NATHAN JOHNSON in his official capacity and REAL COUNTY, TEXAS; GALVESTON COUNTY, TEXAS; THE FEDERAL POLICE FOUNDATION, ICE OFFICERS DIVISION,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) ) | **Civil Action No. 3:21-CV-00168 THIRD AMENDED COMPLAINT** |
| **JOSEPH R. BIDEN, JR., President, in his official capacity; THE UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; PATRICK J. LECHLEITNER, Deputy Director and senior official performing the duties of Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TROY MILLER, Deputy Commissioner and senior official performing the duties of Commissioner of U.S. Customs and Border Protection, in his official** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

capacity; **U.S. CUSTOMS AND**                )
**BORDER PROTECTION,**                        )
                                              )
        **Defendants.**                       )

## INTRODUCTION

1.      Plaintiffs are sheriffs of Texas counties in their official capacity, Texas counties, and the Federal Police Foundation, ICE Officers Division, which is an association of U.S. Immigration and Customs Enforcement ("ICE") officers.

2.      On January 20, 2021, the first day of the Biden Administration, the acting secretary of the U.S. Department of Homeland Security ("DHS") issued a memorandum ordering a department-wide review of "policies and practices concerning immigration enforcement." DHS Memorandum: Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities, at 2, available at: https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf ("January 20 Memorandum"). The January 20 Memorandum also established "interim enforcement priorities" pending the outcome of the policy review and ordered an "immediate pause on removals . . . for 100 days." *Id.* at 2-3. The January 20 Memorandum was directed to the officials leading U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS") and ICE. *Id.* at 1.

3.      The January 20 Memorandum established three interim enforcement priorities:

1. **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.

2. **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.

3. **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a) (43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

*Id.* at 2. These priorities:

apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other **discretionary enforcement decisions**, **including deciding**: whom to stop, question, and arrest; **whom to detain or release**; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action or parole.

*Id.*

4.      On February 18, 2021, Acting Director of ICE Tae Johnson issued a Memorandum entitled "Interim Guidance: Civil Immigration Enforcement Removal and Priorities," available at: https://www.ice.gov/doclib/news/releases/2021/021821_civil-immigration-enforcement_interim-guidance.pdf ("February 18 Memorandum"). The February 18 Memorandum provided guidance on how to implement the enforcement priorities of the January 20 Memorandum and instructed immigration officers to refrain from arresting, detaining, or placing into removal proceedings aliens who are unlawfully present in the United States ("illegal aliens") unless they fell into very narrow categories of "cases that are presumed to be priorities." Those cases consisted principally of illegal aliens who posed a national security or terrorist threat to the United States, had been convicted of an aggravated felony as defined by section 101(a)(43) of the Immigration and Nationality Act) ("INA") (codified at 8 U.S.C. § 1101(a)(43)), or had recently arrived in

the United States unlawfully (defined as those aliens who entered or attempted to enter the United States on or after November 1, 2020).

5.     Shortly after the issuance of the February 18 Memorandum, CBP implemented a corresponding policy of declining to detain illegal aliens apprehended at the southern border who are neither expeditiously removed under 8 U.S.C. § 1225(b)(1) nor directed to remain in Mexico under 8 U.S.C. § 1225(b)(2)(C).

6.     This stand-down in civil immigration enforcement, in particular the failure of CBP and ICE to detain illegal aliens whose detention is required by federal law, fueled a crisis in Texas border counties and in other Texas counties. It also encouraged a massive surge in illegal immigration. Monthly totals in apprehensions by Border Patrol agents rose to levels not seen in the previous 21 years. In March 2021, Border Patrol agents apprehended 173,337 aliens after they illegally entered the United States. In April 2021, the number rose to 178,854. In May 2021, the number rose to 180,034. By contrast, there were 21,593 apprehensions during May 2020—or approximately one-eighth of the May 2021 number. (Official statistics are available at: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters). These numbers have continued to rise, with an average of nearly 200,000 apprehensions at the southern border per month in FY 2022 and over 206,000 per month in FY 2023.

7.     On September 30, 2021, Defendant Secretary of Homeland Security Alejandro Mayorkas issued a Memorandum entitled "Guidelines for the Enforcement of Civil Immigration Laws," available at https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf ("September 30 Memorandum" or "Guidelines"). The September

30 Memorandum stated that it would take effect on November 29, 2021, and would on that date serve to rescind the January 20 and February 18 Memoranda. *See id*. at 6.

8.     The term "civil immigration enforcement and removal decisions" was defined in the February 18 Memorandum by a non-exclusive list of seven determinations, including: "Deciding whether to detain or release from custody subject to conditions." Feb. 18 Memo. at 3.

9.     The terms "civil immigration enforcement" and "enforcement" as used in the September 30 Memorandum also refer to decisions about whether to detain or release aliens.

10.     An enforcement action under the September 30 Memorandum includes deciding whether to continue to detain an alien in custody or to release the alien on his or her own recognizance pending removal proceedings.

11.     According to the September 30 Memorandum, "investigative work" must be done before *any* enforcement action is taken; the September 30 Memorandum states that "our personnel should, to the fullest extent possible, obtain and review the totality of the facts and circumstances of the conduct at issue. The gravity of an apprehension and removal on a noncitizen's life, and potentially the life of family members and the community, warrants the dedication of investigative and evaluative effort." *Id*. at 4.

12.     Regarding threats to public safety, the September 30 Memorandum stated that "[o]ur personnel should not rely on the fact of conviction or the result of a database search alone," *id*. at 4, and that "[w]hether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories," *id*. at 3. Instead,

"mitigating factors that militate in favor of declining enforcement action" would have to be considered. The Memorandum listed the following examples of such factors:

- advanced or tender age;

- lengthy presence in the United States;

- a mental condition that may have contributed to the criminal conduct…;

- status as a victim of crime or victim, witness, or party in legal proceedings;

- the impact of removal on family in the Unites states, such as loss of provider…:

- whether the noncitizen may be eligible for humanitarian protection…;

- military or other public service of the noncitizen or their immediate family;

- time since an offense and evidence of rehabilitation;

- conviction was vacated or expunged.

*Id*. at 3-4.

13.     The September 30 Memorandum also listed a smaller number of aggravating factors that could be considered in cases where an alien was convicted of a crime:

- the gravity of the offense of conviction and the sentence imposed;

- the nature and degree of harm caused by the criminal offense;

- the sophistication of the criminal offense;

- use or threatened use of a firearm or dangerous weapon;

- a serious prior criminal record.

*Id*. at 3.

14.     The September 30 Memorandum establishes Guidelines that govern all civil immigration enforcement and removal decisions—the three most basic being arrests,

6

detentions, and removals. These Guidelines expressly refer to officers' discretion "to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders." *Id*. at 2.

15.     Under the Guidelines, CBP and ICE detention decisions that were previously regarded as mandatory under 8 U.S.C. § 1225(b) are made discretionary.

16.     As a result of the Guidelines, the detention of illegal aliens dropped precipitously, both at the southern border and in the interior of the country.

17.     The surge in apprehensions at the southern border continued at historically high levels after the implementation of the Guidelines due to the fact that incoming illegal aliens expected that they would not be detained. In FY 2022, a total of 2,378,944 apprehensions occurred, or an average of 198,245 per month. In FY 2023, 2,475,669 apprehensions occurred, or an average of 206,306 per month. *Southwest Land Border Encounters*, U.S. CBP, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

18.     Importantly, as Defendants implemented their non-enforcement Guidelines, and while the number of aliens apprehended at the southern border skyrocketed, the number of aliens who were detained plummeted.

19.     ICE detains aliens arrested by CBP, as well as aliens arrested by ICE. The reduction in CBP and ICE detentions is reflected in the ICE Annual Reports.

20.     The ICE Annual Reports show a marked reduction in the number of aliens being detained after the issuance of the Memoranda and the final Guidelines. ICE's detained population number was at a level of more than 55,000 during the summer of 2019.

That detained population level dropped to 19,023 by the end of FY 2020. According to ICE, that drop in 2020 was due to the COVID-19 pandemic: "These significant decreases came as direct result of COVID-19 mitigation efforts, as well as extremely low numbers of arrivals at the Southwest Border during the pandemic." *U.S. Immigration and Customs Enforcement Fiscal Year 2020 Enforcement and Removal Operations Report*, 9, available at https://www.ice.gov/doclib/news/library/reports/annual-report/eroReportFY2020.pdf.

21.     After the end of the pandemic, the detained population numbers remained at very low levels due to Defendants' non-enforcement Guidelines. In September 2022, the last month for which numbers are publicly available, the detained population was only 20,415. *U.S. Immigration and Customs Enforcement Annual Report FY 2022*, 7, available at https://www.ice.gov/doclib/eoy/iceAnnualReportFY2022.pdf; *see also id.* at 10 (discussing "an average of 22,630 people in ICE custody during FY 2022"); *id.* at 14 (Figures 14 & 15).

22.     CBP data show that each month, tens if not hundreds of thousands of aliens apprehended at the southern border are either paroled into the United States or released from detention on their own recognizance after being issued an Notice to Appear (NTA). https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (under tab labelled: "USBP Monthly Southwest Border Encounters by Processing Disposition").

23.     Hundreds of thousands of illegal aliens are being released into the interior of the country due to Defendants' non-detention policies, rather than being detained as required by law. As a direct consequence, the dramatic influx of illegal aliens has continued

unabated. Aliens present themselves to immigration agents at the border, knowing full well that they will not be detained after their custodial interrogation ends.

24.     The custodial interrogation that occurs as apprehended aliens are processed at the border constitutes an arrest, as the individual alien is not free to leave unless and until the immigration officer releases the alien into the United States, rather than detaining the alien as required by federal law.

25.     Plaintiff sheriffs and Texas counties have experienced a dramatic increase in the influx of illegal aliens and in criminal activity by illegal aliens resulting from the implementation of the unlawful and unconstitutional Guidelines and the resulting stand-down of federal immigration enforcement.

26.     When Plaintiff sheriffs and their deputies arrest illegal aliens who have committed crimes, their offices inform ICE or CBP. Prior to the Memoranda and Guidelines, immigration officers routinely detained such aliens and initiated removal proceedings against them as the Immigration and Nationality Act (INA) requires.

27.     Since the issuance of the Memoranda, when Plaintiff sheriffs and their deputies arrest illegal aliens who have committed crimes, and so inform ICE or CBP, immigration officers routinely decline to detain such aliens.

28.     Prior to the Memoranda, ICE officers routinely issued detainers to take custody of illegal aliens who, after being arrested and charged with crimes by local law enforcement, had posted bond, thereby keeping dangerous criminal aliens off the streets and ensuring that such aliens were eventually removed from the country. Since the issuance of the Memoranda, ICE officers have stopped issuing such detainers.

29.     In addition, after the issuance of the Memoranda, ICE officers no longer detained most of the inmates in Plaintiffs' jails who previously would have been transferred to ICE as a result of the agreements between those counties and ICE under 8 U.S.C. § 1357(g).

30.     In a wide variety of other circumstances, ICE and CBP officers, contrary to federal statute, no longer detain illegal aliens who present a criminal threat because those aliens do not fall into the narrow categories of cases that are deemed to be priorities under the Guidelines (and even the detention of those in such priority categories is made discretionary under Guidelines).

31.     Plaintiff sheriffs are no longer able to count on CBP and ICE to detain aliens who have a criminal background or who are likely to engage in crimes in their counties. The detention costs, crime response costs, crime investigation costs, and related costs experienced by the Plaintiff sheriffs and counties have consequently increased dramatically for at least four related reasons: (1) recidivism by illegal alien criminals who have been released, (2) the fact that immigration officers are no longer detaining illegal aliens who have committed crimes in the counties, (3) the related fact that the average period of county detention for illegal alien criminals is now longer, and (4) the entry of new illegal alien criminals into the counties encouraged by Defendants' shutdown of immigration enforcement.

32.     The non-detention of illegal aliens whose detention is mandated by federal law is a direct result of the Guidelines.

33.     Plaintiffs bring this civil action to seek declaratory relief, vacatur, and injunctive relief against the unlawful and unconstitutional Guidelines (or a similar successor memorandum).

34.     As detailed below, the Guidelines make detentions that are mandated in statutes discretionary and are therefore contrary to law under the Administrative Procedure Act ("APA").

## THE PARTIES

### Plaintiffs

35.     Plaintiff Brad Coe is the Sheriff of Kinney County, Texas, acting in his official capacity. The Kinney County Sheriff's Office is located at 109 North Street, Brackettville, Texas. The Sheriff's Office operates the Kinney County Jail, which can house 14 inmates and is used to detain individuals arrested for the commission of crimes in Kinney County.

36.     Plaintiff Kinney County, Texas, is a county of 1,365 square miles with a population of 3,129 in the 2020 census.

37.     Plaintiff J. W. Guthrie is the Sheriff of Edwards County, Texas, acting in his official capacity. The Edwards County Sheriff's Office is located at 404 West Austin Street, Rocksprings, Texas. The Sheriff's Office operates the Edwards County Jail, which can house 20 inmates and is used to detain individuals arrested for the commission of crimes in Edwards County.

38.     Plaintiff Edwards County, Texas, is a county of 2,118 square miles with a population of 1,422 in the 2020 census.

39.     Plaintiff Emmett Shelton is the Sheriff of McMullen County, Texas, acting in his official capacity. The McMullen County Sheriff's Office is located at 401 Main Street, Tilden, Texas. The Sheriff's Office detains individuals arrested for the commission of crimes in McMullen County in the jails of Live Oak County and Atascosa County at a cost of $55.00 and $48.00 per day, per inmate, respectively.

40.     Plaintiff McMullen County, Texas, is a county of 1,157 square miles with a population of 600 in the 2020 census.

41.     Plaintiff Arvin West is the Sheriff of Hudspeth County, Texas, acting in his official capacity. The Hudspeth County Sheriff's Office is located at 525 N. Wilson Avenue, Sierra Blanca, Texas. The Sheriff's Office operates the Hudspeth County Jail, which can house 103 inmates and is used to detain individuals for the commission of crimes in Hudspeth County.

42.     Plaintiff Hudspeth County, Texas, is a county of 4,572 square miles with a population of 3,202 in the 2010 census.

43.     Plaintiff Larry Busby is the Sheriff of Live Oak County, Texas, acting in his official capacity. The Live Oak County Sheriff's Office is located at 200 Larry R. Busby Drive, George West, Texas. The Sheriff's Office operates the Live Oak County Jail, which can house 96 inmates and is used to detain individuals for the commission of crimes in Live Oak County and other counties.

44.     Plaintiff Live Oak County, Texas, is a county of 1,079 square miles with a population of 11,335 in the 2020 census.

45.     Plaintiff Nathan Johnson is the Sheriff of Real County, Texas. The Real County Sheriff's Office is located at 146 Highway 83 South, Leakey, Texas. The Sheriff's Office operates the Real County Jail, which can house three inmates and is used to detain individuals arrested for the commission of crimes in Real County. The Sheriff's Office also detains individuals arrested for the commission of crimes in Real County in the jails of Uvalde, Bandera, Edwards, Kerr, Dimmit, Val Verde Counties, at a cost ranging from $56.00 to $80.00 per day, per inmate.

46.     Plaintiff Real County, Texas, is a county of 700 square miles with a population of 2,758 in the 2020 census.

47.     Plaintiff Galveston County, Texas, owns and operates the Galveston County Jail through the Galveston County Sheriff's Office. The Galveston County Jail can house up to approximately 1,171 inmates. It costs Galveston County $69.43 per person, per day, to detain someone in the Galveston County Jail.

48.     Plaintiff Galveston County, Texas, is a county of 873 square miles with a population of 350,682 in the 2020 census.

49.     Plaintiff sheriffs have each taken an oath of office pursuant to Article XVI, § 1(a) of the Texas Constitution and § 85.001 of the Texas Local Government Code to execute faithfully the duties of their office and, to the best of their ability, to preserve, protect, and defend the Constitution and laws of the United States and of Texas.

50.     Plaintiff Federal Police Foundation is a nonprofit association of federal law enforcement officers registered in the State of Delaware. The purposes of the Federal Police Foundation include, *inter alia*, conducting research, informing federal law

enforcement officers about legal and policy issues affecting their work, and informing the public about federal law enforcement matters. The ICE Officers Division of the Federal Police Foundation includes members who are ICE officers actively serving in immigration law enforcement and who have been compelled to implement the January 20, February 18, and September 30 Memoranda in violation of federal law. Members of the Federal Police Foundation, ICE Officers Division, are serving in the Southern District of Texas.

**Defendants**

51.     Defendants are the United States of America, President Joseph R. Biden, Jr., and officials in the U.S. Department of Homeland Security ("DHS"). All Defendants are sued in their official capacity only.

52.     Defendant Joseph R. Biden, Jr., is the President of the United States and is responsible for taking care that the laws of the United States are faithfully executed.

53.     Defendant United States of America is the federal sovereign.

54.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security and the head of DHS and in his official capacity is responsible for the enforcement of federal immigration laws, 6 U.S.C. § 112, 8 U.S.C. § 1101, *et seq.*, pursuant to 8 U.S.C. § 1103(a)(2).

55.     Defendant U.S. Department of Homeland Security oversees ICE and CBP in their enforcement of federal immigration laws.

56.     Defendant Patrick J. Lechleitner is Deputy Director and the senior official performing the duties of Director of ICE and in his official capacity is responsible for administering all operations of ICE.

57.     Defendant ICE is the component agency of DHS that is principally responsible for the enforcement of federal immigration and customs laws in the interior of the United States, including the removal of those aliens not lawfully present in the United States.

58.     Defendant Troy Miller is Deputy Commissioner and the senior official performing the duties of Commissioner of CBP and in his official capacity is responsible for administering all operations of CBP.

59.     Defendant CBP is the component agency of DHS that is principally responsible for the enforcement of federal immigration laws at the international borders of the United States, for managing and protecting those borders, and for overseeing customs enforcement at international ports of entry.

60.     Defendant Mayorkas issued the September 30 Memorandum. Defendant Mayorkas is the official authorized to promulgate regulations implementing the Immigration and Nationality Act in the Department of Homeland Security.

## JURISDICTION AND VENUE

61.     This Court has subject matter jurisdiction over Plaintiffs' claims under the Constitution and laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 702 and 703. This Court is authorized to grant Plaintiffs' requests for declaratory and vacatur relief pursuant to 28 U.S.C. §§ 1361, 2201, and 2202 and 5 U.S.C.

§§ 705 and 706. The United States Supreme Court is authorized to grant Plaintiffs' request for injunctive relief pursuant to 8 U.S.C. § 1252(f)(1).

62.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the Plaintiffs named in this complaint are sheriffs of Texas counties who reside and exercise their law enforcement duties in the State of Texas, or counties in the State of Texas. McMullen County, Live Oak County, and Galveston County are in the Southern District of Texas. Plaintiff Federal Police Foundation, ICE Officers Division, includes members who are ICE officers serving in the Southern District of Texas. Galveston County is the location of the Galveston Division of the Southern District of Texas.

## THE GUIDELINES AND RELATED EVENTS

63.     The September 30 Memorandum, which establishes the Guidelines, was issued without complying with the notice and comment procedure that the APA requires.

64.     The September 30 Memorandum was issued without consideration of any of the significant harms that the States, counties, county sheriffs, their respective offices, or the public would face as a result of CBP's no longer obeying federal statutes requiring the detention of certain illegal aliens.

65.     Defendants are no longer detaining large numbers of illegal aliens whose detention is required by federal law.

66.     In FY 2019, by utilizing contracts with other federal, state, and local detention facilities, ICE was able to increase its detention capacity to more than 56,000 aliens, and the average daily detained population was 50,165. U.S. Immigration and Customs Enforcement, *ERO FY 2019 Achievements*, available at

https://www.ice.gov/features/ERO-2019. That capacity is two-and-a-half times the current detained population. Since January 20, 2021, ICE has significantly reduced its use of contracts to acquire additional detention capacity. If complying with federal law required Defendants once again to utilize that additional detention capacity, they could do so.

67.    In fiscal year 2023, Defendants have encountered and failed to detain more than 908,000 aliens. *See* https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (expand the "U.S. Border Patrol—Dispositions and Transfers" section and see monthly totals for "Humanitarian Release" under "USBP Monthly Southwest Border Apprehensions by Transfer Destination").[1] Defendants' non-enforcement immigration policies are contrary and inimical to Congress's statutory scheme and should be declared unlawful.

## CONGRESS'S STATUTORY SCHEME

68.    In 1996, Congress sought to reduce executive discretion significantly in the enforcement of federal immigration laws: "[I]mmigration law enforcement is as high a priority as other aspects of Federal law enforcement, and illegal aliens do not have the right to remain in the United States undetected and unapprehended." H.R. Rep. No. 104-725 (1996), at 383. In the then-current phrase, Congress sought to end the "catch and release" of illegal aliens.

---

[1]    A printer-friendly version of the website is available at: https://www.cbp.gov/node/380450/printable/print (last visited Oct. 31, 2023).

69.     In several statutory sections, Congress eliminated the discretion that existed previously regarding the detention and/or removal of certain aliens, and replaced the discretionary regime with a mandatory regime.

70.     Enacted in 1996, 8 U.S.C. § 1225(a)(1) provides that "an alien present in the United States who has not been admitted … shall be deemed for purposes of this chapter an applicant for admission."

71.     8 U.S.C. § 1225(a)(3) provides that all applicants for admission "shall be inspected by immigration officers."

72.     8 U.S.C. § 1225(b)(2)(A) mandates that "if the examining immigration officer determines that an alien seeking admission is not *clearly and beyond a doubt* entitled to be admitted, the alien *shall* be detained for a proceeding under section 1229a of this title." (emphases added). Proceedings under 8 U.S.C. § 1229a are regular removal proceedings before an immigration judge.

73.     A parallel section of federal law at 8 U.S.C. § 1225(b)(1) applies to aliens arriving in the United States who either lack entry documents or attempt to gain admission through misrepresentation, and who are therefore subject to expedited removal. The language of this section is also mandatory: "the officer *shall* order the alien removed from the United States without further hearing or review" unless the alien seeks asylum or asserts a fear of persecution. 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added).

74.     Aliens who are not expeditiously removed are subject to mandatory detention pending review of any asylum application. *See* 8 U.S.C. §§ 1225(b)(1)(B)(ii) (providing that, if it is determined that an alien has a credible fear of persecution, "the alien shall be

detained for further consideration of the application for asylum."); 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1963-66 (2020) (discussing Congress's expedited removal and detention scheme).

75.    The Fifth Circuit has interpreted 8 U.S.C. § 1225(b) as imposing a *mandatory obligation* upon immigration officers to detain aliens encountered by immigration officers. *Texas v. Biden*, 20 F.4th 928, 978 (5th Cir. 2021) (describing § 1225(b)(2)(A) as "obviously a mandatory statutory command—not a commitment to agency discretion"), *rev'd on other grounds*, 142 S. Ct. 2528 (2022); *id.* at 994 ("Read most naturally, §§ 1225(b)(1) and (b)(2) thus mandate detention of applicants for admission until certain proceedings have concluded.") (quoting *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018)).

76.    Justice Alito has also stated that the obligation imposed by 8 U.S.C. § 1225(b)(2)(A) is clearly mandatory: "The language of 8 U.S.C. § 1225(b)(2)(A) is unequivocal. With narrow exceptions that are inapplicable here, it provides that every alien 'who is an applicant for admission' and who 'the examining immigration officer determines . . . is not clearly and beyond a doubt entitled to be admitted . . . *shall be detained* for a [removal] proceeding." *Biden v. Texas*, 142 S. Ct. 2528, 2553-54 (2022) (Alito, J., dissenting) (emphasis in original).

77.    The mandatory obligation imposed on CBP and ICE officers by 8 U.S.C. § 1225(b) leaves no room for the discretion described in the Guidelines.

78.     The mandatory obligations of 8 U.S.C. § 1225(b)(2)(A) and 8 U.S.C. § 1225(b)(1)(A) apply to "immigration officers," a term that encompasses both ICE and CBP officers.

79.     The Guidelines violate the mandatory commands of 8 U.S.C. § 1225(b)(1)(A) and (2)(A) by making the detention of illegal aliens encountered by CBP and ICE officers discretionary.

### IRREPARABLE INJURY CAUSED BY DEFENDANTS' ACTIONS

80.     Defendants' failure to detain illegal aliens as required by federal law significantly injures the Plaintiff sheriffs and counties.

81.     Detaining illegal alien criminals imposes significant costs upon the Plaintiff sheriffs and counties. These costs include the financial cost of detention and the consumption of scarce county law enforcement resources.

82.     Those detention costs have increased substantially since the implementation of the Guidelines and as a result of Defendants' failure to detain illegal aliens, particularly those involved in criminal activity, because it increases the number of criminal illegal aliens that Plaintiff sheriffs and counties must detain.

83.     The cost of detaining additional individuals is significant, ranging from $48.00 to $80.00 per inmate, per day.

84.     For example, since February 2021, there has been a massive increase in illegal immigration through Kinney County and in the number of crimes committed by illegal aliens in Kinney County. In 2020, Kinney County apprehended a total of 180 illegal aliens. In 2021, Kinney County apprehended a total of 1121 illegal aliens, and more than

2,468 in 2022. In 2020, Kinney County apprehended a total of 47 individuals who were attempting to smuggle illegal aliens. In 2021, Kinney County apprehended a total of 188 individuals who were attempting to smuggle illegal aliens, and more than 534 such individuals in 2022.

85.     As a result of this surge in illegal immigration and crimes by illegal aliens, since February 18, 2021, the Kinney County jail, which can hold 14 inmates, has been full or nearly full. In addition, the Kinney County sheriff's office has between 10-12 inmates detained in other counties' facilities at a cost of $70.00 per person, per day.

86.     The increase in Kinney County detention costs is principally attributable to Defendants' abandonment of immigration enforcement and recidivism by illegal alien criminals who have been released.

87.     Because ICE and CBP are no longer taking custody of illegal aliens who have already been arrested or convicted of at least one crime, those aliens are committing additional crimes in Kinney and neighboring counties after their release.

88.     In addition, the release of criminal illegal aliens into all seven Plaintiff counties imposes significant costs on Plaintiff sheriffs and their respective offices. Those costs include the effects of the crimes they commit while free, the costs of investigating those crimes, the costs of monitoring or supervising criminal illegal aliens, and the costs of arresting and detaining those same aliens a subsequent time or times.

89.     In addition, Defendants' Memoranda and the resulting Guidelines implemented by Defendants have caused a surge in illegal immigration and massive increase in crime in all seven Plaintiff counties. This surge includes thousands of additional

illegal aliens beyond the specific aliens that Defendants arrested, but failed to detain. Plaintiffs bear the financial costs of investigation, arrest, and detention caused by that increase in crime.

90.     In addition, the surge in illegal immigration and related crime caused by the actions of Defendants has diverted all seven Plaintiff counties' scarce law enforcement resources. Sheriff's deputies are not able to attend to their normal patrol and other public safety duties because the crime associated with the surge in illegal immigration has consumed their attention and time.

91.     Finally, Defendants' failure to detain illegal aliens whose detention is required by federal law has led to demands on Plaintiff's jail facilities beyond their capacity. As a result, Plaintiff sheriffs are left with no alternative but to release such criminal aliens into the public when, prior to the Memoranda and Guidelines, ICE would have detained such aliens as required by federal law.

92.     This release of illegal aliens and consequent endangering of the public effectively forces Plaintiff sheriffs to violate their oaths of office to preserve, protect, and defend the Constitution and laws of the United States and of Texas. In particular, Plaintiff sheriffs are concerned that they are compelled to release illegal aliens whose detention by immigration officers is mandated by federal law but is not occurring.

93.     Plaintiff Federal Police Foundation, ICE Officers Division, has been compelled to expend resources that it otherwise would not have expended informing its members of the February 18 and September 30 Memoranda and the ways in which the Guidelines violate federal law. The Foundation has had to divert resources to advising

members of their legal options and employment consequences when those members face the dilemma of following federal law versus following the unlawful Memoranda.

94.     As a result of Defendants' actions, the Federal Police Foundation has had to divert its limited resources to deal with the consequences of Defendants' radical change in immigration enforcement practices. Addressing the February 18 and September 30 Memoranda and their consequences has consumed more than 50 percent of the Foundation's man-hours of activity.

95.     Addressing the February 18 and September 30 Memoranda and their consequences has also caused the Federal Police Foundation to spend an additional $1,017.48 per year to provide rapid updates to its members on the implementation of the Memoranda, consequent changes in agency protocols, and litigation regarding the Memoranda.

96.     Members of Plaintiff Federal Police Foundation, ICE Officers Division, are forced by the February 18 and September 30 Memoranda to choose between following the dictates of the Memoranda and following federal law that clearly requires them to detain certain illegal aliens. Plaintiffs fear that they will be disciplined or will lose their jobs if they follow the law.

97.     Members of Plaintiff Federal Police Foundation, ICE Officers Division, are compelled by the February 18 and September 30 Memoranda to violate their oaths of office because the Memoranda force them to violate federal law or face discipline.

## FIRST CAUSE OF ACTION
## APA - THE GUIDELINES ARE CONTRARY TO LAW

98.     Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

99.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

100.    The Guidelines constitute a final agency action that is reviewable under the APA: (1) the September 30 Memorandum consummates Defendants' policy decision; and (2) legal consequences flow from the decision because it changes the statutory obligations of ICE officers.

101.    Defendants' making it discretionary under the Guidelines to detain illegal aliens apprehended at the southern border and who are not expeditiously removed under 8 U.S.C. § 1225(b)(1) or directed to remain in Mexico under 8 U.S.C. § 1225(b)(2)(C) is contrary to the mandatory statutory command that such aliens be detained. *See* 8 U.S.C. §§ 1225(b)(1)(B)(ii) (providing that, if it is determined that an alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum."); 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); 1225(b)(2)(A) ("[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this

title."); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1963-66 (2020) (discussing Congress's expedited removal and detention scheme).

102.    In contravention of these congressional directives, the September 30 Memorandum proclaims that "[t]he fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them." September 30 Memorandum, at 2.

103.    An "enforcement action" described in the September 30 Memorandum includes any determination about whether to continue to detain an alien in a custodial setting or to release such aliens from custody.

104.    Where Congress directs that certain aliens "shall" be detained, Defendant Mayorkas has instructed DHS officers that they "should not" take such action before weighing non-statutory aggravating and mitigating circumstances and concluding that such circumstances are sufficient to warrant action.

105.    Under the Guidelines, Defendants are acting contrary to statute by releasing from custody tens to hundreds of thousands of aliens each month after initiating removal proceedings against such aliens by issuing them Notices to Appear (NTA). *See*, *e.g.*, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (showing that for the last three months of FY 2023, DHS released 70,408 aliens in July, 101,598 in August, and 155,914 in September).[2]

---

[2]    To see the monthly totals, expand the "U.S. Border Patrol – Dispositions and Transfers" section and monthly totals for "Notice To Appear/Own Recognizance (NTA-OR)" are located in the "USBP Monthly Southwest Border Encounters by Processing

106.    Each encounter or apprehension of an alien near the border involves a custodial interrogation and arrest, inasmuch as individual aliens are not free to leave unless and until the immigration officer releases or paroles the alien into the interior of the United States.

107.    These detention determinations do not constitute unreviewable exercises of prosecutorial discretion because, at least with respect to aliens being released following the issuance of an NTA, Defendants have made the decision to prosecute such aliens, that is, Defendants have initiated removal proceedings against this class of aliens.

108.    The Guidelines are contrary the above-listed provisions of federal law by making discretionary the detention of aliens who are already in custody, whereas federal law clearly mandates that Defendants detain such aliens.

109.    Because Congress has by statute expressly eliminated the discretion of Defendants to not detain certain aliens, any discretion that Defendants exercise must be consistent with 8 U.S.C. § 1225(b) and could only occur under a provision of federal law expressly authorizing such discretion.

110.    The Guidelines attempt to replace the mandatory system imposed by Congress in 8 U.S.C. § 1225(b) with a discretionary system created by executive decree.

111.    Defendant Mayorkas's authority under 8 U.S.C. § 1103(a)(5) and 8 C.F.R. § 2.1 does not authorize him to order his subordinate officers or employees to violate the requirements of federal law set forth in 8 U.S.C. § 1225(b).

---

Disposition" table. A printer-friendly version of the website is available at: https://www.cbp.gov/node/380450/printable/print (last visited Oct. 31, 2023).

112.    The Guidelines are therefore both "not in accordance" with the INA and "in excess of statutory … authority," 5 U.S.C. § 706(2)(A), (C), and should be held unlawful and set aside. 5 U.S.C. § 706(2).

113.    Plaintiffs seek a declaratory judgment to these effects, together with vacatur, and corresponding injunctive relief (if this case comes before the Supreme Court).

**SECOND CAUSE OF ACTION**
**APA - THE GUIDELINES WERE NOT PROMULGATED FOLLOWING**
**NOTICE AND COMMENT**

114.    Plaintiffs reallege, adopt, and incorporate by reference all preceding paragraphs as though fully set forth herein.

115.    The Guidelines violate the specific procedural requirements of the APA, described below.

116.    The APA requires that agencies implementing congressional statutes in whole or in part through an agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy do so through a rulemaking. A rulemaking under the APA is defined as the agency process for formulating, amending, or repealing a rule through notice and comment procedures under the APA, 5 U.S.C. § 553. The INA delegates authority to the Secretary of Homeland Security and the Attorney General to implement its provisions through regulations. The Secretary has not promulgated any regulation that establishes the criteria or processes set forth in the Guidelines.

117.    The September 30 Memorandum states categorically: "The fact an individual is a removable noncitizen … should not alone be the basis of an enforcement action against

27

them." September 30 Memorandum, at 2. This is a substantive rule under the APA that binds immigration officers and is procedurally invalid because it was promulgated without the required notice and comment.

118.    The September 30 Memorandum also states unconditionally that the fact that an alien has been convicted of any crime is insufficient to trigger an enforcement action: "Our personnel should not rely on the fact of conviction or the result of a database search alone." *Id*. at 2. This is a substantive rule under the APA that binds immigration officers and is procedurally invalid because it was promulgated without the required notice and comment.

119.    The September 30 Memorandum also requires immigration officers to exercise discretion guided by a list of non-statutory factors when weighing whether to detain or release aliens. This requirement, too, binds immigration officers and is procedurally invalid because it was promulgated without the required notice and comment.

120.    Defendant Mayorkas's authority under 8 U.S.C. § 1103(a)(5) and 8 C.F.R. § 2.1 does not include the authority to circumvent the terms of the Administrative Procedure Act by simply issuing a "Memorandum" that significantly transforms the enforcement of federal immigration law.

121.    The Guidelines should be held "unlawful and set aside" because they were promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

122.    Plaintiffs seek a declaratory judgment to these effects, together with vacatur, and corresponding injunctive relief (if this case comes before the Supreme Court).

### THIRD CAUSE OF ACTION
### APA - THE GUIDELINES ARE ARBITRARY AND CAPRICIOUS

123.   The Guidelines violate the APA in a second respect because they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).

124.   The Guidelines and their preceding Memoranda represent a sharp and significant departure from statute and previous policy governing the detention of aliens. Because Defendants do not sufficiently explain that sudden departure, the Memoranda are arbitrary and capricious.

125.   The September 30 Memorandum does not represent reasoned decision-making. Defendants ignored the harms that failing to detain illegal aliens causes.

126.   In the September 30 Memorandum, Defendant Mayorkas failed to analyze the costs that predictably fall on local law enforcement entities such as Plaintiff sheriffs and counties. Failing to consider important costs of a new policy renders that policy arbitrary and capricious.

127.   Defendants also failed to consider alternative approaches that would have allowed a greater number of detentions to occur, that would have offered greater protection to the public, that would have caused less financial injury to Plaintiffs, and that would have caused less of an influx of additional illegal immigration.

128.   Even if the Defendants had considered the harms caused by, and alternative approaches to, the Guidelines, they did not explain or justify the grounds on which the Defendant agency proceeded to issue the Guidelines.

129.    Plaintiffs seek a declaratory judgment to these effects, together with vacatur, and corresponding injunctive relief (if this case comes before the Supreme Court).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

A.      Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that the Guidelines adopted by Defendants are contrary to the statutory detention mandate in 8 U.S.C. § 1225(b)(2).

B.      Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(D) that the Guidelines are unlawful and in violation of the Administrative Procedure Act as a rule promulgated without conforming to the procedures described therein.

C.      Declare pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(D) that the Guidelines are unlawful and in violation of the Administrative Procedure Act as arbitrary and capricious.

D.      Vacate the September 30 Memorandum as contrary to law, arbitrary and capricious, and procedurally invalid.

E.      Preserve for potential adjudication by the United States Supreme Court, pursuant to 8 U.S.C. § 1252(f)(1), the question of whether Defendants and their subordinate officers, employees, and agents should be enjoined from implementing or enforcing the Guidelines and should be enjoined to detain relevant aliens as required by 8 U.S.C. 1225(b).

F.      Preserve for potential adjudication by the United States Supreme Court, pursuant to 8 U.S.C. § 1252(f)(1), the question of whether Defendants and their subordinate officers, employees, and agents should be enjoined to comply with 8 U.S.C. § 1225(b) and detain illegal aliens apprehended at the southern border who are not expeditiously removed under 8 U.S.C. § 1225(b)(1) or directed to remain in Mexico under 8 U.S.C. § 1225(b)(2)(C).

G.      Direct Defendants to pay all costs associated with this lawsuit; and

H.      Grant such other and further relief as this Court deems equitable, just, and proper.


Dated:  November 10, 2023   By:  s/ Christopher J. Hajec

**Christopher J. Hajec**, attorney in charge
D.C. Bar No. 492551, admitted *pro hac vice*
Immigration Reform Law Institute
25 Massachusetts Avenue, N.W.
Suite 335
Washington, D.C. 20001
Telephone:  202-323-5590
chajec@irli.org

**Matt A. Crapo**
D.C. Bar No. 473355, *pro hac vice* application pending
Immigration Reform Law Institute
25 Massachusetts Avenue, N.W.
Suite 335
Washington, D.C. 20001
Telephone:  202-323-5590
mcrapo@irli.org

**Brent P. Smith**
Texas Bar No. 24080722, admitted *pro hac vice*
County Attorney, Kinney County, Texas
P.O. Box 365
Brackettville, Texas 78832

Telephone: 830-563-2240
bsmith@co.kinney.tx.us

**Kimberly Kreider-Dusek**
Texas Bar No. 50511919
County Attorney, McMullen County, Texas
P.O. Box 237
Tilden, Texas 78072
kimberly.dusek@mcmullencounty.org

**Douglas Poole**
Texas Bar. No. 16115600
S.D. Texas Bar. No. 619
McLeod, Alexander, Powel, & Apffel, P.C.
802 Rosenberg
Galveston, Texas 77553
Telephone:  409-763-2481
dwpoole@mapalaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Third Amended Complaint was filed electronically and served on Defendants via the Court's CM/ECF system on this 10th day of November, 2023.

<u>/s Matt A. Crapo</u>
MATT A. CRAPO